**FILED**

APR 2 2 2024

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

George P. Umberger II
Lisabeth A. King
Savannah R. Bailey
9268 Greenback Ln
Orangevale, CA 95662
916-342-6915
Ovjloan2@yahoo.com
Plaintiffs in Pro Per

# THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

GEORGE P. UMBERGER II, LISABETH A. KING, SAVANNAH R. BAILEY

    Plaintiff,

vs.

CITY OF FOLSOM, DETECTIVE JOSEPH HOWARD, COMMANDER BRIAN LOCKHART, SERGEANT ROMAN KEHM, SERGEANT ZACHARY WELLS, SERGEANT JOHN WAGNER, SERGEANT BRANDON MONSOOR, SERGEANT PAUL RICE, CORPORAL DEREK KOUPAL, OFFICER MICHAEL AUSTIN, OFFICER JOSHUA SENA, OFFICER EATHAN VAVACK, AND OFFICER JOHN MONIZ

    Defendant

Case No.: 2:24-cv-1169 KJM JDP (PS)

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

## JURY TRIAL DEMANDED

## CAUSE OF ACTION

1.    George P. Umberger II, Lisabeth A. King, and Savannah R. Bailey, bring to this

action for the violation of their Fourth Amendment rights under the United States Constitution,

against the city of Folsom and the defendant law enforcement officers of the Folsom Police Department.

2.     On July 13, 2023, while the Plaintiffs were still asleep, the Folsom Police Department's Special Weapons and Tactical ("SWAT") team, forcibly entered the residence, detained Plaintiffs by pointing multiple automatic assault rifles at them, forced them to the community parking lot, while in their undergarments, battered Plaintiff Umberger, and kept him in handcuffs for an unreasonable length of time, to execute a search warrant for an investigation of a non-violent offence.    Defendants caused Plaintiffs to suffer pain, emotional trauma, economic harm, loss of income, and loss of use and enjoyment of real property.

## JURISDICTION

3.     This action includes claims under 42 U.S.C.    § 1983, and the Fourth and Fourteenth Amendments to the United States Constitution.    This Court thus has subject matter jurisdiction pursuant to 28 U.S.C. §§1331 and 1343.    This Court has jurisdiction over the claims for declaratory relief pursuant to 28 U.S.C. §§2201-2202.    The claims alleged herein occurred in the City of Folsom, County of Sacramento, California.    Therefore, venue in the Eastern District of California is proper pursuant to 28 U.S.C. § 1391(b)(2); E.D. Local Rule 120(d).

## PRE-LAWSUIT PROCEDURES

4.     Plaintiffs filed a timely administrative claim with the City of Folsom, pursuant to Cal. Gov't Code § 910, on December 19, 2023.    The City of Folsom rejected the claim "by operation of law" and provided notice of that rejection in a letter dated January 18, 2024.

## PARTIES

5.      Plaintiff George P. Umberger II ("Plaintiff Umberger") was, at all times relevant to this complaint, a resident of the City of Folsom, and Sacramento County, California.

6.      Plaintiff Lisabeth A. King ("Plaintiff King") was, at all times relevant to this complaint, a resident of the City of Folsom, and Sacramento County, California.

7.      Plaintiff Savannah R. Bailey ("Plaintiff Bailey") was, at all times relevant to this complaint, a resident of the City of Folsom, and Sacramento County, California.

8.      The City of Folsom ("Defendant City") is a duly organized local public entity within the meaning of California Government Code § 940.4, existing under the laws of the State of California and manages and operates the Folsom Police Department ("Folsom PD"). Defendant City was at all times relevant to this complaint, responsible for the policies, practices, and customs of Folsom PD and its employees.

9.      Detective Joseph Howard ("Defendant Howard") was, at all times relevant to this complaint, a law enforcement officer with the Folsom PD. Defendant Howard was the agent in charge at the scene and the affiant for the search warrant affidavits relevant to this claim. He is sued in his individual capacity.

10.     Commander Brian Lockhart ("Defendant Lockhart") was, at all times relevant to this complaint, the Administrative Bureau Commander for Folsom PD, as well as the Tactical Commander for the Folsom PD's SWAT team. Defendant Lockhart is responsible for the retention, screening, supervision, training, instruction, promoting, disciplining, and terminating of the Folsom PD's SWAT team. He is sued in his official and individual capacity.

11.     Sergeant Roman Kehm ("Defendant Kehm") was, at all times relevant to this complaint, a law enforcement officer with the Folsom PD.   On information and belief, Defendant Kehm is in a leadership role within the SWAT team, with the authority and duty to supervise, assign, train, investigate, and discipline officers for the Folsom PD.   He is sued in his official and individual capacity.

12.     Sergeant Zachary Wells ("Defendant Wells") was, at all times relevant to this complaint, a law enforcement officer with the Folsom PD.   Defendant Wells is the Operations Bureau Team 5 supervisor with the authority and duty to supervise, assign, train, investigate, and discipline officers for the Folsom PD.   He is sued in his official and individual capacity.

13.     Sergeant John Wagner ("Defendant Wagner") was, at all times relevant to this complaint, a law enforcement officer with the Folsom PD.   On information and belief, Defendant Wagner is an official in a leadership role with the authority and duty to supervise, assign, train, investigate, and discipline officers for the Folsom PD.   He is sued in his official and individual capacity.

14.     Sergeant Brandon Monsoor ("Defendant Monsoor") was, at all times relevant to this complaint, a law enforcement officer with the Folsom PD.   On information and belief, Defendant Monsoor is in a leadership role with the authority and duty to supervise, assign, train, investigate, and discipline officers for the Folsom PD.   He is sued in his official and individual capacity.

15.     Sergeant Paul Rice ("Defendant Rice") was, at all times relevant to this complaint, a law enforcement officer with the Folsom PD. Defendant Rice is the Operations Bureau Team 4 supervisor with the authority and duty to train, assign, investigate, and discipline officers for the Folsom PD.   He is sued in his individual capacity.

16.     Corporal Derek Koupal ("Defendant Koupal") was, at all times relevant to this complaint, a law enforcement officer with the Folsom PD.    Defendant Koupal is sued in his individual capacity.

17.     Defendant Officer Michael Austin ("Defendant Austin") was, at all times relevant to this complaint, a law enforcement officer with the Folsom PD.    Defendant Austin is sued in his individual capacity.

18.     Officer Joshua Sena ("Defendant Sena") was, at all times relevant to this complaint, a law enforcement officer with the Folsom PD.    Officer Sena is sued in his individual capacity.

19.     Officer Eathan Vavack ("Defendant Vavack") was, at all times relevant to this complaint, a law enforcement officer with the Folsom PD.    Defendant Vavack is sued in his individual capacity.

20.     Officer John Moniz ("Defendant Moniz") was, at all times relevant to this complaint, a law enforcement officer with the Folsom PD.    Defendant Moniz is sued in his individual capacity.

21.     All the individually named defendants (collectively hereinafter "Defendant Officers"), were acting within the course and scope of their employment with the Folsom PD and Defendant City.

22.     The identity of the Defendant Officers were obtained in the Folsom PD's response to the Plaintiffs public records request for the names of the law enforcement officers who participated in the search warrant execution at the residence on July 13, 2023.

23.     Defendant City and Defendant Officers (collectively hereinafter "Defendants") acted under the color of state laws and in concert with, and as an agent and/or employee of, each other when directly and proximately caused harm to the Plaintiffs.


**FACTUAL ALLEGATIONS**


24.     On July 13, 2023, at 7:00 a.m., Plaintiff Umberger, Plaintiff King, and her daughter Plaintiff Bailey, (collectively herein as "Plaintiffs"), were asleep in the residence at 1780 Creekside Drive, Apartment 1125 in Folsom, California, ("residence") a multi-unit apartment complex where many families reside.

25.     The Folsom PD's Special Weapons and Tactics ("SWAT") team, by request of Defendant Howard, arrived at the residence in their military-grade Armored Personnel Carrier, to execute a search warrant for Plaintiff Umberger.   The alleged crime for which the search warrant was granted was Cal. Pen. Code § 632, eavesdropping, a non-violent wobbler offense. All acts, by the Defendant Officers, alleged in this complaint that occurred at the residence are verifiable with digital videos from the Kasa Smart Doorbell installed at the residence.

26.     Plaintiff King was woken by the Folsom PD's SWAT team pounding on her door. She yelled out to the officers that she was getting dressed.  When she was just a couple of inches from the door, a battering ram forced it open causing her to lose her footing.  The knock and announce occurred less than one minute prior.

27.     There were eight SWAT officers at her door, Defendants Kehm, Wells, Rice, Koupal, Monsoor, Austin, Sena, And Moniz, armed with loaded automatic M4 carbine assault

rifles with suppressors attached.    Three SWAT officers, Defendants Kehm, Wells, and Austin had their loaded automatic M4 carbine assault rifles pointed directly at her.

28.    Furthermore, it is clearly seen on Kasa Smart Doorbell video #S-05, that Defendant Wells had his finger resting on the trigger, not outside of the trigger guard.

29.    Plaintiff King, being a veteran combat medic with the U.S. Army, is very familiar with the unintentional discharge statistics of the automatic M4 carbine assault rifles pointed at her, informed the Defendant Officers that her daughter was inside, hoping they would not point their loaded automatic M4 carbine assault rifles at her daughter as well.

30.    Plaintiff King was told to show her hands and she was brought to the community parking lot.    There she was shocked to see over a dozen officers, a military-grade armored personnel vehicle, drones, riot shields and a K-9 unit.

31.    Plaintiff Umberger was directly behind her and was met with the same three loaded automatic M4 carbine assault rifles pointed at him.    With his hands above his head, and walking backwards as commanded to do, Defendant Austin aggressively grabbed him by his wrists, pulled him down the breezeway where Defendant Austin then slammed his face against the wall, rammed his shoulder into his back, and his knee into his thigh, then utilizing a type of rear twist-lock control hold, he twisted his left arm outside the normal range of motion to put the handcuff on, and did the same with his right arm, then yanked on the handcuffs.

32.    Defendant Wells asked Plaintiff Umberger who was left inside, and he stated, "Savannah, Lisa's daughter."

33.    Plaintiff Umberger was then pushed forward and pulled backward by the handcuffs, while being escorted to the parking lot in front of his neighbors, wearing only underwear and a t-shirt.

34.     Plaintiff Bailey woke up to Defendant Wells yelling her name.  Defendant Wells was informed that Plaintiff Bailey was the only person left inside, yet, she was not spared the potentially fatal practice, by Defendant Wells, of pointing a loaded automatic assault rifle at an innocent civilian.

35.     Plaintiff Bailey was then brought to the community parking lot, while she was wearing only a t-shirt and underwear.

36.     After the SWAT team cleared the residence, Defendant Howard and his team searched the electronic devices for evidence of eavesdropping.   When Defendant Officers could not find any evidence to seize from the residence, they took Plaintiff Umberger to his corporation, Orangevale Jewelry and Loan, located in a strip mall in Orangevale, CA, while remaining handcuffed.

37.     Meanwhile at the residence, Plaintiff King and Plaintiff Bailey were overwhelmed as they looked around their home at the broke in door, ruined carpets, rearranged furniture and belongings scattered.  Within minutes, Plaintiff King was consoling her traumatized daughter when she started trembling and had her first of many panic attacks to come.

38.     Plaintiff Umberger has been the owner and operator of his shop for 24 years.  The Defendant Officers forced him to sit on the ground, while remaining handcuffed, in front of his store with two armed officers standing over him, as ordered by Defendant Howard.

39.      Plaintiff Umberger was humiliated when two of his business associates from the neighboring store within the same strip mall witnessed this.   To minimize damage to his shop's reputation, Plaintiff Umberger repeatedly requested to be brought away from the view of the public, but his requests were either denied or ignored.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - JURY TRIAL DEMANDED - 8

40.    Defendant Howard allowed Plaintiff Umberger to go inside the shop when he needed the code to shut off the alarm on the security system.  It did not appear that any officer was in fear of their safety around Plaintiff Umberger.

### Custom and practice of Unnecessary SWAT deployment

41.    When the officers were leaving the residence, Defendant Wagner is heard, on Kasa Smart Doorbell video #S-36, saying to Officer Davis, ***"We figured we just got these new drones, so let's start getting them indoctrinated"*** and ***"this search warrant is more about learning to move people around, we knew there wasn't going to be a lot of evidence, if any at all, to be collected here, these restraining orders are to start getting you warmed up."*** Defendant Officers exaggerating crimes and labeling suspects as high risk to justify deploying their militarized SWAT team, while risking the lives, not only of the Plaintiffs, but of every family in the connecting apartments, to indoctrinate their new military equipment is an appalling practice of the Folsom PD.

42.    California Assembly Bill (AB) 481 requires a governing body to approve funding for military equipment, if the police department can demonstrate that there is no reasonable alternative that can achieve the same objective of officer and civilian safety.  Due to Folsom being renowned for its low crime rate, Folsom PD has started labeling non-violent offences as "high risk" to boost the SWAT teams deployment numbers.  This practice has normalized the use of their SWAT team to perform routine warrant work.

### Defendant Howard's Misleading Statements and Omissions

43.    For Defendant Howards request for the use of remote operated reconnaissance technology to be granted, the search warrant affidavit needed to show that Plaintiff Umberger

was a high risk to officer safety.   Defendant Howard made the following false statements to deceive the magistrate and get the order granted:

> "Due to the increased threat of violence involving firearms and other deadly weapons whenever officers enter a structure for the purpose of executing a search warrant to **search for firearms, controlled substances, weapons, the fruits and instrumentalities of a violent crime,** or to **execute an arrest warrant** on an individual wanted for a **violent crime.**"   [See Exhibit A]

44.   This statement is not even applicable to this case.   The search warrant was for computers and electronic storage devices that could possibly reveal a non-violent eavesdropping violation.   Defendant Howard implying the search would produce firearms, controlled substances, or evidence of a violent crime committed by Plaintiff Umberger is grossly misleading.

45.   Not only was there no mention of Plaintiff Umberger possessing firearms or controlled substances in either affidavit, Folsom PD was also informed Plaintiff Umberger did not possess firearms prior to the execution of the search warrant.   Defendant Vavack and Officer Vo entered Plaintiff Umberger's shop to serve him with a restraining order related to the same allegations, and they asked Plaintiff Umberger if he owned or possessed any firearms, specifically about a firearm he gave to his father 15 years ago, and he informed the officers that he did not possess any firearms.

46.   In addition, the family court judge for the restraining order found Plaintiff Umberger to be compliant with the prohibition of firearms pursuant to California Senate Bill 320.

47.   The device search warrant dated 07/18/2023, Defendant Howards justification for violating Plaintiff Umberger's privacy, by claiming he needed unlimited access to all the

data on the devices, without any limiting language, was to establish ownership of the voice recorder. [See Exhibit B]

48.    However, ownership was established five days prior on 07/13/2023 when Plaintiff King informed Defendant Howard that she was the owner of the recording device, and she let Plaintiff Umberger use it when his GoPro was not working, confirmed with Kasa Smart Doorbell video S-33. She also informed Defendant Howard that she had texts showing Plaintiff Umberger had consent from his ex-wife to record their interaction. [See Exhibit C]

### Excessive force-pointing firearms and trigger discipline

49.    Kasa Smart Doorbell video #S-05, clearly shows Defendant Wells resting his finger on the trigger of the automatic M4 carbine rifle while pointing it at the Plaintiffs. Nobody is immune to involuntary contractions, as they are physiological responses, such as the startle response. The majority of fatal unintentional discharge incidences are due to the startle response. [See Exhibit D]

50.    California Department of Justice, and Commission on Peace Officer Standards and Training has fundamental rules of firearm safety. Rule two states, 'a firearm should **only be pointed at a target if the officer is willing and prepared to shoot.**' Rule three states, '**always keep your fingers off the trigger until ready to fire** the firearm. The officer's finger should rest on the **outside of the trigger guard** or along the frame of the firearm until ready to fire.'

51.    For Defendant City to recognize their approved policies are not being enforced by their chosen leaders, Defendant City needs to be held accountable. The supervisors chosen by Defendant City, trained their SWAT team without different levels of risk for deployment. Being willing to use deadly force on Plaintiffs, even if Plaintiff Umberger was guilty of eavesdropping, cannot be justified. Furthermore, Plaintiff King, Plaintiff Bailey, and the families in the

connecting apartments weren't even suspects, yet all of them were at a high risk of being a casualty.

## Excessive Force - Handcuffs

52.     Plaintiff Umberger was not under arrest, yet he was violently handcuffed by Defendant Austin and detained for over two hours.   Defendant Officers would not remove the handcuffs for Plaintiff Umberger to put clothing on or when he needed to use the restroom.

53.     It was only when Defendant Howard left the scene that an officer removed the handcuffs and offered Plaintiff Umberger a ride home, which he declined.    When Officer Schmidt heard him calling for a ride on Officer Davis's cell phone, he offered to drive him home as well.

54.     The only reasonable explanation to keep Plaintiff Umberger in handcuffs for such an unreasonable extended period of time would be out of fear for the safety of the officers, however two of the officers were willing to drive him 20 minutes back to the residence after the handcuffs were removed.

55.     Plaintiff Umberger does not have a history of violence, nor does he have prior felonies. He had a misdemeanor conviction 15 years ago. When Plaintiff Umberger's car broke down, he had to borrow his father's vehicle at the last minute. While driving his father's vehicle he was pulled over for a DUI, when the officers asked Plaintiff Umberger if they were going to find any weapons in his car, Plaintiff Umberger told them he didn't know because it's his fathers car, and his father did sometimes have his registered handgun in his car, and there was a possibility of it being in there. This does not constitute a history of violent behavior, hence why it was a misdemeanor. Plaintiff Umberger has been clean since the DUI and he completed the divergent program, making him eligible for a dismissal.

56.    Additionally, Defendant Wagner stated that "*everyone was cooperative,*" when he was standing outside of the residence, as heard on the Kasa Smart Doorbell video #S-36.   At that point, with everyone cooperating, it would be unreasonable to keep Plaintiff Umberger in handcuffs for another hour, which is exactly what happened.

**Custom and practice of retaining officers with a propensity toward violence.**

57.    The indifference the leadership of the Folsom PD has toward the citizens of Folsom is made apparent when they hire officers with a history of police misconduct, such as Owen Anstess.   Commander Andrew Bates acknowledged publicly that Folsom PD was aware their new officer had sustained allegations of police misconduct for unreasonable search and seizure and excessive force but hired him anyway.

58.    Furthermore, Folsom PD retains officers with a history of using deadly force such as Defendant Wagner.   As well as retaining officers with a history of using excessive force such as Defendant Austin and Defendant Rice.

59.    The Folsom PD has a long history of abusing their power, including but not limited to, police misconduct, excessive force, deadly force, perjury, and reckless driving.   The victims of these officers did not take solace in knowing their suffering prevented the future suffering of others because none of the officers were disciplined for their actions.

60.    The Plaintiffs filed a complaint with Folsom PD on December 19, 2023, with the same events that form this complaint.   The response dated January 23, 2023, signed by Defendant Kehm, stated all allegations were investigated and determined to be unfounded. Folsom PD assigning officers to investigate complaints, who directly participated in the incident that forms the complaint, is an ineffective and corrupt practice. [See Exhibit E]

**Unreasonable Search and seizure – Excessive Force**

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - JURY TRIAL DEMANDED - 13

61.    It states in the Folsom PD policy manual, in §321.2 that members will conduct searches in strict observance of the constitutional rights of persons being searched, and with dignity and courtesy.  There was no dignity or courtesy extended to the Plaintiffs as they were forced to leave their home at gun point, to be displayed in a community parking lot, in their under garments.  All the while, Defendant Koupal was nonchalantly singing a song outside the residence, moments after traumatizing the Plaintiffs, as heard on Kasa Smart Doorbell video S-11.

## **INJURY**

62.    Plaintiff Bailey suffers from a corticosteroid resistant form of systemic eczema that has only been manageable with an immunosuppressive biological medication (Dupixent) that she injects twice a month since 2017.   She was among the first few children to be approved for the experimental biological injection at that time.   One day after she had a SWAT team at the front door of her home, she woke up with a stress induced systemic inflammation, while on the biological, resulting in her being in severe pain seeking medical attention, she then had to endure a very uncomfortable week of steroids, despite the fact of it being contraindicated while on the biological.  [See Exhibit F]

63.    Plaintiff Bailey had been making progress with her psychologist to overcome depression, until her symptoms resurfaced from the trauma experienced the morning the Folsom Police Department made her home feel unsafe.   She has now been diagnosed with PTSD and has started having panic attacks.   She has been stuck in a major depressive episode, without significant moments of remission.   She had to drop her classes at American River College to

focus on her mental health.    Plaintiff Bailey now has a fear of law enforcement.    This is very unsettling to Plaintiff King as she fears if her daughter is ever in a dangerous situation, she will not call for help.

64.    The stress that the Defendants have caused Plaintiff King has her in constant fear, and doesn't allow anybody to know where she lives.    Plaintiff King has been on disability since 2014 for major depressive disorder and sees a new therapist directly due to the events that form this complaint, that has diagnosed her with PTSD.    Her failure to create a safe home for her already suffering daughter has caused her depression to become severe, and her new symptoms from PTSD has her suffering with anxiety, emotional distress, and fear.

65.    On July 15, 2023, two days after the SWAT team traumatized Plaintiff King, her property manager informed her that they were not renewing her lease.    This forced the Plaintiffs to take on the unexpected and costly expense of moving.

66.    Plaintiff King asked Defendant Howard if Folsom PD was going to pay for the damage that they caused to the door and the carpets.    Defendant Howard stated that Defendant City would take care of it.    When Plaintiff King received a bill for the damage to the residence for $3,119.02, she filed a claim with the Folsom City Clerk's office, which was denied.    [See Exhibit G]

67.    The Folsom PD seized all the computers at Plaintiff Umberger's shop, resulting in him losing approximately three months of income.    This has put him, and his shop, in extreme financial distress, as his shop was just starting to recover from the pandemic closures.    He emailed and called Defendant Howard several times to remind him that he could not open for business until the computers were returned, yet he would not return the computers for over two

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - JURY TRIAL DEMANDED - 15

months. The CAD report states that no evidence of a crime was found within any of Plaintiff Umberger's devices.

68.    This also forced Plaintiff Umberger to purchase a new laptop to prepare his family court case and other daily tasks. The seized computers and their backup drives were not replaceable, as they contained the software and information required to process loans, sales and monitor inventory.

69.    As a direct result of the event in this complaint, Plaintiff Umberger has suffered, and continues to suffer from serious emotional distress, pain, trauma, worry, anxiety, humiliation, and embarrassment, as well as having difficulties concentrating and sleeping.    Plaintiff Umberger has become hyper vigilant, every time he sees a police officer, he is overcome with fear and the physical unease that accompanies anxiety. This anxiety and pain has prevented Plaintiff Umberger from opening his shop on several occasions.    Shortly after the Defendants violated his constitutional rights, he moved out of Folsom, where he has lived his entire life. He has started seeing a professional to help him cope with this.

70.    Worse yet, as a direct result of Defendant Howard unnecessarily involving Plaintiff Umberger's minor son in the investigation, Plaintiff Umberger and his minor son have suffered a complete loss of their parent-child relationship.    Plaintiff Umberger has not heard anything from his son since 06/03/2023. Their relationship was already strained due to Plaintiff Umberger's ex-wife suffering with symptoms of an adjustment disorder.    Plaintiff Umberger was treading carefully to minimize the documented long-term effects of her abuse, following the recommendations of U.S. Senate bill 78 (Kaden's Law). In the CAD report Detective Howard stated that he listened to the audio recordings of Plaintiff Umberger's ex-wife, had he the knowledge or training, he would have been able to recognize that his sons are suffering severe

emotional and psychological abuse, which is complex and fragile.    Involving Plaintiff Umberger's minor son in his misinformed investigation has caused the loss of a familial relationship for Plaintiff Umberger. This loss has Plaintiff Umberger grieving and suffering with the inability to find any enjoyment for life.

## CLAIMS FOR RELIEF

**FIRST CLAIM**
**Violation of the Fourth Amendment**
**(42 U.S.C. § 1983)**
**Unreasonable Search and Seizure**
**(All Plaintiffs Against Defendant City and Defendants Howard and Wagner)**

71.    Plaintiffs re-allege and incorporate by reference all the preceding paragraphs as though fully set forth in this claim.

72.    The Fourth Amendment guarantees that no warrant shall issue but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

73.    Defendant Howard violated the Plaintiffs Fourth Amendment rights by intentionally and/or with a reckless disregard for the truth, made misleading statements, and misrepresentations by omission, in order to manipulate the court to authorize a search warrant for Plaintiffs' residence, vehicle, shop, and persons.

74.    The unlawfulness of deliberately using false statements and omitting material facts to establish probable cause is made apparent in, *Hart v. Mannina*, 798 F.3d 578, 591 (7th Cir. 2015), "a warrant request violates the Fourth Amendment if the requesting officer knowingly, intentionally, or with reckless disregard for the truth, makes false statements in requesting the

warrant    and    the    false    statements    were    necessary    to    the

determination  that a warrant should issue."

75.    Defendant Howard knew that the search warrant was facially invalid due to the

lack of factual support for probable cause.

76.    Defendant Howard misled the Magistrate when he stated the purpose of the search

warrant was for a violent crime, and/or to search for firearms and/or controlled substances.  These

Exaggerations by Defendant Howard directly led to the Folsom PD's exploitation of the Plaintiffs

and Defendant Officers excessive use of force, with complete indifference.

77.    Without probable cause, the execution of the search warrant was wrongful and

deprived Plaintiffs of their Fourth Amendment right to be free of unreasonable search and

seizures.

78.    Defendant Howard knowingly omitted facts in the second search warrant

affidavit as he was not interested in any evidence that would disprove the already established

narrative, as he now needed an arrest to justify executing the search warrant.

79.    The search warrant affidavit omits numerous material and exculpatory facts that

undercut probable cause.  Those omissions include:

    1.    The ownership of the device was already established.

    2.    Defendant Howard was informed of evidence showing Plaintiff Umberger had the

       consent of all parties, disproving allegations of eavesdropping.

    3.    A judicial officer and two Folsom PD officers were informed that Plaintiff

       Umberger did not own or possess any firearms prior to the execution of the search

       warrant.

4. Neither affidavits suggested that Plaintiff Umberger could own or possess a firearm.

5. Plaintiff Umberger has no prior felonies.

6. Plaintiff Umberger had lived in Folsom his entire life, where he raised his two sons, and for the last 24 years has been a local business owner and homeowner.

7. Plaintiff Umberger has assisted the local policing agencies, several times, with cases involving stolen goods. He is not a violent criminal.

80. To include the omitted information, it would render the affidavit insufficient to support a finding of probable cause.

81. Defendant Howard, and the approving supervisor, Defendant Wagner, who was obligated to guide Defendant Howard on his first case as a detective, caused the Plaintiffs to suffer pain, anxiety, trauma, emotional distress, humiliation, and economic harm. Furthermore, the Plaintiffs have suffered special damages with the loss of use and enjoyment of real property, loss of earned income due to the seizure of Plaintiff Umberger's shops' computers, and the loss of a familial relationship.

82. In *Hervey v. Estes*, 65 F.3d 784, 788-89 (9th Cir. 1995) "a peace officer's conduct is objectively unreasonable, and therefore outside the protection of qualified immunity, when he or she deliberately or recklessly misstate facts material to the probable cause determination."

83. Plaintiffs are entitled to compensatory, equitable, and/or exemplary damages against Defendants under 42 U.S.C. § 1983 because Defendants' actions were malicious, willful, or with reckless disregard of the Plaintiffs' constitutional rights.

**SECOND CLAIM**
**Violation of the Fourth Amendments of the U. S. Constitution**
**(42 U.S.C. § 1983)**
**Unreasonable Search and Seizure – Excessive force**
**(All Plaintiffs against Defendant City and Defendants Lockhart, Howard, and Koupal)**

84.    Plaintiffs re-allege and incorporate by reference all the preceding paragraphs as though fully set forth in this claim.

85.    Defendants violated the rights of the Plaintiffs to be free from unreasonable search and seizure secured to them by the Fourth Amendment to the United States Constitution.

86.    Defendant Koupal was acting under the color of law when he unnecessarily used a battering ram to break in the door of the residence.

87.    Defendant Koupal was obeying a direct order from his trainer and supervisor, Defendant Lockhart, and in accordance with Folsom PD training, policies, practices, and customs when carrying out these acts.

88.    Defendants actions are a direct and proximate result of Defendant Howards misleading search warrant affidavit.

89.    Defendants acted with complete indifference to the physical harm that their actions could have caused the Plaintiffs.

90.    Defendants caused damage to the residence, and caused the Plaintiffs to suffer anxiety, trauma, emotional distress, humiliation, and economic harm.

91.    Defendants are not entitled to qualified immunity for their conduct, because their use of force against the Plaintiffs violated their clearly established constitutional rights and was objectively unreasonable.

92.    Plaintiffs are entitled to compensatory, equitable, and/or exemplary damages against Defendants under 42 U.S.C. § 1983 because Defendants' actions were malicious, willful, or with reckless disregard of the Plaintiffs' constitutional rights.

**THIRD CLAIM**
**Violation of the Fourth Amendment**
**(42 U.S.C. § 1983)**
**Unreasonable Seizure of Persons – Excessive Force and Detention**
**(All Plaintiffs Against Defendant City, and Defendants Lockhart, Kehm, Wells, Austin, and Howard)**

93.    Plaintiffs re-allege and incorporate by reference all the preceding paragraphs as though fully set forth in this claim.

94.    Plaintiffs were deprived of their right to be secure in their persons against unreasonable search and seizure guaranteed to them under the Fourth Amendment of the United States Constitution.

95.    Defendants Kehm, Wells, and Austin were acting under the color of law when they unreasonably used excessive force to detain the Plaintiffs at gun point.

96.    Defendant Kehm, Wells, and Austin knew, or should have known, that pointing loaded automatic M4 carbine assault rifles at civilians is a potentially deadly practice.

97.    The Tenth Circuit held in, *Holland v. Harrington, 1:11-cv-00185-GBC (PC) (E.D. Cal. Aug. 22, 2011)*, that aiming a firearm directly at a person inescapably involves the immediate threat of deadly force.

98.    Defendant Wells had his finger on the trigger of the loaded automatic M4 carbine assault rifle, that he pointed at each of the Plaintiffs, indicating that he was willing to use deadly force.

99.    It reasonably appeared to the Plaintiffs that Defendants were about to commit homicide and that Plaintiffs were about to die.

100.    The Fourth Amendment's reasonableness standard requires balancing the nature and quality of the intrusion on the individual's Fourth Amendment privacy interest, against the governmental interest.  The factors to be considered, that are articulated in *Graham vs. Connor*, are: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect actively resisted arrest or attempted to escape.

101.    To take into consideration the totality of the circumstances by weighing those factors in this case, (1) the severity of the crime is a non-violent wobbler offense, (2) the Plaintiffs were not armed, the only danger to others were the Defendants, (3) Plaintiffs did not resist or attempt to flee, they were completely compliant.  It is reasonable to conclude the violation of the Plaintiffs constitutional rights were not justified.

102.    Defendant Kehm, Wells, and Austin were obeying direct orders from their supervisor, Defendant Lockhart, and in accordance with Folsom PD training, policies, practices, and customs when carrying out these acts.

103.    The potential death to the Plaintiffs was deemed reasonable or necessary, as a direct result of Defendant Howards misleading affidavit.

104.    At no time prior to this act of violence did any of the Defendants speak to any of the Plaintiffs or otherwise inform them that they were prepared to use deadly force.

105.    The Defendants did not provide the Plaintiffs with an opportunity to submit to a nonviolent detention.

106.    Any reasonable person would be offended or harmed by the actions of the Defendants towards the Plaintiffs.

107.    Defendants caused the Plaintiffs to suffer pain, anxiety, trauma, emotional distress, humiliation, and economic harm.

108.    Defendants are not entitled to qualified immunity for their conduct, because their use of force against the Plaintiffs violated their clearly established constitutional rights and was objectively unreasonable.

109.    Plaintiffs are entitled to compensatory, equitable, and/or exemplary damages against Defendants under 42 U.S.C. § 1983 because Defendants' actions were malicious, willful, or with reckless disregard of the Plaintiffs' constitutional rights.


**FOURTH CLAIM**
**Violation of the Fourth Amendment (42 U.S.C. § 1983)**
**Excessive Force Battery**
**(Plaintiff Umberger Against Defendant City, and Defendants Austin, and Howard)**

110.    Plaintiff Umberger re-alleges and incorporates by reference all the preceding paragraphs as though fully set forth in this claim.

111.    Plaintiff Umberger was deprived of his right to be secure in his person against unreasonable search and seizure as guaranteed under the Fourth Amendment to the United States Constitution.

112.    Defendant Austin's use of excessive force was unreasonable as Plaintiff Umberger was being compliant.

113.    Plaintiff Umberger was barefoot and in his underwear when Defendant Austin pulled Plaintiff Umberger down the breezeway, slammed his face against the wall, rammed his shoulder into his back, and violently handcuffed him.

114.    Plaintiff Umberger was not under arrest, not trying to escape, nor was he verbally threatening, and he clearly was not armed.

115.    Defendant Austin violently touching Plaintiff Umberger is a direct and proximate result of Defendant Howard's misleading affidavit.

116.    Any reasonable person would know that another reasonable person being grabbed, pushed, pulled, and slammed into a wall by Defendant Austin would be harmed or offended.

117.    When Defendant Austin battered Plaintiff Umberger, a middle-aged man, in such a degrading manner, without provocation, he was acting under color of law and within the customs and practices of the Folsom PD.

118.    Defendants are not entitled to qualified immunity for their conduct, because their use of force against Plaintiff Umberger violated his clearly established constitutional rights and was objectively unreasonable.

119.    Plaintiff Umberger has suffered pain, anxiety, trauma, humiliation, emotional distress, and economic harm as a direct result of Defendant Austin's actions.

120.    Plaintiffs are entitled to compensatory, equitable, and/or exemplary damages against Defendants under 42 U.S.C. § 1983 because Defendants' actions were malicious, willful, or with reckless disregard of the Plaintiffs' constitutional rights.

1

2

3

**FIFTH CLAIM**
**Violation of the Fourth Amendment (42 U.S.C. § 1983)**
**Unreasonable Seizure of Person – Excessive Handcuffing**
**(Plaintiff Umberger Against All Defendants)**

4

5

6

121.    Plaintiff Umberger re-alleges and incorporates by reference all the preceding paragraphs as though fully set forth in this claim.

7

8

9

122.    Plaintiff Umberger was deprived of his right to be secure in his person against unreasonable seizure as guaranteed to him under the Fourth Amendment to the United States Constitution when he was detained in handcuffs for over two hours.

10

11

12

13

123.    Defendants treated Plaintiff Umberger with complete indifference, they did not extend to him basic human decency or respect when they humiliated him in front of his neighbors and his business associates.

14

15

124.    Defendants forced him to sit on the ground in front of the store that he has owned for 24 years, handcuffed with two armed officers standing over him.

16

17

18

19

125.    Defendants' knew, or should have known, that unless arrested, the use of restraints on detainees should continue only for as long as is reasonably necessary to ensure the safety of officers and others.

20

21

22

23

126.    Plaintiff Umberger was kept in handcuffs for two hours when he was being investigated for a non-violent offence, he was not under arrest, and he has no prior felonies.  At no time did Plaintiff Umberger resist, make any threats, nor did he make any attempt to flee.

24

25

26

127.    Plaintiff Umberger's deprivation of his right to be free from unreasonable seizure under the Fourth Amendment of the Constitution, was a direct and proximate result of Defendant Howards misleading search warrant affidavit.

27

28

128.    Defendants caused the Plaintiffs to suffer economically by intentionally damaging his corporation's reputation.  Plaintiff also suffered, and continues to suffer pain, anxiety, trauma, emotional distress, humiliation, and economic harm.

129.    Plaintiffs are entitled to compensatory, equitable, and/or exemplary damages against Defendants under 42 U.S.C. § 1983 because Defendants' actions were malicious, willful, or with reckless disregard of the Plaintiffs' constitutional rights.

**SIXTH CLAIM**
**Violation of the Fourth Amendment (42 U.S.C. §1983)**
**Failure to Intervene**
**(Plaintiff Umberger against Defendants Monsoor, Vavack, Rice, Moniz)**

130.    Plaintiff Umberger re-alleges and incorporates by reference all the preceding paragraphs as though fully set forth in this claim.

131.    Defendants, acting under color of state law, knew or should have known that they and others were violating Plaintiff Umberger's constitutional rights.

132.    Defendants each had a reasonable opportunity to intervene and prevent these violations but, acting with deliberate indifference, declined to do so.

133.    Defendants' failure to intervene violated Plaintiff Umberger's clearly established constitutional rights.

134.    Through their failure to intervene, Defendants directly and proximately caused Plaintiff Umberger harm.

135.    Defendants had a duty to intervene when Defendant Austin was violating Plaintiff Umberger's constitutional rights by subjecting him to unnecessary excessive force.

136.    Defendants conduct was motivated by evil motive or intent, involved reckless or callous indifference to Plaintiff Umberger's Fourth Amendment rights secured by the United States Constitution, or was wantonly or oppressively done.

137.    As a direct and proximate result of the Defendants actions, Plaintiff Umberger suffered pain, anxiety, trauma, humiliation, and emotional distress.

138.    Plaintiff Umberger is entitled to compensatory, equitable, and/or exemplary damages against Defendants under 42 U.S.C.  § 1983 because Defendants' actions were malicious, willful, or with reckless disregard of the Plaintiffs' constitutional rights.

**SEVENTH CLAIM**
**Violation of the Fourth Amendment (42 U.S.C. §1983)**
**Failure To Supervise, Hire, Train, and Discipline - Municipal Liability – (*Monell*)**
**(All Plaintiffs against Defendant City)**

139.    Plaintiffs re-allege and incorporate by reference all the preceding paragraphs as though fully set forth in this claim.

140.    Defendants violated the Plaintiffs Constitutional rights secured to them under the Fourth Amendment by permitting their officers to be fraudulent and encouraged their officers to unreasonably use excessive force against unarmed citizens and instill fear of grave harm into them.

141.    Defendants were not disciplined, reprimanded, retrained, suspended, or otherwise penalized following the Service Complaint the Plaintiffs filed with the Folsom PD.  Defendant Kehm stated in the response, dated December 16, 2023, that all of the allegations were investigated and were determined to be unfounded.

142.    Defendants, under color of law, intentionally, negligently, and with complete indifference, caused Plaintiffs to be deprived of their constitutional rights by failing to properly supervise, screen, hire, appoint, promote, train, and discipline the conduct of Defendants in the following ways:

a. Failing to put in place strict hiring guidelines and not overlook a history of police misconduct when hiring law enforcement officers.

b. Failing to train the officers properly and adequately in the Folsom PD regarding firearm safety.

c. Failing to issue clear, consistent, reasonable policies, to avoid excessive force while executing search warrants, and a separate policy for suspected non-violent offence violation investigations.

d. Failing to issue clear, consistent, and reasonable policies concerning the use of militarized equipment and the risks associated with their use, as required by AB-481.

e. Failure to educate and train officers on the potentially deadly consequences of exploiting their citizens for a live SWAT rehearsal.

f. Failure to discipline Defendants when a complaint is received about unsafe and potentially deadly practices.

g. Failing to properly train the officers regarding the dangers of unnecessarily deploying the SWAT team for routine policing.

h. Failure to adequately educate and train the officers on trigger discipline.

i. Failure to train and educate officers on the risks involved with a lighter trigger pull weight on automatic assault rifles.

j.  Failure to train and educate officers on the increased risk of unintentional

discharge with automatic assault rifles.

143.  Defendant Officers know that their actions will not be properly monitored and

that their misconduct will be tolerated and not be thoroughly investigated or sanctioned.

144.  Plaintiffs have suffered pain, anxiety, trauma, humiliation emotional distress, and

economic harm as a direct and proximate result of Defendants actions.

145.  Plaintiffs are entitled to compensatory, equitable, and/or exemplary damages

against Defendants under 42 U.S.C. § 1983 because Defendants' actions were malicious, willful,

or with reckless disregard of the Plaintiffs' constitutional rights.


**EIGHTH CLAIM**
**Violation of the Fourth Amendment (42 U.S.C.  § 1983)**
**Unconstitutional Custom or Policy Municipal Liability – (*Monell*)**
**(All Plaintiffs against Defendant City)**

146.  Plaintiffs re-allege and incorporate by reference all the preceding paragraphs as

though fully set forth in this claim.

147.  Defendant City violated the Plaintiffs Constitutional rights secured to them

under the Fourth Amendment by having in place policies, procedures, customs, and practices

which were directed, encouraged, allowed, and/or ratified by policy making officers for the

unconstitutional actions and/or omissions of the Defendants.

148.  Defendant City was deliberately indifferent to the safety, security, and rights of

Plaintiffs.

149.  The supervising Defendants do not discipline the Defendant Officers which

means they are encouraging unlawful conduct with indifference.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - JURY TRIAL DEMANDED - 29

150.    The Defendant policymakers and supervisors approved and maintained the following unconstitutional customs, practices, and policies:

a.  The potentially fatal practice of exploiting their citizens for a live SWAT rehearsal.

b.  Encouraging the exploitation of their citizens to indoctrinate new military equipment.

c.  Unnecessarily deploying the SWAT team to justify its existence.

d.  Unnecessarily deploying the SWAT team while executing search warrants for a suspected violation of a non-violent offence.

e.  Assigning new detectives to investigations without guidance or supervision.

f.  Allowing and encouraging detectives to exaggerate and mislead the magistrate on affidavits to increase the chance of obtaining a search warrant.

g.  Allowing detectives to go to the extreme measure of obtaining a search warrant and deploying the SWAT team, before thoroughly investigating suspected crimes.

151.    Policies, training, and/or customs that need updating or completely absent from the Folsom Police Department policy manual:

a.  A policy to not aim firearms at innocent civilians who are compliant.

b.  A policy for mandatory education on the statistics and risks associated with the unintentional discharge of automatic assault rifles.

c.  A policy restricting deployment of SWAT to ONLY when dealing with suspects that have a propensity towards violence, or when a person is suspected of committing a violent crime.

d. A detailed policy that carefully weighs the risk against the need for their SWAT team deployment to multi-unit apartment complexes where many innocent families with young children reside.

e. A policy for a structured guide to help new detectives be more thorough and successful in their investigations.

f. A policy that distinguishes that the officer investigating service complaints must not have had direct involvement in the incident the complaint is in reference to.

g. A policy promoting integrity and encouraging officers to take accountability for their mistakes.

156.    Plaintiffs have suffered and continue to suffer pain, anxiety, trauma, humiliation, emotional distress, and economic harm as a direct and proximate result of Defendants actions.

157.    Plaintiffs are entitled to compensatory, equitable, and/or exemplary damages against Defendants under 42 U.S.C. § 1983 because Defendants' actions were malicious, willful, or with reckless disregard of the Plaintiffs' constitutional rights.


**PRAYER FOR RELIEF**

The Plaintiffs Pray for the following relief from Defendant City and Defendant Officers for each of the above causes of action;

1. Declare that Defendants violated Plaintiff's constitutional rights;

2. For compensatory, equitable, and/or exemplary damages against Defendants under 42 U.S.C. § 1983, and any other applicable laws or statutes, in an amount sufficient for losses suffered by the Plaintiffs and to deter future misconduct;

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - JURY TRIAL DEMANDED - 31

3. For special damages, including but not limited to, loss of use and enjoyment of real property, and loss of familial relationship;

4. For injunctive relief prohibiting Defendants' prospective actions, inactions, and/or policies or customs complained of herein in violation of the U.S. Constitution;

5. For statutory damages according to proof;

6. For such further relief as the court deems just and proper.


## JURY DEMAND

Plaintiffs hereby demand a trial by jury in this action.


Dated April 22, 2024

_____
Lisabeth A King

_____
George P. Umberger II

_____
Savannah R. Bailey

# Exhibit A

# Exhibit A

experienced investigators with whom I have spoken, as well as the facts and circumstances of this investigation, as described above, I formed the opinion that **George Umberger** was in violation of Penal Code Sections 632 (Eavesdropping) and that a search of the requested location(s), vehicle(s), and person(s) will reveal evidence of those offenses and/or **Umberger's** involvement in those offenses.

I request that the search warrant authorizes the seizure of any computers and computer systems as evidence for the purpose of later applying for search warrants for said devices. Any device containing electronically stored data seized pursuant to this warrant will not be searched until an additional search warrant can be obtained authorizing the search of the device in compliance with the California Electronic Communications Privacy Act (ECPA).

Based on my training and experience, as well as the training and experience of other experienced investigators with whom I have spoken, as well as my review of other crime reports, I know that, although it may be possible to search these digital storage devises where they are located, investigators with specialized skills, software and equipment are frequently needed to examine the device and extract and preserve the data and information found within. I know this is a process, which cannot usually be performed where the digital storage device is located, thus I request that this warrant authorize the seizure of digital storage devices, which will be searched only upon your affiant or another law enforcement officer obtaining a subsequent search warrant in compliance with the provisions of the California ECPA.

In the event that law enforcement officers encounter safes, locked cabinets, or other secured containers at the location or in the vehicle listed in this affidavit, it is requested that the Court direct the officers or their agents to access those items to search for evidence listed in this affidavit. I know that some safes or locked storage containers may require the assistance of a locksmith or other experts to open. I therefore request permission to employ such experts if needed and to remove the safe or storage container to a location where it can be opened.

**REQUEST TO USE LAW ENFORCEMENT RECONNAISSANCE TECHNOLOGY**

Based on my training and experience, as well as the training and experience of other experienced investigators with whom I have spoken, as well as my review of other crime reports, I am aware that there exists an increased threat of violence, often involving firearms and other deadly weapons whenever officers enter a structure for the purpose of executing a search warrant to search for firearms, controlled substances, weapons, the fruits and instrumentalities of a violent crime, and/or to execute an arrest warrant on an individual wanted for a violent crime. Based on my training and experience, I have formed the opinion that this heightened threat exists for two reasons. First, in executing warrants for these purposes, officers frequently discover firearms and other deadly weapons, and these weapons are often located in places and in a manner that enable the occupants to quickly use them against anyone who is perceived as a threat. Second, officers will give notice of their authority and purpose either before they enter the structure or, in the case of exigent circumstances, shortly thereafter. In any event, when the occupants become aware of the officers' authority and objective, it is not unusual for them to panic because of the possibility that they are about to be taken into custody and subsequently prosecuted and imprisoned. In this fight-or-flight

Page **12** of **15**

# Exhibit B

# Exhibit B

(6) Evidence Item **243-4**, further described as a black Dell Desktop Computer (SN:HGMBX01).

(7) Evidence Item **243-5**, further described as a black HP Desktop Computer (SN:2UA3091KM7).

(8) Evidence Item **243-6**, further described as a WD MyPassport External Drive (SN:WXG1EC3HSHS7)

(9) Evidence Item **243-7**, further described as a PMY 64 GB USB.

As described above this application seeks permission to search and seize records that might be found on the described electronic communications device, in whatever form they are found.

The intention of the search warrant is to gather evidence of the above listed offense by **George Umberger**. Based on the information in this affidavit, as well as my training and experience, as well as the training and experience of other experienced investigators with whom I have spoken, I believe that there is a high probability that there will be evidence connected to the above-described criminal offense(s) stored in the above-described digital devices. I believe a search of these digital devices will produce reliable evidence of the above-described criminal offenses.

Based upon the information contained in this affidavit and the knowledge I have gained through experience, I believe that **Umberger** has committed a violation of the above listed felony offense. I believe that the evidence sought and described elsewhere in this search warrant application will tend to prove **Umberger's** involvement in these crimes.

I believe forensic examination of this device will further substantiate **Umberger's** involvement in the above-listed felony offense. As described above, this application seeks permission to search and seize records that might be found on the described electronic device(s), in whatever form they are found, including but not limited to voice data, written data, photographic data, and video data.

I am seeking evidence of ownership, use, and identification. I know that ownership and control of a digital device can be placed at issue through a simple denial: "That is not my phone." In my training and experience, some of the best ways to establish control are by searching the calendar, contacts, photo gallery, communications, settings, and social networking activity. The calendar often contains appointments specific to an individual such as birthdays and doctor's appointments. Contacts often contain friends and associates specific to an individual such as mother, father, siblings, and/or romantic/sexual partners. A photo gallery often contains self-taken photographs (commonly known as "selfies") that clearly depict the owner/holder of the digital device. Communications via text messages, emails, and voicemails often identify the sender/recipient by name, additionally the context of the communications often identify the sender and/or recipient. Settings often contain usernames, addresses, and phone numbers, Wi-Fi network tables, associated wireless devices (such as known Wi-Fi networks and Bluetooth devices), associated connected devices (such as for backup and syncing), stored passwords, and user dictionaries that can identify the owner/user of the device.

# Exhibit C

# Exhibit C

# PERMISSION TO RECORD OUR INTERACTION
## Real estate agent Gina

  

**Gina >**

**Sun, Jun 4 at 10:03 AM**

Yes I'm helping my dad right now   10:03 A

Ok let me know what time your planning on going I can try and meet you   10:04 A

I'm not sure maybe when it's cooler   10:06 A

I won't need any help today thank you   10:06 A

I'm going to wear my go pro to protect myself from her false accusations I thought jen and I were past these games but a lesson learned   10:10

My lawyer also told me to get a letter from her stating that it was ok for me to been on the property ..Jen still hasn't sent me that email saying it's ok for me to be there   10:15 A

Let me call you in a few minutes so we can figure this out   10:17 A

  

**Gina >**

Ok   10:17 AM

George can come over to remove his stuff from the backyard.
Jen   11:10 AM

No GoPro.   11:11 AM

I'm not coming on the property then   11:12 AM

I need to protect myself   11:12 AM

Jen plays the victim   11:13 AM

+   iMessage   🎤

**Gina >**

Ok she said you can wear the go pro   11:13 AM

**Sun, Jun 4 at 12:34 PM**



I was just at the house and the pool not looking good I dumped some more salt and chemicals. Maybe we need your pool guy to look at it   12:34 PM

# Exhibit D

# Exhibit D





**FINGER ON TRIGGER**



# Exhibit E

# Exhibit E



# Folsom Police Department
## Richard D. Hillman
*CHIEF OF POLICE*

December 19, 2023

George Umberger II
9268 Greenback Lane
Orangevale, CA 95662

Re:    *Service Complaint submitted December 16, 2023*

Dear George Umberger II,

You submitted a complaint dated 12/16/2023 relative to an incident that occurred on July 13, 2023. A thorough inquiry of your service complaint was conducted by our Investigation Division and our Professional Standards Unit. The entire report was then forwarded to Command Staff for a final determination. After an evaluation of your complaint, the allegations of officer misconduct were determined to be unfounded. Due to regulations provided in the California Government Code [Section 3300], this office is prohibited from disclosing any investigatory details.

Respectfully,

Sergeant R. Kehm

# Exhibit F

# Exhibit F



# Plaintiff Bailey's systemic stress reaction

# Exhibit G

# Exhibit G

## ITEMIZED STATEMENT REGARDING DAMAGES & FEES

- FILL OUT ONLY GREY BOXES -

| PROPERTY NAME: | The Falls at Willow Creek | ADDRESS: | 1780 Creekside Drive | UNIT CODE: | #1125 |
|---|---|---|---|---|---|
| | | | Folsom, Ca. 95630 | Move In Date: | 7/9/2022 |
| RESIDENT NAME: | George Umberger | Contact | (916)576-1830 | Move Out Date: | 8/27/2023 |

### A.

| | Description of work performed by Landlord/Agent or Employee of Landlord/Agent: (Invoices attached) | Date of Installation | CHARGES Hourly Rate | CHARGES Time (hrs) | CHARGES Amount | Pro Rated Amount (if applicable) | Resident Total Charge |
|---|---|---|---|---|---|---|---|
| 1 | Apartment Cleaning (In-House) | | $39.43 | | $ - | | $ - |
| 2 | Apartment Cleaning (Vendor, Flat Fee) | | | | $ 295.00 | | $ 295.00 |
| 3 | Apartment Painting (In-House) | 7/9/2022 | | | | | |
| 3a | Paint Material ($prorated) | | | | $ 110.00 | $ 67.83 | $ 67.83 |
| 3b | Paint Labor | | $ 39.43 | 2 | $ 78.86 | $ 48.63 | $ 48.63 |
| 4 | Apartment Painting (Vendor) | 7/9/2022 | | | $ 470.00 | $ 289.83 | $ 289.83 |
| 5 | Carpet Shampoo (Flat Fee) | | | | | | $ - |
| 6 | Carpet Replacement ($prorated) | 7/17/2020 | | | $ 1,773.00 | $ 654.00 | $ 654.04 |
| 7 | Appliance Supplies | | | | | | $ - |
| 8 | Electrical Supplies | | | | | | $ - |
| 9 | Not Returned Parking Permit (s) | | | | | | $ - |
| 10 | Not Returned Parking Remote (s) | | | | | | $ - |
| 11 | Paint Supplies | | | | | | $ - |
| 12 | Plumbing Supplies | | | | | | $ - |
| 13 | Trash Out | | | | | | $ - |
| 14 | Wall Damage (Over 30 min. work) | | | | $ - | | $ - |
| 15 | Window Covering Damage | | | | | | $ - |
| | | | | | | SUB TOTAL (A) | $ 1,355.34 |

### B.

| | Description of other repairs, work, services, materials and supplies from the Landlord/Agent, Employees of Landlord/Agent or person or entity not listed above. (Invoices attached) | Resident Total Charges | | Resident Total Charges |
|---|---|---|---|---|
| 1 | Door removal, installation, and trim repairs | $ 1,763.00 | | $ 1,763.00 |
| 2 | | | | $ - |
| 3 | | | | $ - |
| 4 | | | | $ - |
| 5 | | | | $ - |
| 6 | | | | $ - |
| 7 | | | | $ - |
| 8 | | | | $ - |
| 9 | | | | $ - |
| 10 | | | | $ - |
| | | | SUB TOTAL (B) | $ 1,763.00 |

### C.

| | | |
|---|---|---|
| | (This amount reflects the total damages & fees noted on the Final Account Statement) GRAND TOTAL | $ 3,118.34 |

* Civil Code Section 1950.5(b) allows deductions from the security deposit for (1) the compensation of a Landlord for resident's default in the payment of rent. (2) The repair of damages to the premises, exclusive of ordinary wear and tear, caused by the resident or by a guest or licensee of the resident. (3) The cleaning of the premises upon termination of the tenancy necessary to return the unit to the same level of cleanliness it was in at the inception of the tenancy. (4) To remedy future defaults by the resident in any obligation under the rental agreement to restore, replace or return personal property or appurtenances, exclusive of ordinary wear and tear, if the security deposit is authorized to be applied thereto by the rental agreement.

** The Landlord/Agent is not required to provide receipts or other documentation if (1) the total deductions for repairs, cleaning and replacement do not exceed $125.00 or (2) the Resident has affirmatively waived the right to documentation. The Landlord/Agent has decided to provide all residents with the above detail and documentation of charges incurred and deducted by the Landlord to repair, clean or restore the premises on the attached Final Account Statement.