UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| George P. Umberger II, et al., | No. 2:24-cv-01169-KJM-JDP |
| Plaintiffs, | ORDER |
| v. | |
| City of Folsom, et al., | |
| Defendants. | |

Plaintiffs George Umberger, II, Lisabeth King and Savannah Bailey allege several Folsom City Police officers obtained a warrant to search their apartment and Umberger's business based on a misleading affidavit. They also allege the officers used excessive force during the search, and they allege the City of Folsom had an unconstitutional policy of excessive force. The defendant officers and the City move to dismiss for failure to state a claim. As explained in this order, the complaint does not include allegations that could support the claims about the search warrant affidavit, nor about the City's policies. It does, however, include allegations that make out plausible claims of excessive force. The court thus **grants the motion to dismiss in part and denies it in part**, with leave to amend as explained below.

I.  **ALLEGATIONS**

As summarized above, plaintiffs' allegations relate to a search warrant and its execution by officers of the Folsom Police Department. Because plaintiffs refer extensively to the warrant

1

and the supporting affidavit in their complaint, and because those documents are public records, the court will consider them in this order. *See* Compl. ¶¶ 43–48 & Ex. A, ECF No. 1. (referring to warrant and excerpting affidavit); *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (discussing incorporation by reference); *Ferguson v. Cal. Dep't of Just.*, No. 16-06627, 2017 WL 2851195, at *1 (N.D. Cal. July 4, 2017) ("Courts regularly find that search warrants are public records properly subject to judicial notice.").

The supporting affidavit describes an investigation that began in the summer of 2023. *See* Req. J. Not. at 12, ECF No. 14-2. A woman told police she suspected her ex-husband, plaintiff George Umberger, had secretly installed a recording device outside her home. *See id.* at 12–13. She and her son showed officers text messages in which Umberger implied he had been listening in on private conversations. *See id.* at 13–14. She also gave the officers the suspected recording device, along with surveillance video she had recorded outside her home, which showed Umberger looking for something, presumably the same device, after she had found and removed it. *See id.* at 12, 14. Officers obtained a warrant to search the device and confirmed it had indeed recorded the woman's conversations. *See id.* at 15.

The officers, suspecting a violation of California's criminal eavesdropping prohibitions, asked a superior court judge to authorize a search of Umberger's apartment and shop for computers and for other electronics or computers he might have used in connection with an eavesdropping offense. *See id.* at 15–16 (citing Cal. Pen. Code § 632).[1] The warrant application also asked the judge for authorization to use a drone during the search. *See id.* at 16. Although the supporting affidavit does not offer any reason to suspect any guns or drugs were in Umberger's apartment or shop, and although the officers suspected no violent crimes, the author of the affidavit explained his request to use a drone by describing how useful drones had been in cases involving guns and drugs. *See id.* at 16–17.

---

[1] "A person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication . . . shall be punished by a fine not exceeding two thousand five hundred dollars ($2,500) per violation, or imprisonment in a county jail not exceeding one year, or in the state prison, or by both that fine and imprisonment." Cal. Pen. Code § 632(a).

2

A state superior court judge signed the warrant, and officers of the Folsom Police Department executed it early in the morning of July 13, 2023. *See id.* at 10; Compl. ¶ 24. The three plaintiffs—Umberger, King and Bailey—were at home asleep when they heard officers "pounding" on the door. *Id.* ¶¶ 24–26. King woke up and went to the door, where she yelled out that she was getting dressed. *Id.* ¶ 26. Less than a minute later, officers broke down the door with a "battering ram." *Id.* She saw eight officers carrying automatic rifles outside, and more were located further back from the house with a police dog and riot gear. *Id.* ¶¶ 27, 30. The officers pointed their rifles at her, their fingers hovering over the guns' triggers, and they took her outside. *Id.* ¶¶ 28–30. Officers also led Umberger outside at gunpoint, where one of them "slammed his face against the wall, rammed his shoulder into his back, and his knee into his thigh," twisted his arms painfully behind his back, handcuffed him, and pushed and pulled him out into the parking lot, where he was made to wait in his t-shirt and underwear. *Id.* ¶¶ 31, 33. An officer then went back in, aimed his rifle at Bailey, and brought her outside, too. *See id.* ¶ 34. She, like Umberger, was made to wait in the parking lot in a t-shirt and her underwear. *Id.* ¶¶ 34–35.

When officers finished searching the apartment, they let King and Bailey back in. *Id.* ¶ 37. They took Umberger to his shop. *Id.* ¶¶ 38–39. They made him sit on the ground in handcuffs for two hours—still in his underwear—while they searched the shop, even though he was cooperative and nonthreatening and has no history of violence. *Id.* ¶¶ 39, 52, 55. After officers finished their search and seized "all the computers," they removed the handcuffs and allowed Umberger to leave. *See id.* ¶¶ 52–53, 67.

The search caused Bailey to suffer from panic attacks and depression, and she has been diagnosed with post-traumatic stress disorder. *Id.* ¶¶ 62–63. The search also painfully exacerbated her preexisting eczema. *Id.* ¶ 62. King lives in "constant fear" and, like Bailey, suffers from depression and has been diagnosed with post-traumatic stress disorder. *Id.* ¶ 64. Additionally, the property manager terminated King's lease after the search, forcing her to move. *Id.* ¶ 65. Umberger has become "hypervigilant" and has sought professional help for his anxiety, which along with the loss of his computers and data has prevented him from running his business.

3

*Id.* ¶ 69. He has also moved away from Folsom, where he had lived his whole life before the search. *Id.* Finally, he attributes a breakdown in his relationship with his son to the search. *Id.* ¶ 70.

After the City of Folsom denied an administrative claim, Umberger, King and Bailey filed this case in this court. *See generally id.* They originally represented themselves but have now retained an attorney. *See* Not. Appearance, ECF No. 15. Their complaint includes eight claims against several defendants, all under 42 U.S.C. § 1983:

- In claim one, all three plaintiffs allege the City of Folsom and two Folsom Police officers violated the Fourth Amendment by making misleading statements in the search warrant affidavit. Compl. ¶¶ 71–83.
- In claim two, all three plaintiffs allege the City and three officers violated the Fourth Amendment by breaking down the apartment's front door. *Id.* ¶¶ 84–92.
- In claim three, all three plaintiffs allege the City and five officers violated the Fourth Amendment by pointing weapons at them during the search. *Id.* ¶¶ 93–109.
- In claim four, Umberger alleges the City and two officers used excessive force when they took him out of the apartment and put him in handcuffs. *Id.* ¶¶ 110–20.
- In claim five, Umberger alleges the City and several officers violated the Fourth Amendment by leaving him in handcuffs outdoors in his underwear during the search. *Id.* ¶¶ 121–29.
- In claim six, Umberger alleges four officers violated the Fourth Amendment because they could have intervened to prevent the other officers' excessive force described above, but did not do so. *Id.* ¶¶ 130–38.
- In claim seven, all three plaintiffs allege the City is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), because it did not discipline, reprimand, train, suspend or otherwise penalize the officers for using excessive force. *Id.* ¶¶ 139–45.
- In claim eight, all three plaintiffs allege the City is liable under *Monell* because it has a policy of using unconstitutionally excessive force. *Id.* ¶¶ 146–57.

4

Defendants move to dismiss under Federal Rule of Civil Procedure 12(b)(6).  *See generally* Mot., ECF No. 14; Mem., ECF No. 14-1.  Plaintiffs did not oppose the motion, but instead filed an amended complaint, which this court struck as unauthorized and construed as a request for leave to amend and proposed amendment.  *See generally* Proposed Am. Compl., ECF No. 25; Order (Oct. 16, 2025), ECF No. 26.  After defendants replied, the court took the matter under submission without hearing oral argument.  *See generally* Reply, ECF No. 27.

## II.   DISCUSSION

A party may move to dismiss for "failure to state a claim upon which relief can be granted" under Federal Rule of Civil Procedure 12(b)(6).  In response, the court begins by assuming the complaint's factual allegations are true, but not its legal conclusions.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  As noted, the court also may take judicial notice of any materials that fit the requirements of Federal Rule of Evidence 201(b), and it may consider any materials the complaint incorporates by reference.  *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998–99, 1002–03 (9th Cir. 2018).  The court then determines whether those materials and the plaintiffs' factual allegations, taken together, "plausibly give rise to an entitlement to relief" under Rule 8.  *Id.* at 679.  This evaluation of plausibility is a context-specific task drawing on "judicial experience and common sense."  *Id.*

As summarized in the previous section, plaintiffs assert several of their claims against the City itself.  But in only their final two claims (eight and nine) do they allege the City itself undertook some action.  "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."  *Monell*, 436 U.S. at 691.  Nor can the City be liable under a respondeat superior theory.  *Id.*  Claims one, two, three, four, and five against the City are thus dismissed without leave to amend.  The court evaluates each of remaining claims in turn.

### A.   Claim 1: False or Misleading Warrant Affidavit

In claim one, plaintiffs allege officers used false or misleading statements to obtain the search warrant.  *See* Compl. ¶¶ 43–48, 71–83 & Ex. A.  The Fourth Amendment prohibits

5

searches under "ill-begotten or otherwise invalid" warrants. *Bravo v. City of Santa Maria*, 665 F.3d 1076, 1083 (9th Cir. 2011). Officers may not rely on deception to obtain search warrants. *KRL v. Moore*, 384 F.3d 1105, 1117 (9th Cir. 2004) (citing *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978)). Nor may officers omit information from their affidavits if the omission results "in an affidavit that, considered as a whole, is materially misleading." *Scanlon v. County of Los Angeles*, 92 F.4th 781, 799 (9th Cir. 2024). It is the court's task to decide whether any false statements or omissions were "material." *KRL*, 384 F.3d at 1117.

The complaint here does not identify any false statements within the search warrant affidavit; instead it alleges several facts were wrongly omitted from the affidavit—such as that Umberger was not suspected of a violent crime and was a long-time Folsom resident. *See* Compl. ¶ 79. These omissions were not material to the warrant application. They did not cast doubt on the officer's belief that police were likely to find evidence of unlawful eavesdropping, which was the purpose of the proposed search.

Plaintiffs also allege the affidavit's author misled the state court by referring to guns or drugs and by implying Umberger was violent or suspected of a violent crime. *See, e.g., id.* ¶ 76. But the warrant application did not request and the state court did not authorize a search for guns or drugs. Nor did the state court authorize any particular force or use of weapons. Although the state court did authorize the officers' use of a drone in response to statements about how useful drones can be in potentially violent or unpredictable searches, plaintiffs do not attribute any of their alleged injuries or harm to the drone, and they do not claim it was unreasonable for officers to use a drone. There appears to be no logical connection between plaintiffs' first claim and their allegations about drones. *See, e.g., id.* ¶¶ 43–45.

For these reasons, the court dismisses claim one. The court cannot exclude the possibility that an amendment could cure the deficiencies described above, taking account of the applicable legal standards the court has reviewed. Plaintiffs are thus permitted to amend their first claim, but only to assert claims against the individual officers, and only if possible within the confines of Federal Rule of Civil Procedure 11.

6

1  **B.     Claim 2: Excessive Force During Entry**

2  In claim two, plaintiffs allege officers violated the Fourth Amendment when they forced
3  open the front door. *See id.* ¶¶ 84–92. The Supreme Court has confirmed that "the method of an
4  officer's entry into a dwelling" is "among the factors to be considered in assessing the
5  reasonableness of a search or seizure" under the Fourth Amendment. *Wilson v. Arkansas*,
6  514 U.S. 927, 934 (1995). Officers may in some cases enter a home without knocking, but they
7  "must have a reasonable suspicion that knocking and announcing their presence, under the
8  particular circumstances, would be dangerous or futile, or that it would inhibit the effective
9  investigation of the crime by, for example, allowing the destruction of evidence." *Richards v.*
10 *Wisconsin*, 520 U.S. 385, 394 (1997). Finally, "[s]ince most people keep their doors locked,
11 entering without knocking will normally do some damage." *United States v. Banks*, 540 U.S. 31,
12 37 (2003). But this circumstance is "too common to require a heightened justification when a
13 reasonable suspicion of exigency already justifies an unwarned entry." *Id.*

14 In this case, the officers did not break down the door without announcing themselves, but
15 the Supreme Court has applied the standards above to this situation as well. If officers announce
16 themselves, it might be reasonable for them to break down the door if no one opens it. *See Banks*,
17 540 U.S. at 37–38. How long they must wait before doing so depends on "the circumstances
18 known to the officers." *Id.* at 37. The Supreme Court has declined to create any clear
19 "categories" or generalized "protocols" for these situations. *Id.* at 36. It has instead "treated
20 reasonableness as a function of the facts of cases so various that no template is likely to produce
21 sounder results than examining the totality of circumstances in a given case." *Id.* In *Banks*, for
22 example, the Court held it was reasonable for officers to go in after waiting 15 to 20 seconds
23 based on their suspicion that someone inside was destroying the very same drugs they intended to
24 search for and seize. *See id.* at 39–40.

25 The officers in this case urge the court to find it was reasonable for them to enter after
26 waiting about a minute, citing *Banks*: "it takes little to no time to destroy electronic data," they
27 argue, "either by the push of a button on a keyboard, or physically breaking a USB stick or
28 crushing a drive so they are not usable." Mem. at 11. That may be, but at this stage, the court

7

must take the complaint's allegations as true, and it must make reasonable assumptions in plaintiffs' favor. *See Iqbal*, 556 U.S. at 678–79. The court cannot say as a matter of law, based on the complaint's allegations alone, that it was reasonable for the officers to break down the door after waiting less than a minute. It was early in the morning, King had told the officers she was dressing, and the officers have not identified any allegations within the complaint that suggest she was lying or buying time. Nor have the officers cited any circumstances suggesting they knew what form or format any evidence might take, how difficult or easy it would be to delete or destroy that evidence, or even whether King and Umberger would immediately think to destroy anything. Umberger, for instance, alleges for his part that he had consent to make the recordings in question. *See* Compl. ¶ 48. For these reasons, the court denies the motion to dismiss claim two.

### C. Claim 3: Pointing Weapons

In the complaint's third claim, all three plaintiffs allege several individual officers violated the Fourth Amendment by aiming automatic rifles at them during the search. *Id.* ¶¶ 93–109. Officers use unconstitutionally excessive force when they aim firearms at people who are not suspected of violent crimes, who do not pose a threat, who have complied with the officers' instructions, who are not resisting and who are not attempting to flee. *See, e.g.*, *Thompson v. Rahr*, 885 F.3d 582, 586–87 (9th Cir. 2018); *Espinoza v. City & County of San Francisco*, 598 F.3d 528, 537–38 (9th Cir. 2010); *Robinson v. Solano County*, 278 F.3d 1007, 1015 (9th Cir. 2002) (en banc). Defendants do not acknowledge or discuss this clearly established law. The court denies the motion to dismiss claim three. Defendants are reminded that their filings must comply with Federal Rule of Civil Procedure 11 as well.

### D. Claims 4 and 5: Umberger's Painful, Degrading and Overlong Detention

In the complaint's fourth claim, Umberger alleges two officers used excessive force when they took him from the apartment, pushed him roughly against a wall and fastened handcuffs painfully around his wrists. Compl. ¶¶ 110–20. Similarly, Umberger alleges in claim five that all of the individual defendants violated the Fourth Amendment because they kept him in handcuffs

throughout his detention and made him wait in his underwear in public for about two hours. *Id.*
¶¶ 121–29. Because these claims are related and similar, the court considers them together.

The Fourth Amendment forbids unreasonable "seizures." Even a short detention that is not technically an "arrest" can be a "seizure," so if it was not "reasonable," then it was not constitutional. *See, e.g.*, *Michigan v. Summers*, 452 U.S. 692, 696 (1981). Over the years, however, federal courts have held that some detentions are categorically reasonable and so do not deprive people of their Fourth Amendment rights. For example, officers may detain the occupants of a house while they are executing a search warrant for contraband within it. *See Muehler v. Mena*, 544 U.S. 93, 98 (2005); *Summers*, 452 U.S. at 705. But otherwise reasonable detentions or searches might still violate the Fourth Amendment if officers conduct them in an unreasonable way. *See, e.g.*, *C.B. v. City of Sonora*, 769 F.3d 1005, 1030–31 (9th Cir. 2014) (en banc) (finding it unreasonable to handcuff child during thirty-minute drive).

Umberger claims the officers acted unreasonably in this case because they used unreasonably excessive force. When a person alleges officers have used excessive force in violation of the Fourth Amendment, courts use the objective, three-factor test set out in *Graham v. Connor*, 490 U.S. 386, 396 (1989). *See Thompson*, 885 F.3d at 586. First, the court must consider the "type and amount of force inflicted." *Id.* (quoting *Espinoza*, 598 F.3d at 537). Second, the court must assess the "government's interests," such as the seriousness of the suspected crime and the danger to the officers or the public. *Id.* (quoting *Espinoza*, 598 F.3d at 537). Third, the court must decide whether the government's interests justified the force used. *See id.* The court must assess the officers' conduct "from the perspective of a reasonable officer on the scene." *Graham*, 490 U.S. at 396.

As summarized above, Umberger alleges the officers "slammed his face against the wall," "rammed" him in the back and thigh, and painfully twisted his arms into an unnatural position when they put him in handcuffs. Compl. ¶ 31. He also alleges they made him wait outside in handcuffs on the ground in his underwear in a public place for two hours and would not remove the handcuffs to allow him to dress or use the restroom. *Id.* ¶¶ 38–40, 52–53. At this early stage, based on plaintiffs' allegations taken as true, the court must assume the government had very

9

little interest in using any force at all. Umberger alleges he was complying with the officers' instructions, was suspected of no violent crimes, was not resisting or attempting to flee and in general posed no threat. Based on these allegations, the government's interests did not justify the force the officers allegedly used. Although the law may very well have authorized the officers to detain Umberger while they searched the apartment and his shop, his allegations permit the court to infer the officers used unreasonable force and subjected him to unreasonably embarrassing conditions during his detention.

Umberger asserts his fifth claim against all the individual officers generally, but the complaint makes relevant allegations about defendants Howard, Austin and Schmidt only. *See* Compl. ¶¶ 31, 38, 40, 52–53. The court therefore denies the motion to dismiss claim four; denies the motion to dismiss claim five with respect to the claims against officers Howard, Austin and Schmidt; and grants the motion to dismiss claim five in part with respect to the other defendants, but with leave to amend if amendment is possible subject to Rule 11.

### E. Claim 6: Failure to Supervise or Intervene

The Ninth Circuit has "long permitted plaintiffs to hold supervisors individually liable in § 1983 suits when culpable action, or inaction, is directly attributed to them." *Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011). "[A] plaintiff may state a claim against a supervisor for deliberate indifference based upon the supervisor's knowledge of and acquiescence in unconstitutional conduct by his or her subordinates." *Id.* at 1207. In *Maxwell v. County of San Diego*, for example, the Ninth Circuit denied summary judgment to two supervising officers because they were on the scene of an allegedly unlawful detention and assault and did not intervene. 708 F.3d 1075, 1086 (9th Cir. 2013).

In addition, officers may be liable if they do not intervene to prevent or halt their colleagues' unconstitutional actions: "police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000) (quoting *Koon v. United States*, 34 F.3d 1416, 1447 n.25 (9th Cir.1994), *rev'd on other grounds*, 518 U.S. 81 (1996)).

Plaintiffs' allegations make out a plausible claim against the officers named as defendants in claim six. They allegedly stood by as their colleagues or subordinates pointed loaded weapons at all three plaintiffs, made Umberger and Bailey wait outside in their underwear, and kept Umberger in handcuffs for two hours. The court denies the motion to dismiss claim six.

### F.   Claims 7 and 8: Unconstitutional Policies and Deficient Supervision, Hiring, Training and Discipline

Plaintiffs assert their seventh and eighth claims against the City itself. To plead a *Monell* claim and withstand a Rule 12(b)(6) motion to dismiss, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *AE ex rel. Hernandez v. County of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012) (quoting *Starr*, 652 F.3d at 1216). To impose liability on a local government for failure to adequately train its employees, the government's omission must amount to "deliberate indifference" to a constitutional right. *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). This standard is met when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* A pattern of similar violations is normally necessary to support such a claim, *see, e.g.*, *Starr*, 652 F.3d at 1216, although the need for training is sometimes "plainly obvious," *Canton*, 489 U.S. at 390 n.10.

In the complaint, plaintiffs identify several allegedly unconstitutional policies or practices, but do not include factual allegations to support these allegations. They do not identify any similar occasions on which officers used similarly excessive force, and do not include allegations showing the need for more or better training or discipline was plainly obvious. Nor do they include allegations showing the City or its official policymakers adopted or ratified any particular policy. The court thus grants the motion to dismiss claims seven and eight, but with leave to amend if possible.

/////

11

### III. CONCLUSION

The court **grants in part and denies in part** defendants' motion to dismiss, as follows:

- Claims one, two, three, four and five against the City of Folsom are dismissed, without leave to amend.
- Claim one against the individual officers is dismissed, with leave to amend.
- The court denies the motion to dismiss claim five with respect to the claims against officers Howard, Austin and Schmidt and grants the motion to dismiss claim five with respect to the other defendants, with leave to amend.
- Claims seven and eight are dismissed, with leave to amend.
- The motion is otherwise denied.

Plaintiffs must file any amended complaint **within twenty-one days**.

This order resolves ECF No. 14.

IT IS SO ORDERED.

DATED: November 12, 2025.

_____
UNITED STATES DISTRICT JUDGE