Shawn A. McMillan (SBN: 208529)
attyshawn@netscape.net
The Law Office of Shawn A. McMillan, APC
4955 Via Lapiz
San Diego, CA 92122
Phone: (858) 646-0069
Fax: (858) 746-5283

Samuel H. Park (SBN: 261136)
sam@sampark.lawyer
Law Office of Samuel H. Park, APC
2161 Trapani Circle
Monterey, CA 93940
Phone: (831) 529-5955

Attorneys for Plaintiffs,
George P. Umberger, II; Lisabeth A. King; Savannah R. Bailey

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEORGE P. UMBERGER, II, et al.<br><br>              Plaintiffs,<br><br>       v.<br><br>COUNTY OF FOLSOM, et al.,<br><br>              Defendants. | Case No. 2:24-cv-1169-KJM-JOP(PS)<br><br>**FIRST AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS (42 USC Section 1983)**<br><br><br>Department:<br>Judge:          Hon. Kimberly J. Mueller |

## <u>INTRODUCTION</u>

1.       George P. Umberger II, Lisabeth A. King, and Savannah R. Bailey, bring this action for the violation of their Fourth Amendment rights under the United States Constitution, against the city of Folsom and the defendant law enforcement officers of the Folsom Police Department.

2.       On July 13, 2023, at 7:00 a.m. while the Plaintiffs were still asleep, the Folsom Police Department's Special Weapons and Tactical ("SWAT") team, forcibly entered their residence, rounded up and detained Plaintiffs by pointing multiple automatic assault rifles at them, forced them to the community parking lot, while in their undergarments, battered Plaintiff Umberger, and kept him in handcuffs for an unreasonable length of time, to execute a search warrant for an investigation of a non-violent offence. Defendants caused

1  Plaintiffs to suffer pain, emotional trauma, economic harm, loss of income, and loss of use
2  and enjoyment of real property.

3       3.      Subsequent to the initial filing of the Complaint in this matter, on November
4  8, 2024, Plaintiffs received Folsom Police Department body camera videos from the District
5  Attorney's Office. This evidence disclosed information previously unknown to the Plaintiffs
6  at the time of filing the initial complaint, and these details are set forth in the subsequent
7  paragraphs.

8                                    **JURISDICTION**

9       4.      This action includes claims under 42 U.S.C. § 1983, and the Fourth
10  Amendment to the United States Constitution. This Court thus has subject matter jurisdiction
11  pursuant to 28 U.S.C. §§1331 and 1343. This Court has jurisdiction over the claims for
12  declaratory relief pursuant to 28 U.S.C. §§2201-2202. The claims alleged herein occurred in
13  the City of Folsom, County of Sacramento, California. Therefore, venue in the Eastern
14  District of California is proper pursuant to 28 U.S.C. § 1391(b)(2); E.D. Local Rule 120(d).

15                              **PRE-LAWSUIT PROCEDURES**

16       5.      Plaintiffs filed a timely administrative claim with the City of Folsom, pursuant
17  to Cal. Gov't Code § 910, on December 19, 2023. The City of Folsom rejected the claim "by
18  operation of law" and provided notice of that rejection in a letter dated January 18, 2024. See
19  **Exhibit 5**.

20                                      **PARTIES**

21       6.      Plaintiff George P. Umberger II ("Plaintiff Umberger") was, at all times
22  relevant to this complaint, a resident of the City of Folsom, and Sacramento County,
23  California.

24       7.      Plaintiff Lisabeth A. King ("Plaintiff King") was, at all times relevant to this
25  complaint, a resident of the City of Folsom, and Sacramento County, California.

26       8.      Plaintiff Savannah R. Bailey ("Plaintiff Bailey") was, at all times relevant to
27  this complaint, a resident of the City of Folsom, and Sacramento County, California.

28

FIRST AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

9.    The City of Folsom ("Defendant City") is a duly organized local public entity within the meaning of California Government Code § 940.4, existing under the laws of the State of California and manages and operates the Folsom Police Department ("Folsom PD"). Defendant City was at all times relevant to this complaint, responsible for the policies, practices, and customs of Folsom PD and its employees.

10.    Detective Joseph Howard ("Defendant Howard") was, at all times relevant to this complaint, a law enforcement officer with the Folsom PD. Defendant Howard was the detective in charge at the scene and the affiant for the search warrant affidavits relevant to this claim. He is sued in his individual capacity.

11.    Commander Brian Lockhart ("Defendant Lockhart") was, at all times relevant to this complaint, the Administrative Bureau Commander for Folsom PD, as well as the Tactical Commander for the Folsom PD's SWAT team. Defendant Lockhart is responsible for the retention, screening, supervision, training, instruction, promoting, disciplining, and terminating of the Folsom PD's SWAT team. He is sued in his official and individual capacity.

12.    Sergeant Roman Kehm ("Defendant Kehm") was, at all times relevant to this complaint, a law enforcement officer with the Folsom PD. On information and belief, Defendant Kehm is in a leadership role within the SWAT team, with the authority and duty to supervise, assign, train, investigate, and discipline officers for the Folsom PD. He is sued in his official and individual capacity.

13.    Sergeant Zachary Wells ("Defendant Wells") was, at all times relevant to this complaint, a law enforcement officer with the Folsom PD. Defendant Wells is the Operations Bureau Team 5 supervisor with the authority and duty to supervise, assign, train, investigate, and discipline officers for the Folsom PD. He is sued in his official and individual capacity.

14.    Sergeant John Wagner ("Defendant Wagner") was, at all times relevant to this complaint, a law enforcement officer with the Folsom PD. On information and belief, Defendant Wagner is an official in a leadership role with the authority and duty to supervise,

FIRST AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

assign, train, investigate, and discipline officers for the Folsom PD. He is sued in his official and individual capacity.

15.     Sergeant Brandon Monsoor ("Defendant Monsoor") was, at all times relevant to this complaint, a law enforcement officer with the Folsom PD. On information and belief, Defendant Monsoor is in a leadership role with the authority and duty to supervise, assign, train, investigate, and discipline officers for the Folsom PD. He is sued in his official and individual capacity.

16.     Sergeant Paul Rice ("Defendant Rice") was, at all times relevant to this complaint, a law enforcement officer with the Folsom PD. Defendant Rice is the Operations Bureau Team 4 supervisor with the authority and duty to train, assign, investigate, and discipline officers for the Folsom PD. He is sued in his individual capacity.

17.     Corporal Derek Koupal ("Defendant Koupal") was, at all times relevant to this complaint, a law enforcement officer with the Folsom PD. Defendant Koupal is sued in his individual capacity.

18.     Officer Michael Austin ("Defendant Austin") was, at all times relevant to this complaint, a law enforcement officer with the Folsom PD. Defendant Austin is sued in his individual capacity.

19.     Officer Joshua Sena ("Defendant Sena") was, at all times relevant to this complaint, a law enforcement officer with the Folsom PD. Officer Sena is sued in his individual capacity.

20.     Officer Eathan Vavack ("Defendant Vavack") was, at all times relevant to this complaint, a law enforcement officer with the Folsom PD. Defendant Vavack is sued in his individual capacity.

21.     Officer John Moniz ("Defendant Moniz") was, at all times relevant to this complaint, a law enforcement officer with the Folsom PD. Defendant Moniz is sued in his individual capacity.

22.     Detective Patrick Thibeault ("Defendant Thibeault") was, at all times relevant to this complaint, a law enforcement officer with the Folsom PD. Defendant is sued in his

FIRST AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

individual capacity. At the time that Plaintiffs filed their initial complaint, they mistakenly believed that Defendant Thibeault's name was "Schmidt." On November 8, 2024, Plaintiffs received body cam footage from the District Attorney's office, and learned that officer Schmidt's name was actually Patrick Thibeault. Plaintiffs hereby correct this misnomer.

23.     All the individually named defendants (collectively hereinafter "Defendant Officers"), were acting within the course and scope of their employment with the Folsom PD and Defendant City.

24.     The identity of the Defendant Officers were obtained in the Folsom PD's response to the Plaintiffs public records request for the names of the law enforcement officers who participated in the search warrant execution at the residence on July 13, 2023.

25.     All Defendant Officers acted under the color of California state law.

26.     Defendant City and Defendant Officers (collectively hereinafter "Defendants") acted in concert with, and as an agent and/or employee of, each other when directly and proximately causing harm to the Plaintiffs.

## FACTUAL ALLEGATIONS

27.     On July 13, 2023, at 7:00 a.m., Plaintiff Umberger, Plaintiff King, and her daughter Plaintiff Bailey, (collectively herein as "Plaintiffs"), were asleep in the residence at 1780 Creekside Drive, Apartment 1125 in Folsom, California, ("residence") a multi-unit apartment complex where many families reside.

28.     The Folsom PD's Special Weapons and Tactics ("SWAT") team, at the request of Defendant Howard, arrived at the residence in their military-grade Armored Personnel Carrier, to execute a search warrant for Plaintiff Umberger. The alleged crime for which the search warrant was granted was Cal. Pen. Code § 632, eavesdropping, a non-violent wobbler offense.

29.     All of the acts, by the Defendant Officers, alleged in this complaint that occurred at the residence are verifiable with digital videos from the Kasa Smart Doorbell installed at the residence.

FIRST AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

30. Plaintiff King was woken by the Folsom PD's SWAT team pounding on her door. She yelled out to the officers that she was getting dressed. She dressed as quickly as she could and made her way to the door.

31. When she was just a couple of inches from the door, a battering ram was thrown into it with such force that the door crashed open and stuck her body with such force that it caused her to lose her footing.

32. The knock and announce occurred less than one minute prior. Given the early morning hour on a weekend, no reasonable officers in the defendants' position could possibly assume that King's statement that she was getting dressed was a refusal to open the door. Nor, did any exigent circumstances support the breaking down of the door within the few seconds it would have taken for the door to be opened. As discussed in greater detail below, City of Folsom police officers did not even expect to find any evidence at the residence.

33. There were eight SWAT officers at her door, Defendants Kehm, Wells, Rice, Koupal, Monsoor, Austin, Sena, And Moniz, armed with loaded automatic M4 carbine assault rifles.

34. Three SWAT officers, Defendants Kehm, Wells, and Austin had their loaded automatic M4 carbine assault rifles pointed directly at her.

35. Furthermore, it is clearly seen on Kasa Smart Doorbell video #S-05, that Defendant Wells had his finger resting on the trigger, not outside of the trigger guard.

36. Plaintiff King, being a veteran combat medic with the U.S. Army, is very familiar with the unintentional discharge statistics of the automatic M4 carbine assault rifles pointed at her. She informed the Defendant Officers that her daughter was inside, hoping they would not point their loaded automatic M4 carbine assault rifles at her daughter as well.

37. Plaintiff King was told to show her hands and she was brought to the community parking lot.

38. Plaintiff King was shocked to see over a dozen officers, a military-grade armored personnel vehicle, drones, riot shields and a K-9 unit.

- 6 -

39.    Plaintiff Umberger was directly behind her and was met with the same three loaded automatic M4 carbine assault rifles pointed at him.

40.    With his hands above his head, and walking backwards as commanded to do, Defendant Austin aggressively grabbed him by his wrists, pulled him down the breezeway where Defendant Austin then slammed his face against the wall, rammed his shoulder into his back, and his knee into his thigh, then utilizing a type of rear twist-lock control hold, he twisted his left arm outside the normal range of motion to put the handcuff on, and did the same with his right arm, then yanked on the handcuffs.

41.    Defendant Wells asked Plaintiff Umberger who was left inside, and he stated, "Savannah, Lisa's daughter."

42.    Plaintiff Umberger was then pushed forward and pulled backward by the handcuffs, while being escorted to the parking lot in front of his neighbors, wearing only underwear and a t-shirt.

43.    Plaintiff Bailey woke up to Defendant Wells yelling her name. Defendant Wells was informed that Plaintiff Bailey was the only person left inside, yet, she was not spared the potentially fatal practice, by Defendant Wells, of pointing a loaded automatic assault rifle at an innocent civilian.

44.    Plaintiff Bailey was then brought to the community parking lot, while she was wearing only a t-shirt and underwear.

45.    After the SWAT team cleared the residence, Defendant Howard and his team searched the electronic devices for evidence of eavesdropping.

46.    When Defendant Officers could not find any evidence to seize from the residence, they took Plaintiff Umberger to his place of business, Orangevale Jewelry and Loan, ("shop") located in a strip mall in Orangevale, CA, while remaining handcuffed.

47.    Meanwhile at the residence, Plaintiff King and Plaintiff Bailey were overwhelmed as they looked around their home at the broke in door, ruined carpets, rearranged furniture and belongings scattered. Within minutes, Plaintiff King was consoling

1 her traumatized daughter when she started trembling and had her first of many panic attacks

2 to come.

3       48.    Plaintiff Umberger has been the owner and operator of his shop for 24 years.

4 The Defendant Officers forced him to sit on the ground, while remaining handcuffed, in front

5 of his store with two armed officers standing over him, as ordered by Defendant Howard.

6       49.    Plaintiff Umberger was humiliated when two of his business associates from

7 the neighboring store within the same strip mall witnessed this.

8       50.    To minimize damage to his shop's reputation, Plaintiff Umberger repeatedly

9 requested to be brought away from the view of the public, but his requests were either denied

10 or ignored.

11       51.    Defendant Howard finally allowed Plaintiff Umberger to go inside the shop

12 when he needed the code to shut off the alarm on the security system.

13       52.    None of the officers were ever in fear for their health or their safety around

14 Plaintiff Umberger.

15 ***Custom and practice of unnecessary SWAT deployment***

16       53.    At the time of the SWAT raid, Defendant Officers, and each of them, were

17 aware that the residence was leased to Plaintiff King and her daughter, that no arrest warrant

18 was issued, that the crime being investigated was a non-violent wobbler offence, that none of

19 the Plaintiffs had prior felony convictions, and that no registered firearms were associated

20 with any of the Plaintiffs or the residence. Under this set of circumstances, it was manifestly

21 unreasonable to use deadly force, or any substantial force, in executing the search warrant.

22       54.    When the officers were leaving the residence, Defendant Wagner is heard, on

23 Kasa Smart Doorbell video #S-36, saying to Officer Davis, "*We figured we just got these new*

24 *drones, so let's start getting them indoctrinated*" and "*this search warrant is more about*

25 *learning to move people around, we knew there wasn't going to be a lot of evidence, if any at*

26 *all, to be collected here, these restraining orders are to start getting you warmed up*." These

27 statements suggest that the search warrant was used as an opportunity for SWAT officers to

28 familiarize themselves with new military equipment on a low risk search warrant.

55.    Defendant Officers exaggerating crimes and labeling suspects as high risk to justify deploying their militarized SWAT team, while risking the lives, not only of the Plaintiffs, but of every family in the connecting apartments, to "indoctrinate" their new military equipment is an appalling practice of the Folsom PD.

56.    Prior to the enactment of Assembly Bill 481, the Folsom PD possessed unrestricted authority to acquire military equipment, irrespective of necessity. Since the Bill took effect on January 1, 2022, the Folsom PD has had to demonstrate publicly in front of the Folsom City Council both the funding and operational necessity of its SWAT team and their military equipment.

57.    On information and belief, Plaintiffs allege that official policymakers of the City of Folsom understood that to acquire new or additional military equipment, the use of SWAT teams needed to increase so that sufficient data could be gathered to justify additional procurement, to wit:

58.    In December 2023, the Folsom PD submitted a grant application to the Department of Homeland Security seeking funding for the acquisition of an ICOR Mini Caliber Robot. Folsom PD had to meet the mandated rigorous requirements including a history of tactical operations where the robot could have enhanced safety and required compliance with the data sharing requirements prior to submitting the application. Their efforts were successful, in September 2024, the Folsom PD received their grant for $75,000 for the ICOR Mini Caliber Robot.

59.    Plaintiffs are informed and believe and thereon allege that Folsom PD, through the direct ratification of policymakers having final authority and/or through an established custom or practice, stepped up the use of SWAT in minor non-violent offenses for the purpose of field testing equipment, such as the Loki drone used in the execution of the search warrant in this case, and to develop the data needed to justify the procurement of additional military equipment.

60.    Folsom PD and its policymakers established or condoned a widespread practice of broadly using SWAT to the execute warrants of any kind, including in low level

non-violent offenses as a means to justify the procurement of additional military equipment. This practice was necessary because, as touted on the city's official website, Folsom is renowned for its low crime rate.

61.     The use of SWAT under the circumstances alleged herein, was ratified by a final policymaker for the City of Folsom PD. It states in the Folsom PD Policy Manual under Policy 404.1.6 – ACTIVATION AND DEPLOYMENT:

> Requests for service will be reviewed and approved by the Division Commander or SWAT Tactical Commander based upon a high-risk operations threat assessment. Situations which warrant the use of a tactical team may include: (a) Suspect(s) believed to possess a firearm, assault weapon, automatic weapons, body armor or explosives. (b) Target location is fortified, has surveillance devices or is protected by guard dogs. (c) Suspect(s) have violent criminal history, are wanted for armed assault on a peace officer, or have made specific threats against officers. (d) A violent confrontation is likely or imminent.

62.     Each of the defendants, including the Division Commander or SWAT Tactical Commander, knew that Plaintiffs did not meet any of the above criteria. Yet, together they made the decision to deploy SWAT nonetheless. This decision came about as a result of the City's deliberate failure to provide any training on the above Policy or widespread and entrenched practice of disregarding the same. Additionally, Folsom PD was notified and fully aware at all relevant times that Plaintiff Umberger did not possess any firearms before and/or during the execution of the search warrant, i.e., when Defendant Vavack and Officer Vo earlier served him with the DVRO, as documented in body camera footage. Plaintiff Umberger also submitted a sworn affidavit in response to the restraining order stating he did not possess any firearms, and the family court Judge found Plaintiff Umberger to be compliant, a fact that was known or should have been known to Defendants. See **Exhibit 2.**

***Defendant Howard's Misleading Statements and Omissions***

63.     For Defendant Howard's request for the use of remote operated reconnaissance technology to be granted, the search warrant affidavit needed to show that Plaintiff Umberger was a high risk to officer safety. Defendant Howard made the following false statements to deceive the magistrate and get the order granted:

- 10 -

"Due to the increased threat of violence involving firearms and other deadly weapons whenever officers enter a structure for the purpose of executing a search warrant to search for firearms, controlled substances, weapons, the fruits and instrumentalities of a violent crime, or to execute an arrest warrant on an individual wanted for a violent crime." See **Exhibit 8**.

64.     The concern set out in this statement was not applicable to this case and was inserted into the warrant application merely to color the gravity of the situation and paint Plaintiff in a false light. The search warrant was for computers and electronic storage devices that could possibly reveal a non-violent eavesdropping violation, and the officers knew that there was little or no risk of firearms on the premises.

65.     By inserting the above language into his affidavit, Defendant Howard knowingly implied that the search could produce firearms, controlled substances, or evidence of a violent crime committed by Plaintiff Umberger and is thereby grossly misleading.

66.     Defendant Howard and his supervisor, Defendant Wagner, included the aforementioned language in the search warrant with the fraudulent intention of misleading the judicial officer into authorizing the use of SWAT team drone equipment, and by extension, the deployment of SWAT officers who have the certifications to operate the military equipment.

67.     But for the knowing suppression of the above material information, the warrant permitting the use of drone technology would not have issued.

68.     Not only was there no mention of Plaintiff Umberger actually possessing firearms or controlled substances in either affidavit, but Folsom PD had been informed Plaintiff Umberger did *not* possess firearms prior to the execution of the search warrant.

69.     In crafting the warrant affidavit Defendant Howard intentionally and knowingly omitted the fact that Umberger did not possess any firearms, or any other inherently dangerous weapons or implements. Defendant Howard knew at the time he drafted his supporting affidavit that this information was material in that it would have had a direct impact on the court's decision whether or not to issue the warrant in such a manner as to allow for the deployment of drones and other military and/or paramilitary equipment and/or tactics in that in the absence of firearms or other dangerous weapons, there would be no need

- 11 -

FIRST AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

to deploy SWAT or any other militarized unit. The suppressed information described above

was material to the issuance of the warrant in that without knowing the *whole* truth, the court

was mislead into believing that Plaintiff posed a "high risk to officer safety." Which was

utterly false and Howard knew it.

70.     Defendant Vavack and Officer Vo entered Plaintiff Umberger's shop to serve

him with a restraining order related to the same allegations, and they asked Plaintiff

Umberger if he owned or possessed any firearms, specifically they asked about a firearm he

gave to his father 15 years prior. He informed the officers that he did not own or possess any

firearms. In addition, the family court judge for the restraining order found Plaintiff

Umberger to be compliant with the prohibition of firearms pursuant to California Senate Bill

320. All of this information was known to Defendants Howard and Wagner at the time

Howard drafted the sworn affidavit supporting the warrant, yet all of this information was

intentionally omitted and suppressed from the court in Howard's supporting affidavit.

71.     The device search warrant dated 07/18/2023, Defendant Howard's

justification for violating Plaintiff Umberger's privacy, i.e., by claiming he needed unlimited

access to all the data on the devices, without any limiting language, was to establish

ownership of the voice recorder.

72.     However, ownership had been established five days prior on 07/13/2023 when

Plaintiff King informed Defendant Howard that she was the owner of the recording device,

and that she had let Plaintiff Umberger use it when his GoPro was not working. The

substance of this conversation can be confirmed with Kasa Smart Doorbell video S-33.

Plaintiff King also informed Defendant Howard that she had texts showing Plaintiff

Umberger had consent from his ex-wife to record their interaction. See **Exhibit 4**. All of this

information was known to Defendant Howard at the time he drafted the sworn affidavit

supporting his warrant. Nonetheless, all of this information was intentionally omitted and

suppressed from the supporting affidavit and thereby from the court.

73.     On information and belief, prior to crafting, signing, and filing his warrant

application including his fraudulent supporting affidavit, Defendant Howard consulted with

FIRST AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

1  Defendant Wagner about the above information and details. After having been fully apprised

2  of all relevant facts, including but not limited to the existence of the above described

3  suppressed information, Defendant Wagner approved of Defendant Howard's plan to file his

4  incomplete, false, and misleading affidavit and, in fact, directed him to do so.

5  ***Excessive force-pointing firearms and trigger discipline***

6        74.     Kasa Smart Doorbell video #S-05, clearly shows Defendant Wells resting his

7  finger on the trigger of the automatic M4 carbine rifle while pointing it at the Plaintiffs. See

8  **Exhibit 3**. Nobody is immune to involuntary contractions, as they are physiological

9  responses, such as the startle response. The majority of fatal unintentional discharge

10  incidences are due to the startle response.

11        75.     California Department of Justice, and Commission on Peace Officer Standards

12  and Training has fundamental rules of firearm safety. Rule two states, 'a firearm should only

13  be pointed at a target if the officer is willing and prepared to shoot.' Rule three states,

14  'always keep your fingers off the trigger until ready to fire the firearm. The officer's finger

15  should rest on the outside of the trigger guard or along the frame of the firearm until ready to

16  fire.'

17  ***Excessive Force - Handcuffs***

18        76.     Plaintiff Umberger was not under arrest, yet he was violently handcuffed by

19  Defendant Austin and detained for over two hours while officers rummaged through his

20  home and business. Defendant Officers, DOES 1 – 10, and each of them refused and

21  refrained from removing the handcuffs for Plaintiff Umberger to allow him to put clothing on

22  or when he needed to use the restroom. There was no justification for the prolonged detention

23  in handcuffs as Umberger was unarmed, cooperating and complying with officers' directions

24  completely, posed no danger to himself or others, and importantly posed no danger to officer

25  safety whatsoever.

26        77.     Additionally, Defendant Wagner stated that "everyone was cooperative,"

27  when he was standing outside of the residence after the search warrant was executed at the

28  residence, as heard on the Kasa Smart Doorbell video #S-36. See **Exhibit 1**.

FIRST AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

78.     At that point, with everyone cooperating, it was patently unreasonable to keep Plaintiff Umberger in handcuffs for another hour, which is exactly what happened.

79.     Plaintiff Umberger was handcuffed both at his residence and at his pawn shop. Defendants Wagner, Thibeault, and DOES 1—10, were on scene at both locations and collaborated in the excessive handcuffing or did not intercede, despite seeing Umberger handcuffed for an extensive period of time.

80.     It was only when Defendant Howard left the scene that an officer removed the handcuffs and offered Plaintiff Umberger a ride home..

81.     When Officer Thibeault heard him calling for a ride on Officer Davis's cell phone, he also offered Umberger a ride home.

82.     The only reasonable explanation to keep Plaintiff Umberger in handcuffs for such an unreasonable extended period of time would be out of fear for the safety of the officers, however two of the officers were willing to drive him 20 minutes back to his residence after the handcuffs had been removed. Plaintiff is informed and believes that Defendants Austin, Thibeault, Wagner, and the other officers handcuffed Plaintiff for over two hours in order to punish, humiliate, and inflict emotional and physical distress to Umberger.

83.     Plaintiff Umberger does not have a history of violence, nor does he have prior felonies. There was no lawful or legitimate basis to keep him in handcuffs for any period of time at all, much less the two or more hours that day.

***Folsom PD's History and Pattern of Police Misconduct and Lack of Discipline and Training***

84.     The indifference the leadership of the Folsom PD has toward the citizens of Folsom is made apparent when they hire officers with a history of police misconduct, such as Owen Anstess. Commander Andrew Bates acknowledged publicly that Folsom PD was aware their new officer had sustained allegations of police misconduct for unreasonable search and seizure and excessive force but hired him anyway.

FIRST AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

1  https://ca.sports.yahoo.com/news/sacramento-police-department-finds-former-
2  120000294.html.

3      85.    Furthermore, Folsom PD retains officers with a history of using deadly force
4  such as Defendant Wagner. As well as retaining officers with a history of using excessive
5  force such as Defendants Austin and  Rice.

6      86.    The Folsom PD has a long history of abusing their power, including but not
7  limited to, police misconduct, excessive force, deadly force, perjury, and reckless driving.
8  The victims of these officers did not take solace in knowing their suffering prevented the
9  future suffering of others because none of the officers were disciplined for their actions. See,
10  *Suit v. City of Folsom*, CIV. NO. 2:16-00807 WBS AC (E.D. Cal. Nov. 14, 2016), and *Yao v.*
11  *City of Folsom,* No. 2:16-cv-02609-MCE-AC (E.D. Cal. Apr. 18, 2017).

12     87.    The Plaintiffs filed a complaint with Folsom PD on December 19, 2023, with
13  the same events that form this complaint. The response dated January 23, 2023, signed by
14  Defendant Kehm, stated all allegations were investigated and determined to be unfounded.
15  Folsom PD assigning officers to investigate complaints, who directly participated in the
16  incident that forms the complaint, is an ineffective and corrupt practice. See **Exhibit 7**.

17  ***Unreasonable Search and seizure – Excessive Force***

18     88.    It states in the Folsom PD policy manual, in §321.2 that members will conduct
19  searches in strict observance of the constitutional rights of persons being searched, and with
20  dignity and courtesy. There was no dignity or courtesy extended to the Plaintiffs as they were
21  forced to leave their home at gun point, to be displayed in a community parking lot, in their
22  under garments.

23     89.    All the while, Defendant Koupal was nonchalantly singing a song outside the
24  residence, moments after traumatizing the Plaintiffs, as seen and heard on Kasa Smart
25  Doorbell video S-11.

26     90.    Moreover, the fact that all of the individuals named as Defendants in this case
27  either directly participated in the above alleged excessive force events, or otherwise failed to

28

FIRST AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

1    intervene and/or intercede is evincive of the fact that the aforementioned conduct comports

2    with the regularly established customs and practices of the police department.

3

4                                          **INJURY**

5         91.    Plaintiff Bailey suffers from a corticosteroid resistant form of systemic

6    eczema that has only been manageable with an immunosuppressive biological medication

7    (Dupixent) that she injects twice a month since 2017. She was among the first few children to

8    be approved for the experimental biological injection at that time. One day after she had a

9    SWAT team at the front door of her home, she woke up with a stress induced systemic

10   inflammation, while on the biological, resulting in her being in severe pain seeking medical

11   attention, she then had to endure a very uncomfortable week of steroids, despite the fact of it

12   being contraindicated while on the biological.

13        92.    Plaintiff Bailey had been making progress with her psychologist to overcome

14   depression, until her symptoms resurfaced from the trauma experienced the morning the

15   Folsom Police Department made her home feel unsafe. She has now been diagnosed with

16   PTSD and has started having panic attacks. She has been stuck in a major depressive episode,

17   without significant moments of remission. She had to drop her classes at American River

18   College to focus on her mental health. Plaintiff Bailey now has a fear of law enforcement.

19   This is very unsettling to Plaintiff King as she fears if her daughter is ever in a dangerous

20   situation, she will not call for help.

21        93.    The stress that the Defendants have caused Plaintiff King has her in constant

22   fear, and doesn't allow anybody to know where she lives. Plaintiff King has been on

23   disability since 2014 for major depressive disorder and sees a new therapist directly due to

24   the events that form this complaint, that has diagnosed her with PTSD. Her failure to create a

25   safe home for her already suffering daughter has caused her depression to become severe,

26   and her new symptoms from PTSD has her suffering with anxiety, emotional distress, and

27   fear.

28

FIRST AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

94.     On July 15, 2023, two days after the SWAT team traumatized Plaintiff King, her property manager informed her that they were not renewing her lease. This forced the Plaintiffs to take on the unexpected and costly expense of moving.

95.     Plaintiff King asked Defendant Howard if Folsom PD was going to pay for the damage that they caused to the door and the carpets. Defendant Howard stated that Defendant City would take care of it. When Plaintiff King received a bill for the damage to the residence for $3,119.02, she filed a claim with the Folsom City Clerk's office, which was denied.

96.     The Folsom PD seized all the computers at Plaintiff Umberger's shop, resulting in him losing approximately three months of income. This has put him, and his shop, in extreme financial distress, as his shop was just starting to recover from the pandemic closures. He emailed and called Defendant Howard several times to remind him that he could not open for business until the computers were returned, yet he would not return the computers for over two months. The CAD report states that no evidence of a crime was found within any of Plaintiff Umberger's devices.

97.     This also forced Plaintiff Umberger to purchase a new laptop to prepare his family court case and other daily tasks. The seized computers and their backup drives were not replaceable, as they contained the software and information required to process loans, sales and monitor inventory.

98.     As a direct result of the event in this complaint, Plaintiff Umberger has suffered, and continues to suffer from serious emotional distress, pain, trauma, worry, anxiety, humiliation, and embarrassment, as well as having difficulties concentrating and sleeping. Plaintiff Umberger has become hyper vigilant, every time he sees a police officer, he is overcome with fear and the physical unease that accompanies anxiety. This anxiety and pain has prevented Plaintiff Umberger from opening his shop on several occasions. Shortly after the Defendants violated his constitutional rights, he moved out of Folsom, where he has lived his entire life. He has started seeing a professional to help him cope with this.

FIRST AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

99.    Worse yet, as a direct result of Defendant Howard unnecessarily involving Plaintiff Umberger's minor son in the investigation, Plaintiff Umberger and his minor son have suffered a complete loss of their parent-child relationship. Plaintiff Umberger has not heard anything from his son since 06/03/2023. Their relationship was already strained due to Plaintiff Umberger's ex-wife suffering with symptoms of an adjustment disorder. Plaintiff Umberger was treading carefully to minimize the documented long-term effects of her abuse, following the recommendations of U.S. Senate bill 78 (Kaden's Law). In the CAD report Detective Howard stated that he listened to the audio recordings of Plaintiff Umberger's ex-wife, had he the knowledge or training, he would have been able to recognize that his sons are suffering severe emotional and psychological abuse, which is complex and fragile. Involving Plaintiff Umberger's minor son in his misinformed investigation has caused the loss of a familial relationship for Plaintiff Umberger. This loss has Plaintiff Umberger grieving and suffering with the inability to find any enjoyment for life.

## CLAIMS FOR RELIEF

### FIRST CLAIM

### Violation of the Fourth Amendment

### (42 U.S.C. § 1983)

### Unreasonable Search and Seizure

### (All Plaintiffs Against Defendant City and Defendants Howard and Wagner, and DOES 1--10, and each of them)

100.    Plaintiffs' First Claim for Relief is dismissed pursuant to the Court's Order, filed November 13, 2025 (Document 28).

### SECOND CLAIM

### Violation of the Fourth Amendment of the U. S. Constitution

### (42 U.S.C. § 1983)

### Unreasonable Search and Seizure – Excessive force

FIRST AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

**(All Plaintiffs against Defendant City and Defendants Lockhart, Howard, and Koupal, and DOES 1-10, and each of them)**

101.    Plaintiffs re-allege and incorporate by reference all the preceding paragraphs as though fully set forth in this claim.

102.    Defendants violated the rights of the Plaintiffs to be free from unreasonable search and seizure secured to them by the Fourth Amendment to the United States Constitution.

103.    Defendant Koupal, and DOES 1—10, and each of them, were acting under the color of law when he unnecessarily used a battering ram to break in the door of the residence.

104.    Defendant Koupal, and DOES 1—10, and each of them, were obeying a direct order from his trainer and supervisor, Defendant Lockhart, and DOES 1—10, and each of them, and in accordance with Folsom PD training, policies, practices, and customs when carrying out these acts.

105.    Defendants' actions are a direct and proximate result of Defendant Howards misleading search warrant affidavit.

106.    Defendants, and each of them, acted with complete indifference to the physical harm that their actions could have caused the Plaintiffs.

107.    Defendants, and each of them, caused damage to the residence, and caused the Plaintiffs to suffer anxiety, trauma, emotional distress, humiliation, and economic harm.

108.    Defendants are not entitled to qualified immunity for their conduct, because their use of force against the Plaintiffs violated their clearly established constitutional rights and was objectively unreasonable.

109.    Plaintiffs are entitled to compensatory, equitable, and/or exemplary damages against Defendants under 42 U.S.C. § 1983 because Defendants' actions were malicious, willful, or with reckless disregard of the Plaintiffs' constitutional rights.

/ / /

/ / /

/ / /

FIRST AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**THIRD CLAIM**

**Violation of the Fourth Amendment**

**(42 U.S.C. § 1983)**

**Unreasonable Seizure of Persons – Excessive Force and Detention**

**(All Plaintiffs Against Defendant City, and Defendants Lockhart, Kehm, Wells, Austin,**

**and Howard, and DOES 1—10, and each of them)**

110.    Plaintiffs re-allege and incorporate by reference all the preceding paragraphs as though fully set forth in this claim.

111.    Plaintiffs were deprived of their right to be secure in their persons against unreasonable search and seizure guaranteed to them under the Fourth Amendment of the United States Constitution.

112.    Defendants Kehm, Wells, and Austin, and DOES 1—10, and each of them, were acting under the color of law when they unreasonably used excessive force to detain the Plaintiffs at gun point.

113.    Defendant Kehm, Wells, and Austin, and DOES 1—10, and each of them, knew or should have known, that pointing loaded automatic M4 carbine assault rifles at civilians is a potentially deadly practice.

114.    The Tenth Circuit held in, Holland v. Harrington, 1:11-cv-00185-GBC (PC) (E.D. Cal. Aug. 22, 2011), that aiming a firearm directly at a person inescapably involves the immediate threat of deadly force.

115.    Defendant Wells had his finger on the trigger of the loaded automatic M4 carbine assault rifle, that he pointed at each of the Plaintiffs, indicating that he was willing to use deadly force.

FIRST AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

116.    It reasonably appeared to the Plaintiffs that Defendants were about to commit homicide and that Plaintiffs were about to die.

117.    The Fourth Amendment's reasonableness standard requires balancing the nature and quality of the intrusion on the individual's Fourth Amendment privacy interest, against the governmental interest. The factors to be considered, that are articulated in *Graham vs. Connor*, are: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect actively resisted arrest or attempted to escape.

118.    To take into consideration the totality of the circumstances by weighing those factors in this case, (1) the severity of the crime is a non-violent wobbler offense, (2) the Plaintiffs were not armed, the only danger to others were the Defendants, (3) Plaintiffs did not resist or attempt to flee, they were completely compliant, and (4) Plaintiffs King and Bailey were innocent bystanders and residents of the home. It is reasonable to conclude the violation of the Plaintiffs constitutional rights were not justified.

119.    The supervisors chosen by Defendant City, trained their SWAT team without different levels of risk for deployment. Being willing to use deadly force on Plaintiffs, even if Plaintiff Umberger was guilty of eavesdropping, cannot be justified. Furthermore, Plaintiff King, Plaintiff Bailey, and the families in the connecting apartments weren't even suspects, yet all of them were at a high risk of being a casualty

120.    Defendant Kehm, Wells, and Austin, and DOES 1—10, and each of them, were obeying direct orders from their supervisor, Defendant Lockhart, and in accordance with Folsom PD training, policies, practices, and customs when carrying out these acts.

121.    The potential death to the Plaintiffs was deemed reasonable or necessary, as a direct result of Defendant Howards misleading affidavit.

122.    At no time prior to this act of violence did any of the Defendants speak to any of the Plaintiffs or otherwise inform them that they were prepared to use deadly force.

123.    The Defendants did not provide the Plaintiffs with an opportunity to submit to a nonviolent detention.

FIRST AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

124.    Any reasonable person would be offended or harmed by the actions of the Defendants towards the Plaintiffs.

125.    Defendants caused the Plaintiffs to suffer pain, anxiety, trauma, emotional distress, humiliation, and economic harm.

126.    Defendants are not entitled to qualified immunity for their conduct, because their use of force against the Plaintiffs violated their clearly established constitutional rights and was objectively unreasonable.

127.    Plaintiffs are entitled to compensatory, equitable, and/or exemplary damages against Defendants under 42 U.S.C. § 1983 because Defendants' actions were malicious, willful, or with reckless disregard of the Plaintiffs' constitutional rights.

**FOURTH CLAIM**

**Violation of the Fourth Amendment (42 U.S.C. § 1983)**

**Excessive Force Battery**

**(Plaintiff Umberger Against Defendant City, and Defendants Thibeault, Austin, and Howard, and DOES 1—10, and each of them)**

128.    Plaintiff Umberger re-alleges and incorporates by reference all the preceding paragraphs as though fully set forth in this claim.

129.    Plaintiff Umberger was deprived of his right to be secure in his person against unreasonable search and seizure as guaranteed under the Fourth Amendment to the United States Constitution.

130.    Defendant Austin's, and that of DOES 1—10, and each of them, use of excessive force was unreasonable as Plaintiff Umberger was being compliant.

131.    Plaintiff Umberger was barefoot and in his underwear when Defendant Austin pulled Plaintiff Umberger down the breezeway, slammed his face against the wall, rammed his shoulder into his back, and violently handcuffed him.

132.    Plaintiff Umberger was not under arrest, not trying to escape, nor was he verbally threatening, and he clearly was not armed.

133. Defendant Austin, and DOES 1—10, and each of them, violently touching Plaintiff Umberger is a direct and proximate result of Defendant Howard's misleading affidavit.

134. Any reasonable person would have known that another reasonable person being grabbed, pushed, pulled, and slammed into a wall by Defendant Austin would be harmed or offended.

135. When Defendant Austin, and DOES 1—10, and each of them, battered Plaintiff Umberger, a middle-aged man, in such a degrading manner, without provocation, he was acting under color of law and within the customs and practices of the Folsom PD.

136. Defendants are not entitled to qualified immunity for their conduct, because their use of force against Plaintiff Umberger violated his clearly established constitutional rights and was objectively unreasonable.

137. Plaintiff Umberger has suffered pain, anxiety, trauma, humiliation, emotional distress, and economic harm as a direct result of Defendant Austin's actions.

138. Plaintiffs are entitled to compensatory, equitable, and/or exemplary damages against Defendants under 42 U.S.C. § 1983 because Defendants' actions were malicious, willful, or with reckless disregard of the Plaintiffs' constitutional rights.

**FIFTH CLAIM**

**Violation of the Fourth Amendment (42 U.S.C. § 1983)**

**Unreasonable Seizure of Person – Excessive Handcuffing**

**(Plaintiff Umberger Against Defendant City, and Defendants Thibeault, Austin, and Howard, and DOES 1—10, and each of them)**

139. Plaintiff Umberger re-alleges and incorporates by reference all the preceding paragraphs as though fully set forth in this claim.

140. Plaintiff Umberger was deprived of his right to be secure in his person against unreasonable seizure as guaranteed to him under the Fourth Amendment to the United States Constitution when he was detained in handcuffs for over two hours.

141. Defendants treated Plaintiff Umberger with complete indifference, they did not extend to him basic human decency or respect when they humiliated him in front of his neighbors and his business associates.

142. Defendants forced him to sit on the ground in front of the store that he has owned for 24 years, handcuffed with two armed officers standing over him.

143. Defendants knew, or should have known, that unless arrested, the use of restraints on detainees should continue only for as long as is reasonably necessary to ensure the safety of officers and others.

144. Plaintiff Umberger was kept in handcuffs for two hours when he was being investigated for a non-violent offence, he was not under arrest, and he has no prior felonies. At no time did Plaintiff Umberger resist, make any threats, nor did he make any attempt to flee.

145. Plaintiff Umberger's deprivation of his right to be free from unreasonable seizure under the Fourth Amendment of the Constitution, was a direct and proximate result of Defendant Howards misleading search warrant affidavit.

146. Defendants caused the Plaintiffs to suffer economically by intentionally damaging his corporation's reputation. Plaintiff also suffered, and continues to suffer pain, anxiety, trauma, emotional distress, humiliation, and economic harm.

147. Plaintiffs are entitled to compensatory, equitable, and/or exemplary damages against Defendants under 42 U.S.C. § 1983 because Defendants' actions were malicious, willful, or with reckless disregard of the Plaintiffs' constitutional rights.

### SIXTH CLAIM

### Violation of the Fourth Amendment (42 U.S.C. §1983)

### Failure to Intervene

### (Plaintiff Umberger against Defendants Monsoor, Vavack, Rice, Moniz, and DOES 1— 10, and each of them)

148. Plaintiff Umberger re-alleges and incorporates by reference all the preceding paragraphs as though fully set forth in this claim.

- 24 -

149.    Defendants, acting under color of state law, knew or should have known that they and others were violating Plaintiff Umberger's constitutional rights.

150.    Defendants each had a reasonable opportunity to intervene and prevent these violations but, acting with deliberate indifference, declined to do so.

151.    Defendants' failure to intervene violated Plaintiff Umberger's clearly established constitutional rights.

152.    Through their failure to intervene, Defendants directly and proximately caused Plaintiff Umberger harm.

153.    Defendants had a duty to intervene when Defendant Austin, and DOES 1—10, and each of them, were violating Plaintiff Umberger's constitutional rights by subjecting him to unnecessary excessive force.

154.    Defendants' conduct was motivated by evil motive or intent, involved reckless or callous indifference to Plaintiff Umberger's Fourth Amendment rights secured by the United States Constitution, or was wantonly or oppressively done.

155.    As a direct and proximate result of the Defendants' actions, Plaintiff Umberger suffered pain, anxiety, trauma, humiliation, and emotional distress.

156.    Plaintiff Umberger is entitled to compensatory, equitable, and/or exemplary damages against Defendants under 42 U.S.C. § 1983 because Defendants' actions were malicious, willful, or with reckless disregard of the Plaintiffs' constitutional rights.

**SEVENTH CLAIM**

**Violation of the Fourth Amendment (42 U.S.C. §1983)**

**Failure To Supervise, Train, and/or Discipline - Municipal Liability – (*Monell*)**

**(All Plaintiffs against Defendant City)**

157.    Plaintiffs re-allege and incorporate by reference all the preceding paragraphs as though fully set forth in this claim.

158.    Defendant City violated the Plaintiffs' Constitutional rights secured to them under the Fourth Amendment by failing to supervise, train and/or discipline its officers.

FIRST AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

159.     It is an abuse of power for the supervisors, who prioritize the acquisition of new military equipment, to train their new detectives to be dishonest on search warrant affidavits, to "indoctrinate" their new drones. These exaggerations violated the Plaintiffs' privacy and directly led to the Defendant Officers, DOES 1—10, and each of them, excessive use of force, with complete indifference.

160.     The Folsom City Council meeting held on 07/29/2024, in receipt of the annual report for the use of certain 'military' type equipment by the Folsom PD, was to determine if the Folsom PD had complied with the Standards of Approval set forth in Assembly Bill 481, (Ordinance No. 1326). The Folsom PD acknowledged receiving one community complaint [related to the use of drones and the display of SWAT Rifles during a search warrant, but stated the complaint was investigated and determined to be "unfounded"]. See **Exhibit 6**.

161.     Defendants were not disciplined, reprimanded, retrained, suspended, or otherwise penalized following the service of the Complaint the Plaintiffs filed with the Folsom PD. Defendant Kehm stated in the response, dated December 16, 2023, that all of the allegations were investigated and were determined to be unfounded. Indeed, on information and belief, the City refrained from even investigating the complaint.

162.     The Folsom PD has a long history of retaining and promoting officers that abuse their power, including but not limited to, police misconduct, excessive force, deadly force, perjury, illegal search and seizure, and reckless driving as revealed in cases such as:

    a.   *People v. Kim*, No. 94F01848 (Cal. Super. Ct. Sacramento Cnty. Filed Mar. 4, 1994). Officer Perry Albers shot 19-year-old Ty Kim in the back, claiming he was involved in a local Asian gang. Officer Perry Albers was then promoted to Detective, and he retired as a Commander.

    b.   *Han v. City of Folsom*, 51 Fed. Appx. 923 (9th Cir. 2014), Officer Paul Barber shot and killed 23-year-old Joseph Han, during a psychiatric well-check, he was not disciplined and remained employed by the Folsom PD for another ten years before voluntarily leaving.

FIRST AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

c. *Suit v. City of Folsom*, CIV. NO. 2:16-00807 WBS AC (E.D. Cal. Nov. 14, 2016), Officer Jon Kracher caused Heather Suit to become permanently disabled while driving recklessly, in pursuit of a man wanted for a misdemeanor, he retired that same year.

d. *Yao v. City of Folsom*, No. 2:16-cv-02609-MCE-AC (E.D. Cal. Apr. 18, 2017), Defendant Rice used excessive force when he dragged Jing Jing Yao out of her car and pinned her to the ground when she questioned signing a fix it ticket, despite knowing English is her second language. Officer Rice was not disciplined and was promoted to sergeant.

e. *O'Neel v. City of Folsom* No. 2:21-cv-02403-WBS-DB (E.D. Cal. 2021), Defendant Austin and Officer Melanie Catanio unlawfully removed four children from the care, custody, and control of their parents without a warrant or an exception to the warrant requirement. Defendant Austin was then awarded trainer of the year. Defendant City settled this lawsuit with monetary compensation to the victims.

f. *Daniels v. City of Folsom*, No. 2:10-cv-00323 (E.D. Cal. 2010), Officer Andrea Chapman used her taser on Michael Daniels without a stated reason, resulting in multiple surgeries leaving him permanently disabled. Defendant Rice was a defendant in this case as well, for negligence.

g. *Trifu v. Police Dep't* No. 2:23-cv-01993-TLN-DB (E.D. Cal. 2023), Officer Brian Airoso used excessive force when he battered Doru Trifu during a traffic stop. The victims of these officers did not take solace in knowing their suffering prevented the future suffering of others because none of the officers were disciplined for their actions.

163.    Defendants, under color of law, intentionally, negligently, and with complete indifference, caused Plaintiffs to be deprived of their constitutional rights by failing to properly supervise, screen, hire, appoint, promote, train, and discipline the conduct of Defendants in the following ways:

a.      Failing to train the officers properly and adequately in the Folsom PD regarding firearm safety.

b.      Failing to issue clear, consistent, reasonable policies, to avoid excessive force while executing search warrants, and a separate policy for suspected non-violent offence violation investigations.

c.      Failing to issue clear, consistent, and reasonable policies concerning the use of militarized equipment and the risks associated with their use, as required by AB-481, particularly when executing search warrants for non-violent offenses, e.g. eavesdropping.

d.      Failure to educate and train officers on the different levels of force to be exercised when executing a search warrant for a non-violent offense where none of the occupants of the home are known to have firearms or other deadly weapons.

e.      Failure to discipline Defendants when a complaint is received about unsafe and potentially deadly practices.

f.      Failing to properly train the officers regarding the dangers of unnecessarily deploying the SWAT team for routine policing.

g.      Failure to adequately educate and train the officers on trigger discipline.

h.      Failure to train and educate officers on the risks involved with a lighter trigger pull weight on automatic assault rifles.

i.      Failure to train and educate officers on the increased risk of unintentional discharge with automatic assault rifles.

164.      Defendant Officers know that their actions will not be properly monitored and that their misconduct will be tolerated and not be thoroughly investigated or sanctioned.

165.      Plaintiffs have suffered pain, anxiety, trauma, humiliation emotional distress, and economic harm as a direct and proximate result of Defendants actions.

FIRST AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

166.    Plaintiffs are entitled to compensatory, equitable, and/or exemplary damages against Defendants under 42 U.S.C. § 1983 because Defendants' actions were malicious, willful, or with reckless disregard of the Plaintiffs' constitutional rights.

/ / /

### EIGHTH CLAIM

**Violation of the Fourth Amendment (42 U.S.C. § 1983)**

**Unconstitutional Custom or Practice Municipal Liability – (*Monell*)**

**(All Plaintiffs against Defendant City)**

167.    Plaintiffs re-allege and incorporate by reference all the preceding paragraphs as though fully set forth in this claim.

168.    Defendant City violated the Plaintiffs Constitutional rights secured to them under the Fourth Amendment by having in place policies, procedures, customs, and practices which were directed, encouraged, allowed, and/or ratified by policy making officers for the unconstitutional actions and/or omissions of the Defendants.

169.    Given the nature of the work performed by City of Folsom SWAT, the need to establish proper policies, to properly train SWAT members, and to discipline errant officers who engage in the acts alleged herein was at all times relevant known and obvious to Defendant City and its policymakers. The failure to do so is intentional.

170.    In *Flores v. Cnty. Of Los Angeles*, 758 F.3d 1154, 1158 (9th Cir. 2014), the Ninth Circuit explained that a County cannot be held responsible for one Deputies isolated sexual assault incident, as it is unreasonable to file a *Monell* claim for failing to have a policy for conduct that is already universally understood to be unlawful, quoting, *United States v. Budd*, 144 U.S. 154, 163, 12 S.Ct. 575, 36 L.Ed. 384 (1892), "There is, however, every reason to assume that police academy applicants are familiar with the criminal prohibition on sexual assault, as everyone is presumed to know the law."

171.    There is no universal assumption that police officers will be qualified to participate in a SWAT team operation upon completing their police academy training. In California, each police department is responsible for the training of their specialized tactical

team. SWAT teams are highly organized structures, molded to work as a single, synchronized unit, requiring intense training to work together to carry out a detail with precision under dangerous life-threatening conditions. This leaves no room for a rogue officer that cannot follow instructions. If a SWAT team plainly engages in concerted unlawful practices it is indicative of an unlawful practice or custom. If the supervisors chosen by the department are advocating for training that goes against clearly established California law, then there is a systemic break-down that needs to be corrected.

172.    Defendant City, its policymakers, and its supervisors within the Folsom PD know or should know of Cal. Gov. Code § 7286(b)(2)(b), which states that each law enforcement agency must maintain a policy that provides a minimum standard on the use of force, to include the requirement that an officer may only use a level of force that they reasonably believe is proportional to the seriousness of the suspected offense or the reasonably perceived level of actual or threatened resistance. This cohesive unlawful actions of the defendants, as alleged herein above, demonstrates a total disregard of the Section 7286 mandate and is evidence that Defendant City is not training its SWAT team as required by law.

173.    Defendant City, its policymakers, and its supervisors within the Folsom PD are also aware per California Penal Code § 13514.1(b), which requires that law enforcement agencies that conduct SWAT operations must include the recommendations contained in the "Attorney General's Commission on Special Weapons and Tactics (S.W.A.T.) Final Report of 2002" when developing their training and guidelines for their teams. The Report includes a SWAT deployment criteria, a threat assessment criteria, a risk/benefit criteria prior to executing a search warrant, and directs that firearm training should incorporate established written safety protocols. These guidelines were not followed by the Folsom PD. Based on the decision to deploy the SWAT team to carry out a search warrant for a wobbler offense of eavesdropping, it is apparent that Defendant City does not have a threat or risk criteria as part of its decision-making chain, or, alternatively, does not properly train its SWAT teams regarding execution of warrants for low level, non-violent offenses.

FIRST AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

174.    Defendant City, its policymakers, and the supervisors within the Folsom PD also know or should know of the fundamental rules of firearm safety established with Department of Justice, and Commission on Peace Officer Standards and Training that state that a firearm should only be pointed at a target if the officer is willing and prepared to shoot. Based on the number of violations, alleged herein, it is apparent that Defendant City inadequately trains its SWAT members regarding basic firearm safety.

175.    Defendants violated the Plaintiffs Constitutional rights secured to them under the Fourth Amendment by permitting and encouraging their officers to unreasonably use excessive force against unarmed citizens and instill fear of grave physical injury or death into them in connection with executing search warrants.

176.    The supervisors chosen by Defendant City failed to train SWAT team regarding differentiating levels of risk for deployment, and not in accordance with established law. The willingness to use deadly force in executing a warrant for evidence of potential eavesdropping was unreasonable. The fact that the SWAT team was willing to use the threat of deadly violence on Plaintiff King and Plaintiff Bailey, who were not even suspects, was also unreasonable. Defendant City's approval and ratification of the Folsom PDs decision to deploy a SWAT team prepared to use deadly force, on the Plaintiffs for an investigation into an alleged non-violent offense, and determination that Plaintiffs' complaint was "unfounded," reveals Defendant City's deliberate indifference to safety, security, and the rights of Plaintiffs. See **Exhibit 7**.

177.    The Defendant's culture of indifference and malicious intent is made obvious by the Defendants referring to the traumatic SWAT deployment on the Plaintiffs residence as "Loki [drone] practice," as seen and heard on Kasa Smart Doorbell, video S-35. See **Exhibit 1**.

178.    The Defendant policymakers and supervisors approved and maintained the following unconstitutional customs, practices, and policies:

   a. The potentially fatal practice of exploiting their citizens for a live SWAT rehearsal by using SWAT to execute search warrants for alleged non-violent offenses, e.g. eavesdropping.

   b. Encouraging the exploitation of such citizens to indoctrinate and acquire new military equipment.

   c. Unnecessarily deploying the SWAT team against applicable law, recommendations and guidelines set by the Attorney General and the Commission (POST), to ensure the safety and rights of the citizens

   d. Assigning new detectives to investigations without guidance or supervision.

   e. Teaching new detectives unacceptable and dishonest practices when writing affidavits to increase the chance of obtaining a search warrant.

   f. Allowing detectives to go to the extreme measure of obtaining a search warrant and deploying the SWAT team, before thoroughly investigating suspected crimes.

   g. Allowing officers to exaggerate on the threat assessment for deploying the SWAT team.

  179. Policies, training, and/or customs that need updating or completely absent from the Folsom Police Department policy manual:

   a. A policy to not aim firearms at innocent civilians who are compliant.

   b. A policy for mandatory education on the statistics and risks associated with the unintentional discharge of automatic assault rifles.

   c. A policy for a structured guide to help new detectives be more thorough and successful in their investigations.

   d. A policy that distinguishes that the officer investigating service complaints must not have had direct involvement in the incident the complaint is in reference to.

   e. A written and particularized risk and threat assessment in compliance with California Penal Code § 13514.1(b).

FIRST AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

180.    The fact that all of the officer defendants, including supervisors, participated in the above alleged events is evidence that the alleged comported with the regularly established customs and practices of Folsom PD – which customs and practices were the moving force that caused the violation of Plaintiffs' rights.

181.    Plaintiffs have suffered and continue to suffer pain, anxiety, trauma, humiliation, emotional distress, and economic harm as a direct and proximate result of Defendants actions.

182.    Plaintiffs are entitled to compensatory, equitable, and/or exemplary damages against Defendants under 42 U.S.C. § 1983 because Defendants' actions were malicious, willful, or with reckless disregard of the Plaintiffs' constitutional rights.

## **PRAYER FOR RELIEF**

The Plaintiffs Pray for the following relief from Defendant City and Defendant Officers for each of the above causes of action;

1.    Declare that Defendants violated Plaintiffs' constitutional rights;

2.    For compensatory, equitable, and/or exemplary damages against Defendants under 42 U.S.C. § 1983, and any other applicable laws or statutes, in an amount sufficient for losses suffered by the Plaintiffs and to deter future misconduct;

3.    For special damages, including but not limited to, loss of use and enjoyment of real property, and loss of familial relationship;

4.    For injunctive relief prohibiting Defendants' prospective actions, inactions, and/or policies or customs complained of herein in violation of the U.S. Constitution;

5.    For statutory damages according to proof;

6.    Attorney's fees and costs; and

7.    For such further relief as the court deems just and proper.

/ / /

/ / /

/ / /

- 33 -

FIRST AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

1

## JURY DEMAND

2

    Plaintiffs hereby demand a trial by jury in this action.

3

Dated: 12/4/2025              **LAW OFFICE OF SAMUEL H. PARK, APC**

4

5

               By:    _/s/ Samuel H. Park_____

6

                       Samuel H. Park,
                       Attorney for Plaintiffs,

7

                       George P. Umberger, II; Lisabeth A. King;
                       Savannah R. Bailey

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

**EXHIBIT 1**

notta

## S_35_1689258935_1689258995 (1)

⏰ 1mins

## Transcript

**Wagner** 00:01

Alright Buddy, You guys can go enjoy, your SWAT worked out, or Loki practice, whatever you prefer. Yeah, you're canceled, we're actually done here at this location it looks like.

**Wagner 1** 00:12

They were pretty cooperative. We got to log in there, computers. Looked at what we were looking for, and so we're all gonna clear here and head over there. And we should be good. All right, thank you, sir. I appreciate have a good SWAT. Yep, thanks.

**Wagner** 00:27

Yeah, this one was

**Davis** 00:27

Different

**Wagner** 00:38

Well, no, no, I mean, they're all different. So we figured we just have new drones, just start getting them indoctrinated.  These search warrants are about having, as far as you, clearing and moving people around and we knew there was not going to be a lot of evidence, if any at all to collect.

# EXHIBIT 2

# DV-120

## Response to Request for Domestic Violence Restraining Order

Use this form if someone has asked for a domestic violence restraining order against you, and you want to respond in writing. You will need a copy of form DV-100, *Request for Domestic Violence Restraining Order*, that was filled out by the person who asked for a restraining order against you. There is no cost to file this form with the court.

**Do not use this form** if you want to ask for your own restraining order. Read form **DV-500-INFO**, *Can a Domestic Violence Restraining Order Help Me?* to find out more about this type of restraining order.

*Clerk stamps date here when form is filed.*

*Fill in court name and street address:*

Superior Court of California, County of Sacramento
William R. Ridgeway Family Relations Courthouse
3341 Power Inn Road
Sacramento, CA 95826

*Fill in case number:*

Case Number:
22FL02996

(1) **Name of Person Asking for Protection:**
*(See form DV-100, item* (1)*):*
Jennifer A Umberger    *Jennifer A Umberger*

(2) **Your Name:** George P Umberger II

(!) **Address where you can receive court papers**

(**This address will be used by the court and by the person in** (1) **to send you official court dates, orders, and papers**. For privacy, you may use another address like a post office box, a Safe at Home address, or another person's address, if you have their permission and can get your mail regularly. If you have a lawyer, give their information.

Address: 9268 Greenback Lane

City: Orangevale          State: CA          Zip: 95662

(!) **Your contact information** *(optional)*

(The court could use this information to contact you. If you don't want the person in (1) to have this information, leave it blank or provide a safe phone number or email address. If you have a lawyer, give their information.)

Email Address: OVJLoan2@yahoo.com          Telephone: 916-342-6915          Fax: _____

**Your lawyer's information** *(if you have one)*
Name: _____          State Bar No.: _____
Firm Name: _____

(3) **Your Hearing Date (Court Date)**



Your hearing date is listed on form DV-109, *Notice of Court Hearing*. If you do not agree to having a restraining order against you, attend your hearing date. If you do not attend your hearing, the judge could grant a restraining order that could last up to five years.

**This is not a Court Order.**

Judicial Council of California, www.courts.ca.gov
Rev. January 1, 2023, Mandatory Form
Family Code, § 6200 et seq

**Response to Request for Domestic Violence Restraining Order**
(Domestic Violence Prevention)

DV-120, Page 1 of 7
→

**How to complete this form:** To answer the questions below, look at the form DV-100 filled out by the person in ①. Tip: When the restraining order forms say "the person in ②" that means you, and the "person in ①" means the person who is asking for a restraining order against you.

④ **Information About You** *(see ② on form DV-100)*

The person in ① listed your name, age, gender, and date of birth. If any of the information is incorrect, use the space below to give the correct information.

⑤ **Your Relationship to the Person in** ①

In item ③ of form DV-100, has the person in ① correctly described your relationship with them?

☑ Yes  ☐ No  If no, what is your relationship with the person in ①?:

⑥ **History of Court Cases and Restraining Orders** *(see ④ on form DV-100)*

The person in ① may have listed other court cases or restraining orders involving you. If information is incorrect or missing, use the space below to give information.

I was granted DVRO against Jennifer that expired 08/14/22, dissolution 05/15/23 same case number.  22FL02996

☑ Check here if you are including a copy of restraining order or court order that you want the judge to know about.

⑦ ☑ **Other Protected People**

If the judge grants a restraining order, it can include family or household members of the person in ①. See ⑧ on form DV-100 to see if the person in ① is asking for other people to be protected by the restraining order.

a. ☐ I agree to the order requested.

b. ☑ I do not agree to the order requested.

Explain why you disagree, or describe a different order that you would agree to:  I have never

been abusive verbally,  physically or emotionally to Jennifer or my sons.

⑧ ☑ **Order to Not Abuse** *(see ⑩ on form DV-100)*

a. ☐ I agree to the order requested.

b. ☑ I do not agree to the order requested.

Explain why you disagree, or describe a different order that you would agree to:  I have never

been abusive verbally, physically or emotionally to Jennifer or my sons.

**This is not a Court Order.**

**(9)** ☑ **No-Contact Order** *(see* ⑪ *on form DV-100)*

  a. ☐ I agree to the order requested.

  b. ☑ I do not agree to the order requested.

  Explain why you disagree, or describe a different order that you would agree to: <u>I can stay away from her but</u>

<u>my sons do not feel that they need protection from me.</u>

**(10)** ☑ **Stay-Away Order** *(see* ⑫ *on form DV-100)*

  a. ☐ I agree to the orders requested.

  b. ☑ I do not agree to the orders requested.

  Explain why you disagree, or describe a different order that you would agree to: <u>I can stay away from her, but</u>

<u>my sons do not feel that they need protection from me.</u>

**(11)** ☐ **Order to Move Out** *(see* ⑬ *on form DV-100)*

  a. ☐ I agree to the order requested.

  b. ☐ I do not agree to the order requested.

  Explain why you disagree, or describe a different order that you would agree to: _____

_____

**(12)** ☐ **Other Orders** *(see* ⑭ *on form DV-100)*

  a. ☐ I agree to the order requested.

  b. ☐ I do not agree to the order requested.

  Explain why you disagree, or describe a different order that you would agree to: _____

_____

**(13)** ☑ **Child Custody and Visitation** *(see* ⑮ *on form DV-100 and DV-105)*

  a. ☐ I am **not** the parent of the child listed in form DV-105, *Request for Child Custody and Visitation Orders*

  b. ☑ I am the parent of the child or children listed in form DV-105 *(check one):*

    (1) ☐ I agree to the orders requested.

    (2) ☑ I do not agree to the orders requested. (Complete form DV-125, *Response to Request for Child Custody and Visitation Orders*, and attach it to this form.)

**This is not a Court Order.**

Case Number:

**(14)** ☐ **Protect Animals** *(see* **(16)** *on form DV-100)*

   a. ☐ I agree to the orders requested.

   b. ☐ I do not agree to the orders requested.

     Explain why you disagree, or describe a different order that you would agree to: _____

_____

**(15)** ☐ **Control of Property** *(see* **(17)** *on form DV-100)*

   a. ☐ I agree to the order requested.

   b. ☐ I do not agree to the order requested.

     Explain why you disagree, or describe a different order that you would agree to: _____

_____

**(16)** ☐ **Health and Other Insurance** *(see* **(18)** *on form DV-100)*

   a. ☐ I agree to the order requested.

   b. ☐ I do not agree to the order requested.

     Explain why you disagree, or describe a different order that you would agree to: _____

_____

**(17)** ☑ **Record Communications** *(see* **(19)** *on form DV- 00)*

   a. ☐ I agree to the order requested.

   b. ☑ I do not agree to the order requested.

**(18)** ☐ **Property Restraint** *(see* **(20)** *on form DV-100)*

   a. ☐ I agree to the order requested.

   b. ☐ I do not agree to the order requested.

     Explain why you disagree, or describe a different order that you would agree to: _____

_____

**(19)** ☐ **Pay Debt (Bills) Owed for Property** *(see* **(22)** *on form DV-100)*

   a. ☐ I agree to the orders requested.

   b. ☐ I do not agree to the orders requested.

     Explain why you disagree, or describe a different order that you would agree to: _____

_____

**This is not a Court Order.**

**Response to Request for Domestic Violence
Restraining Order**
(Domestic Violence Prevention)

Case Number:

**20** ☐ **Pay Expenses Caused by the Abuse** *(see ㉓ on form DV-100)*

    a. ☐ I agree to the order requested.

    b. ☐ I do not agree to the order requested.

       Explain why you disagree, or describe a different order that you would agree to: _____

       _____

**21** ☐ **Child Support** *(see ㉔ on form DV-100)*

    a. ☐ I agree to the order requested.

    b. ☐ I do not agree to the order requested.

    c. ☐ I agree to pay guideline child support. *(Learn more about guideline child support at www.courts.ca.gov/selfhelp-support.htm.)*

**22** ☐ **Spousal Support** *(see ㉕ on form DV-100)*

    a. ☐ I agree to the order requested.

    b. ☐ I do not agree to the order requested.

       Explain why you disagree, or describe a different order that you would agree to: _____

       _____

**23** ☐ **Lawyer's Fees and Costs** *(see ㉖ on form DV-100)*

    a. ☐ I agree to the order requested.

    b. ☐ I do not agree to the order requested.

       Explain why you disagree, or describe a different order that you would agree to: _____

       _____

    c. ☐ I ask that the person in ① pay for some or all of my lawyer's fees and costs.

**24** ☐ **Batterer Intervention Program** *(see ㉗ on form DV-100)*

    a. ☐ I agree to the order requested.

    b. ☐ I do not agree to the order requested.

       Explain why you disagree, or describe a different order that you would agree to: _____

       _____

**This is not a Court Order.**

**Response to Request for Domestic Violence
Restraining Order**
(Domestic Violence Prevention)

**(25)** ☐ **Transfer Wireless Phone Account** *(see ㉘ on form DV-100)*

   a. ☐ I agree to the order requested.

   b. ☐ I do not agree to the order requested.

   Explain why you disagree, or describe a different order that you would agree to: _____

   _____

**(26)** **Firearms (Guns), Firearm Parts, or Ammunition** *(see ㉙ on form DV-100)*

If you were served with form DV-110, *Temporary Restraining Order*, you must follow the orders in ⑤ on form DV-110. You must file a receipt with the court from the law enforcement agency or a licensed gun dealer within 48 hours after you received form DV-110. You may use form DV-800/JV-270, *Receipt for Firearms, Firearm Parts, and Ammunition*.

   *(Check all that apply)*

   a. ☑ I do not own or have any prohibited items (firearms (guns), prohibited firearm parts, or ammunition).

   b. ☐ I have turned in all prohibited items that I have or own to law enforcement or sold/stored them with a licensed gun dealer. A copy of the receipt showing that I turned in, sold, or stored the prohibited items *(check all that apply):* ☐ is attached    ☐ has already been filed with the court.

   c. ☐ I ask for an exception to carry a firearm for work only. (You will have to show the judge that your work requires you to have a firearm, and that your employer cannot reassign you to another position where a firearm is not needed. If you are a peace officer, there are additional requirements.)

   *(Give details, like what your job is and why you need a firearm):* _____

   _____

**(27)** **Cannot Look for Protected People** *(see ㉚ on form DV-100)*

   a. ☐ I agree to the order.

   b. ☐ I do not agree to the order.

   Explain why you disagree, or describe a different order that you would agree to: _____

   _____

**(28)** ☑ **Additional Reasons I Do Not Agree with the Request** *(optional)*

Explain why you do not agree to any of the orders requested by the person in ① *(give specific facts and reasons):*

~~I have attached text messages between myself and our real estate agent, Gina, on June 4, 2023. Jennifer was~~ ~~informed, and agreed, to our interaction being recorded. This is due to the verbal abuse I endured during an~~ ~~argument when I was there a few days prior. Her erratic behavior resulted in my 17-year-old son having to pull~~ ~~her away from me as she was screaming less than an inch from my face. And then when I went back to get the~~ ~~pressure washer she called the Folsom PD on me.~~

~~-Cont attached Form MC-020~~

   ☑ Check here if you need more space. Attach a sheet of paper and write "DV-120, Additional Reasons I Do Not Agree with the Request" at the top.

---

**This is not a Court Order.**

---

Rev. January 1, 2023   **Response to Request for Domestic Violence**   **DV-120**, Page 6 of 7
**Restraining Order**
**(Domestic Violence Prevention)**

→

**(29)** ☐ **My Out-of-Pocket Expenses**

If the request for restraining order is denied by the judge at the court hearing, I ask the judge to order the person in ① to pay my out-of-pocket expenses because the temporary restraining order was granted without enough supporting facts. The expenses are:

| For: | | Because: | Amount: |
|------|-----------|----------|---------|
| For: | Hired help | Because: Preventing me from doing repairs for house sale | Amount: $ 500 |
| For: | Hired help | Because: Preventing me from pool upkeep for house sale | Amount: $ 220 |
| For: | Missed work | Because: 2 days for responding and appearing | Amount: $ 100 |

**(30)** **Additional Pages**

Number of pages attached to this form, if any:   6

**(31)** **Your signature**

I declare under penalty of perjury under the laws of the State of California that the information above is true and correct.

Date: 06/29/2023

George P Umberger II

*Type or print your name*            *Sign your name*

**(32)** **Your lawyer's signature** *(if you have one)*

Date: _____

*Lawyer's name*                      *Lawyer's signature*

## Your Next Steps

- If the person in ① asked for child support, spousal support, or anyone is asking for lawyer's fees, you must complete form FL-150, *Income and Expense Declaration*. If the person in ① is only asking for child support (item 24 on form DV-100), you may be eligible to fill out a simpler form, form FL-155. Read form DV-570 to see if you are eligible to fill out form FL-155. Before your court date, you must file form FL-150 or FL-155 with the court. Then you must have a server mail a copy to the person in ① and have your server complete form DV-250, *Proof of Service by Mail*. After form DV-250 is completed, file it with the court.

- Prepare for your court date by gathering evidence or witnesses, if you have any. Learn more at: *https://selfhelp.courts.ca.gov/respond-domestic-violence-restraining-order*. More information is also available on *form DV-120-INFO, How Can I Respond to a Request for Domestic Violence Restraining Order?*

**This is not a Court Order.**

# EXHIBIT 3



2023-07-13 07:04:34



# EXHIBIT 4



G

Gina ›

Jun 3, 2023 at 8:29 PM

Are you still planning on going over and finishing the backyard    8:29 PM

Tomorrow    8:29 PM

Yes    8:42 PM

Ok perfect the painters will be there too, let me know if you need anything!    8:43 PM

I'm hope the police don't get called again    8:44 PM

She said she wouldn't    9:07 PM

Jun 4, 2023 at 8:25 AM

What time are you planning on going today?    8:25 AM

So I can let Jennifer know?    8:25 AM

Jun 4, 2023 at 10:03 AM

Yes I'm helping my dad right now    10:03 AM

Ok let me know what time your planning on going I can try and meet you    10:04 AM

I'm not sure maybe when it's cooler    10:06 AM

‹ 28    G    📹

**Gina** ›

Jun 4, 2023 at 10:03 AM

Yes I'm helping my dad right now    10:03 AM

Ok let me know what time your planning on going I can try and meet you    10:04 AM

I'm not sure maybe when it's cooler    10:06 AM

I won't need any help today thank you    10:06 AM

I'm going to wear my go pro to protect myself from her false accusations I thought jen and I were past these games but a lesson learned    10:10 AM

My lawyer also told me to get a letter from her stating that it was ok for me to been on the property ..Jen still hasn't sent me that email saying it's ok for me to be there    10:15 AM

Let me call you in a few minutes so we can figure this out    10:17 AM

Ok    10:17 AM

George can come over to remove his stuff from the backyard.
Jen    11:10 AM



**28** ‹    **G**    Gina ›    ◻

George can come over to remove his stuff from the backyard.
Jen    11:10 AM

No GoPro.    11:11 AM

I'm not coming on the property then    11:12 AM

I need to protect myself    11:12 AM

Jen plays the victim    11:13 AM

Ok she said you can wear the go pro    11:13 AM

Jun 4, 2023 at 12:34 PM

I was just at the house and the pool not looking good  I dumped some more salt and chemicals. Maybe we need your pool guy to look at it    12:34 PM

Can you send me a picture please    12:34 PM

This was weird the filter automatically comes on at 10 o'clock every day. But it was off when I got there    12:35 PM

I will tomorrow in the morning when I go back    12:36 PM

It's to hot right now    12:36 PM

K    12:36 PM

3 People >

Tue, May 23 at 7:29 PM

I need to look in the garage

Jen

You need to get a door handle for the side door as well. They all need keys.

And the interior garage door. Needs a key and to close properly.

Wed, May 24 at 7:59 PM

So why don't you want to paint the house

Wed, May 24 at 9:06 PM

Jen

I'm not paying for that.

Don't contact me again. Talk to Gina only.

Really

Why can't you act like an adult?

The house needs to be painted

Jen

No it does not.

The court yard look like shit

# EXHIBIT 5



CITY OF
**FOLSOM**
DISTINCTIVE BY NATURE

January 18, 2024

George Umberger II
9268 Greenback Lane
Orangevale, CA 95662

Re:    **Claimant:**         **Umberger II, George**
       **Date of Loss:**      **07/13/2023**
       **Our File No.:**      **016-21 23-278**

## NOTICE OF CLAIM REJECTION

**NOTICE IS HEREBY GIVEN** that the claim which you submitted to the City of Folsom on **December 19, 2023**, was rejected on **January 18, 2024**. California Government Code Section 913 requires that the following warning be given when a claim is rejected.

### WARNING

**Subject to certain exceptions, you have only six (6) months from the date that this notice was personally delivered or deposited in the mail to file a court action on this claim. See Government Code Section 945.6. You may seek the advice of an attorney of your choice in connection with this matter. If you desire to consult an attorney, you should do so immediately.**

**If you have questions or concerns regarding this notice, please contact Sedgwick Claim Examiner Alyssa Reese at 916-746-8802.**

Sincerely,

Jennifer Jimenez
Deputy City Clerk

cc:    City Manager
       City Attorney
       File No. 016-21 23-278

## PROOF OF SERVICE BY MAIL

I, Jennifer Jimenez, declare as follows:

I am over the age of 18 years, and not a party to this action.  My business address is 50 Natoma Street, Folsom, California 95630, which is located in the county where the mailing described took place.

I am readily familiar with the business practice at my place of business for collection and processing of correspondence for mailing with the United States Postal Service.  Correspondence so collected and processed is deposited with the United States Postal Service that same day in the ordinary course of business.

On January 18, 2024, at my place of business set forth above, a copy of the attached letter was placed for deposit in the United States Postal Service in a sealed envelope, with postage thereon fully prepaid, addressed as follows:

George Umberger II
9268 Greenback Lane
Orangevale, CA 95662

and that envelope was placed for collection and mailing on that date following ordinary business practices.  This declaration was executed on January 18, 2024, at Folsom, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Jennifer Jimenez, Deputy City Clerk

# EXHIBIT 6



# Folsom City Council
## Staff Report

| MEETING DATE: | 7/9/2024 |
|---|---|
| AGENDA SECTION: | Consent Calendar |
| SUBJECT: | Receive Annual Report regarding Police Use of Military Type Equipment and Approve Resolution No. 11231 - A Resolution Renewing Ordinance No. 1326 and Determining That Specified "Military Equipment" Used by the Folsom Police Department has Complied with Standards for Approval Set Forth in State Law |
| FROM: | Police Department |

## RECOMMENDATION / CITY COUNCIL ACTION

Staff recommends that the City Council receive the annual report for use of 'military' type equipment and approve Resolution No. 11231 - A Resolution Renewing Ordinance No. 1326 and Determining That Specified "Military Equipment" Used by the Folsom Police Department has Complied with Standards for Approval Set Forth in State Law.

.

## BACKGROUND / ISSUE

On May 24th, 2022, City Council first approved the use of certain 'military' type equipment to be in compliance with Assembly Bill 481, which as of 2022, required a law enforcement agency (LEA) to obtain approval from the applicable governing body, via adoption of an ordinance approving a "military equipment" use policy, prior to the LEA, acquiring, using, or seeking funds for military equipment.  AB 481 defines "military equipment" broadly and creates explicit parameters for the military equipment use policy it requires.

As a result of City Council approval, City of Folsom Ordinance 1326 was enacted along with Folsom Police Policy 707. Ordinance 1326 was renewed by the Council on June 27, 2023.

1

AB 481 requires an annual report for each type of approved equipment. The law also requires City Council to review and vote on whether to renew the military equipment use ordinance at least annually.

## POLICY / RULE

Annual Report
In accordance with Folsom Police Policy 707 and Assembly Bill 481 an annual report must be submitted to City Council. The requirements for the annual report are (in summary):
- Annual report submitted to City Council, summarizing how the equipment was used.
- The annual report must be made public.
- The results of any internal audits or complaints and actions taken.
- The total annual cost of applicable items.
- An inventory of how many applicable items are possessed.
- If the department intends to acquire additional applicable equipment in the next year, the type and quantity of equipment sought.

Ordinance Renewal
AB 481 also requires the Council to review Ordinance 1326 at least annually and to vote on whether to renew the ordinance. As a part of this review, the Council must determine, based on the annual military equipment report described above, whether each type of military equipment identified in that report has complied with the following standards for approval:

A. The military equipment is necessary because there is no reasonable alternative that can achieve the same objective of officer and civilian safety.

B. The proposed military equipment use policy will safeguard the public's welfare, safety, civil rights, and civil liberties.

C. If purchasing equipment, the equipment is reasonably cost effective compared to available alternatives that can achieve the same objective of officer and civilian safety.

D. Prior military equipment use complied with the military equipment use policy that was in effect at the time.

If the Council determines that each type of military equipment identified in the report has complied with the standards for approval, it may vote to renew the ordinance. If the Council determines that a type of military equipment identified in the annual report has not complied with the standards for approval, the Council must either disapprove a renewal of the authorization for that type of military equipment or require modifications to the military equipment use policy in a manner that will resolve the lack of compliance.

## ANALYSIS

Annual Report

The Police Department utilized several of the items listed in City of Folsom Ordinance 1326 as well as Folsom Police Policy 707 over the last year. These items were used in a variety of incidents including but not limited to: barricaded subjects, high risk incidents, critical incidents, high risk building entries, felony vehicle stops, suspect searches, missing person searches, outside agency assistance, training, etc.

Number of operational uses per applicable items:
1. Armored Vehicle (Bearcat)- 13
2. Drone (all)- 13
3. Tactical Robot (Robotex Avatar)- 1
4. Long Range Acoustical Device (LRAD)- 5
5. SWAT Rifle- 21
6. Patrol/Officer Rifle- 15
7. Less Lethal Shotgun- 21
8. Less Lethal Munition Launcher- 3
9. Mobile Command and Communications Unit (MCCU)- 2
10. Anti Vehicle Barriers- 5
11. Diversionary Devices- 3
12. Less Lethal Baton- 0
13. Less Lethal Bean Bag- 3
14. Chemical Munitions- 2
15. Sniper Ammunition- 0

Number of training uses per applicable items:
1. Armored Vehicle (Bearcat)- 15
2. Drone (all)- 15
3. Tactical Robot (Robotex Avatar)- 5
4. Long Range Acoustical Device (LRAD)- 2
5. SWAT Rifle- 24
6. Patrol/Officer Rifle- 5
7. Less Lethal Shotgun- 5
8. Less Lethal Munition Launcher- 4
9. Mobile Command and Communications Unit (MCCU)- 2
10. Anti Vehicle Barriers- 0
11. Diversionary Devices- 5
12. Less Lethal Baton- 1
13. Less Lethal Bean Bag- 5
14. Chemical Munitions- 5
15. Sniper Ammunition- 3,500

The Police Department received one community complaint related to the use of drones and the display of SWAT Rifles during a search warrant. The complaint was investigated and determined to be unfounded.

Once submitted, a copy of this report will be placed on the Police Department's website.

In June 2024, the Police Department replaced the current Less Lethal Munition Launchers with Defense Technology 40 mm launchers and required munitions. The Launcher is slated for deployment by the Patrol Division and the SWAT Team. This device boasts several features that render it superior and safer compared to the current launcher in deployment. Equipped with a rifled barrel, it facilitates more precise shot placement and ensures consistent velocities. Notably, it is lighter and more compact than its predecessor, allowing for direct deployment from patrol vehicles. Moreover, it offers the flexibility of both standard range (5-40 meters) and extended range (10-70 meters), thereby expanding the safe distance for engaging aggressive, non-compliant individuals without direct contact. These items have not been authorized for use pending the required training and approval of this report. The current less lethal munition launcher will be taken out of service pending approval of this report and the required training for our personnel.

The Police Department does intend on acquiring a new tactical robot within the next reporting period. The current robot is outdated and in need of replacement. The Police Department was awarded a Homeland Security grant which will cover the entire cost of the robot but is currently awaiting delivery of the award letter. A future staff report will be submitted for approval.

Ordinance Renewal
As shown in the annual report, each type of equipment used has complied with the standards for approval referenced in the Policy/Rule section of this report.

Over the past year, there have been no changes to the necessity for any of the listed equipment. It remains the case that no reasonable alternatives exist to achieve the same objectives of officer and civilian safety gained by use of the listed equipment. As stated to the Council in our initial presentation on this issue, items deemed to be "military equipment" by AB 481 are used as a component of overall best practices for law enforcement agencies throughout the country. These tools have been tested in the field and are used by law enforcement to enhance citizen safety and officer safety. Loss of these items would jeopardize the welfare of citizens and peace officers within the City of Folsom. For example, the rifles deemed to be "military equipment" allow peace officers to address lethal threats from a greater distance, with greater precision. These statements remain true today.

Police Policy 707 has and will continue to safeguard the public's welfare, safety, civil rights, and civil liberties. As explained in association with adoption of Ordinance 1326, all sworn officers with the Folsom Police Department are bound by a stringent set of laws, policies, and procedures which are in line with the public's welfare, safety, civil rights, and civil liberties. Similarly, all officers are trained in a variety of strategies and tactics which are in line with the laws, policies, and procedures by which we are bound, prior to the use or

4

application of any military type equipment. These policies, procedures, and training requirements are all reflected in Police Policy 707 and no changes to that Policy are proposed.

The Police Department's use of military type equipment over the past year complied with Police Policy 707. As explained above, the equipment was used in a variety of incidents including but not limited to: barricaded subjects, high risk incidents, critical incidents, high risk building entries, felony vehicle stops, suspect searches, missing person searches, outside agency assistance, training, etc. The equipment used in each incident was authorized for such uses, as documented in Police Policy 707. In addition, the officers using the equipment were properly trained before each deployment, as required.

While the Department is considering the purchase of a new tactical robot, that equipment is not being requested or approved as a part of this report. A future staff report will analyze the standard for approval of new equipment in association with that proposed purchase.

## ENVIRONMENTAL REVIEW

The California Environmental Quality Act (CEQA) does not apply to activities that will not result in a direct or reasonably foreseeable indirect physical change in the environment or ot activities that are not otherwise considered a "project" as defined by Public Resources Code § 21065. (CEQA Guidelines § 15061(c)(3) and § 15378.) The Council's decision regarding renewal of Ordinance 1326 meets the above criteria and is not subject to CEQA. No environmental review is required.

## FINANCIAL IMPACT

The estimated yearly financial impact of listed items (training and operational), including maintenance costs during this reporting period was approximately $15,165.

## ATTACHMENTS

1. Resolution No. 11231 - A Resolution Renewing Ordinance No. 1326 and Determining that Specified "Military Equipment" Used by the Folsom Police Department has Complied with Standards for Approval Set Forth in State Law
2. Updated Inventory List of Equipment - 2024
3. Folsom Police Policy 707

Submitted,

_____

Richard Hillman, Chief of Police

Attachment 1

Resolution No. 11231 - A Resolution Renewing Ordinance No. 1326 and Determining that Specified "Military Equipment" Used by the Folsom Police Department has Complied with Standards for Approval Set Forth in State Law

**RESOLUTION NO. 11231**

**A RESOLUTION RENEWING ORDINANCE NO. 1326 AND
DETERMINING THAT SPECIFIED "MILITARY EQUIPMENT" USED BY THE
FOLSOM POLICE DEPARTMENT
HAS COMPLIED WITH STANDARDS FOR APPROVAL SET FORTH IN STATE LAW**

**WHEREAS,** on September 30, 2021, Governor Gavin Newsom signed into law Assembly Bill 481, relating to the use of "military equipment" by law enforcement agencies; and

**WHEREAS,** Assembly Bill 481, codified at Government Code section 7070 through 7075, requires law enforcement agencies to obtain approval from the applicable governing body, by an ordinance adopting a "military equipment" use policy, at a regular meeting held pursuant to open meeting law, before taking certain actions related to the funding, acquisition, or use of "military equipment"; and

**WHEREAS,** the term "military equipment" is defined in Government Code section 7070; and

**WHEREAS,** on May 24, 2022, the City Council adopted Ordinance No. 1326 approving the Folsom Police Department's Military Equipment Use Policy in compliance with Assembly Bill 481; and

**WHEREAS**, Assembly Bill 481 requires law enforcement agencies to submit an annual military equipment report containing specified information to the applicable governing body; and

**WHEREAS**, Assembly Bill 481 requires the governing body of a law enforcement agency to review its "military equipment" ordinance at least annually and vote on whether to renew the ordinance at a regular meeting held pursuant to open meeting law; and

**WHEREAS**, Assembly Bill 481 requires the governing body to determine whether each type of military equipment identified in the annual military equipment report has complied with specified standards for approval in association with the annual renewal of the ordinance; and

**WHEREAS,** the annual military equipment report was submitted to the City Council at the July 9, 2024 meeting.

**NOW, THEREFORE, BE IT RESOLVED** that the City Council of the City of Folsom makes the following determinations after reviewing the annual military equipment report submitted by the Folsom Police Department:

1. Each type of military equipment identified in the report is necessary because there is no reasonable alternative that can achieve the same objective of officer and civilian safety.

2. Police Policy 707 will safeguard the public's welfare, safety, civil rights, and civil

liberties.

3.  No new military equipment is proposed for purchase at this time.

4.  Prior military equipment use complied with Police Policy 707.

**BE IT FURTHER RESOLVED** that the City Council of the City of Folsom has reviewed and hereby renews Ordinance No. 1326 in accordance with Government Code section 7071.

**PASSED AND ADOPTED** this 9th day of July 2024, by the following roll-call vote:

**AYES:**        Councilmember(s):

**NOES:**        Councilmember(s):

**ABSENT:**      Councilmember(s):

**ABSTAIN:**     Councilmember(s):

_____
Michael D. Kozlowski, MAYOR

ATTEST:

_____
Christa Freemantle, CITY CLERK

Attachment 2

Updated Inventory List of Equipment - 2024

| DJI Matrice 210 | |
|---|---|
| Description | Commercial UAS |
| Quantity | 1 |
| Capability | Fly, Hover, broadcast video, record video, Photography, FLIR, carry payload up to approx. 7.5lbs. |
| Life Span | UAS devices need to be upgraded as software becomes obsolete by vendors. |
| Manufacturer's Description | Commercial grade UAV equipped with a thermal imaging camera and a 30x zoom camera.  38 mins. maximum flight time. Has live stream capabilites. |
| Purpose | Provide Aerial Support for L.E. operations |
| Authorized Usage | Investigative<br>Used by SWAT, Patrol, Search and Rescue to locate persons. |
| Costs | $30,000                                                                                approx.<br>$2,000 anticipated yearly maintenance & battery cost |
| Required Training | 32-hr Basic Pilots Course (or equivalent), FAA Remote Pilot Certificate (Part 107) |
| Authority for Authorized Use | Certificate of Authority issued by FAA - #2020-WSA-7949-COA, FAA Part 107 holder and completion of Department Training, Folsom Police Department Policy – Section 391 |

| DJI Phantom 4 Pro | |
|---|---|
| Description | Commercial UAS |
| Quantity | 1 |
| Capability | Fly, Hover, broadcast video, record video, Photography |
| Life Span | UAS devices need to be upgraded as software becomes obsolete by vendors. |
| Manufacturer's Description | Commercial grade UAS equipped with UHD capable camera. Has live stream capability and 28 min. flight time. |
| Purpose | Provide Aerial Support for L.E. operations |
| Authorized Usage | Investigative<br>Used by SWAT, Patrol, Search and Rescue to locate persons. |
| Costs | $2,500                                                                                approx.<br>$300 anticipated yearly maintenance & battery cost |
| Required Training | 32-hr Basic Pilots Course (or equivalent), FAA Remote Pilot Certificate (Part 107) |
| Authority for Authorized Use | Certificate of Authority issued by FAA - #2020-WSA-7949-COA, FAA Part 107 holder and completion of Department Training, Folsom Police Department Policy – Section 391 |

| DJI Mavic 2 Enterprise | |
|---|---|
| Description | Commercial UAS |
| Quantity | 3 |
| Capability | Fly, Hover, broadcast video, record video, Photography, broadcast instant and/or prerecorded notifications. |
| Life Span | UAS devices need to be upgraded as software becomes obsolete by vendors. |
| Manufacturer's Description | Commercial grade UAS equipped with Single 4k colored camera with Zoom capabilities. Has live stream capability and 30 min. flight time. |
| Purpose | Provide Aerial Support for L.E. operations |
| Authorized Usage | Investigative<br>Used by SWAT, Patrol, Search and Rescue to locate persons. |

| | |
|---|---|
| Costs | $3,600                                                                      approx.<br>$400 anticipated yearly maintenance & battery cost |
| Required Training | 32-hr Basic Pilots Course (or equivalent), FAA Remote Pilot Certificate (Part 107) |
| Authority for Authorized Use | Certificate of Authority issued by FAA - #2020-WSA-7949-COA, FAA Part 107 holder and completion of Department Training, Folsom Police Department Policy – Section 391 |

| DJI Mavic 2 Zoom | |
|---|---|
| Description | Commercial UAS |
| Quantity | 1 |
| Capability | Fly, Hover, broadcast video, record video, Photography. |
| Life Span | UAS devices need to be upgraded as software becomes obsolete by vendors. |
| Manufacturer's Description | Commercial grade UAS equipped with Single 4k colored camera with Zoom capabilities. Has live stream capability and 30 min. flight time. |
| Purpose | Provide Aerial Support for L.E. operations |
| Authorized Usage | Investigative<br>Used by SWAT, Patrol, Search and Rescue to locate persons. |
| Costs | $1,500<br>approx. $400 anticipated yearly maintenance & battery cost |
| Required Training | 32-hr Basic Pilots Course (or equivalent), FAA Remote Pilot Certificate (Part 107) |
| Authority for Authorized Use | Certificate of Authority issued by FAA - #2020-WSA-7949-COA, FAA Part 107 holder and completion of Department Training, Folsom Police Department Policy – Section 391 |

| DJI Mavic Mini 2 | |
|---|---|
| Description | Commercial UAS |
| Quantity | 2 |
| Capability | Fly, Hover, broadcast video, record video, Photography. |
| Life Span | UAS devices need to be upgraded as software becomes obsolete by vendors. |
| Manufacturer's Description | Commerical grade UAS equipped with Single 4k colored camera. Has live stream capability and 30 min. fight time. |
| Purpose | Provide Aerial Support for L.E. operations |
| Authorized Usage | Investigative<br>Used by SWAT, Patrol, Search and Rescue to locate persons. |
| Costs | $500<br>approx. $80 anticipated yearly maintenance & battery cost |
| Required Training | 32-hr Basic Pilots Course (or equivalent), FAA Remote Pilot Certificate (Part 107) |
| Authority for Authorized Use | Certificate of Authority issued by FAA - #2020-WSA-7949-COA, FAA Part 107 holder and completion of Department Training, Folsom Police Department Policy – Section 391 |

| DJI Mavic Mini | |
|---|---|
| Description | Commercial UAS |
| Quantity | 1 |

| Capability | Fly, Hover, broadcast video, record video, Photography. |
|---|---|
| Life Span | UAS devices need to be upgraded as software becomes obsolete by vendors. |
| Manufacturer's Description | Commerical grade UAS equipped with Single 4k colored camera. Has live stream capability and 30 min. fight time. |
| Purpose | Provide Aerial Support for L.E. operations |
| Authorized Usage | Investigative<br>Used by SWAT, Patrol, Search and Rescue to locate persons. |
| Costs | $400                                                                    approx.<br>$80 anticipated yearly maintenance & battery cost |
| Required Training | 32-hr Basic Pilots Course (or equivalent), FAA Remote Pilot Certificate (Part 107) |
| Authority for Authorized Use | Certificate of Authority issued by FAA - #2020-WSA-7949-COA, FAA Part 107 holder and completion of Department Training, Folsom Police Department Policy – Section 391 |

| LOKI-Mk2 | |
|---|---|
| Description | Commercial UAS |
| Quantity | 4 |
| Capability | Fly, Hover, broadcast video. |
| Life Span | UAS devices need to be upgraded as software becomes obsolete by vendors. |
| Manufacturer's Description | Commerical grade UAS equipped with Single 4k colored camera. 30 min. fight time. |
| Purpose | Provide Aerial Support for L.E. operations |
| Authorized Usage | Investigative<br>Used by SWAT, Patrol for interior tactical scouting missions. |
| Costs | $20,000                                                                approx.<br>$200 anticipated yearly maintenance & battery cost |
| Required Training | 32-hr Basic Pilots Course (or equivalent), FAA Remote Pilot Certificate (Part 107) |
| Authority for Authorized Use | Certificate of Authority issued by FAA - #2020-WSA-7949-COA, FAA Part 107 holder and completion of Department Training, Folsom Police Department Policy – Section 391 |
| Authority for Authorized Use | Completion of Department Training, Folsom Police Department Policy – Section 391 |

| Blu-Link Streaming Box | |
|---|---|
| Description | Commerical streaming box |
| Quantity | 1 |
| Capability | Streams video in real-time HD video over a secure internet connection. |
| Life Span | 3-5 years |
| Manufacturer's Description | Portable video streaming device to stream live HD video in real time over a secure Internet connection. |
| Purpose | Provide real-time video over a secure internet connection for situational awareness and scene assessment. |
| Authorized Usage | Completion of Department Training, Folsom Police Department Policy – Section 391 |

| Costs | $5,400                                                            approx. |
| --- | --- |
| | $50 anticipated yearly maintenance & battery cost |
| Required Training | In house departmental training.  No POST requirement. |
| Authority for Authorized Use | Completion of Department Training, Folsom Police Department Policy – Section 391 |

| Avatar III | |
| --- | --- |
| Description | Robotex INC Avatar III Robot |
| Quantity | 1 |
| Capability | The Avatar III Robot is a radio controlled robot on a track system of propulsion and is outfitted with Cameras, Speakers, and Microphones.  The robot increases officers ability to conduct searches in high risk scenarios by providing video and audio into areas that may not be safe for officers to enter.  In addition the cameras, speakers, and microphones allow for 2 way communication between officers and subjects during critical incidents such as barricaded subjects, hostage situations, or suicidal subjects.  The camera system provides additional safety for officers when placed in strategic positions to monitor doorways, hallways or access points.  The Avatar III Robot is regularly used by the SWAT team during his risk search warrants, emergency calls, and during outside agency requests for assistance.  The Crisis Negotiations Team (CNT) is also able to use the robot for direct communication during critical incidents when other forms of direct contact are unsuccessful. |
| Life Span | 15 years |
| Manufacturer's Description | The AVATAR® enhances the capabilities of SWAT and tactical response teams by allowing them to inspect dangerous situations quickly and safely, there is no longer a need to send personnel in before you've had a chance to assess the situation. The AVATAR® saves lives by keeping first responders out of harm's way, and it does so at a fraction of the price of other robots. The AVATAR® Robots are regarded by tactical teams as a standard operational tool, like a firearm, vehicle, or piece of body armor. Departments across the United States and internationally are using the AVATAR® Robots |
| Purpose | To enhance safety for officers and subjects during high risk or critical Incidents. |
| Authorized Usage | Assisting in lawful searches and surveillance. Communications during critical incidents |
| Costs | $26000                                                                    $0 |
| | anticipated yearly maintenance & battery cost |
| Required Training | In house departmental training.  No POST requirement. |
| Authority for Authorized Use | It is the policy of the FPD to utilize a robot only for official law enforcement purposes, and in a manner that respects the privacy of our community, pursuant to State and Federal law. |

| Lenco Bearcat G2 | |
|---|---|
| Description | Armored personnel carrier |
| Quantity | 1 |
| Capability | The BearCat is a large mobile armored vehicle used to conduct rescues mission for both officers and the public, transport personnel and equipment, and provide security to the public. |
| Life Span | 25 years |
| Manufacturer's Description | The Lenco Bearcat is an armored vehicle built on a Ford F550 frame and is manufactured for law enforcement purposes.  The purpose of the Bearcat armored vehicle is to provide ballistic protection to officers and citizens from gunfire.  The armored vehicle stops rifle rated rounds including .50 caliber which is commercially available and beyond the protection level of shield and personal body armor possessed by the department. <br><br> The Bearcat is often deployed several times a month by SWAT personnel while serving high risk search warrants or assisting other agency.  It can be utilized by trained patrol personnel to rescue downed officers and citizens.  The Bearcat has been struck by gunfire several times and protected the officers inside, behind it, and the community. <br><br> Protecting officers allows them to contain the suspect and reduce the immediacy of the threat while communicating and de-escalating.  Crisis Negotiations Team (CNT) members have operated from inside the armored vehicles during search warrant and SWAT callouts where they communicate with the suspect and attempt to de-escalate. |
| Purpose | Regional asset and provides armored vehicle response to critical incidents. |
| Authorized Usage | To protect and safely transport Police personnel to active scenes.  Provide security for officers and the public.  It is used by the SWAT and officers. |
| Costs | $275,000                                                                         approx. <br> $1,000 anticipated yearly maintenance cost |
| Required Training | All drivers/ operators shall attend formalized instruction and be trained in vehicle operations and practical driving instruction. |
| Authority for Authorized Use | Use is established under FPD Policy 705.  It is the policy of the Department to utilize armored vehicles only for official law enforcement purposes, and pursuant to State and Federal law. |

| Mobile Command & Communications Unit (MCCU) | |
|---|---|
| Description | LDV Custom Specialty Vehicles Command Vehicle |
| Quantity | 1 |
| Capability | The MCCU can be utilized for SWAT/CINT and other critical incidents, preplanned large events, searching for missing persons, natural disasters, and community events |
| Life Span | 20 years |

| | |
|---|---|
| Manufacturer's Description | The LDV Custom Specialty Vehicle is a mobile command center built on a 2006 Freightliner chassis and customized for law/fire command/communication purposes. The purpose of the LDV Mobile Command and Communication Unit (MCCU) is to provide an interior space for command staff to plan and organize responses to critical incidents and special events.  The MCCU is specially equipped with an onboard dispatch center, a command area, and a radio interoperability system (RIOS) which allows radio communication between local, state, and federal law enforcement entities which currently operate under different radio systems/frequencies.  The vehicle contains radios with varying frequencies including 800 megahertz, very high frequency (VHF), ultrahigh frequency (UHF), low band, and short-wave radio systems.  The vehicle has internet capability and computer resources along with access to television channels allowing access to real time news/information.  The vehicle is also equipped with a video downlink system allowing command staff to view live feeds from fire/law enforcement aircraft and UAS devices. |
| Purpose | To be used based on the specific circumstances of a given critical incident, large event, natural disaster or community event that is taking place. |
| Authorized Usage | Situations which the MCCU is authorized for use would include but not be limited to critical incidents, emergencies, and natural disasters. |
| Costs | $750,000                                                                                         approx. $4,000 anticipated yearly maintenance cost |
| Required Training | The MCCU operators will receive training in the overall operation of the vehicle to include set up and break down procedures, and skills training in the computer, dispatch, and radio systems.  The drivers will receive training in the safe handling of the vehicle with the assistance of an experienced driver.  Drivers will undergo California Department of Motor Vehicles commercial vehicle testing.   This training will occur on a bi-monthly basis |
| Authority for Authorized Use | It is the policy of the Department to use the MCCU for official fire and law enforcement purposes, and in accordance with California State law regarding operation of motor vehicles |

| Colt M4 Carbine (11.5") | |
|---|---|
| Description | Enhanced Patrol Rifle |
| Quantity | 14 |
| Capability | These rifles fire an intermediate-power cartridge (.223) which is more powerful than a standard pistol but less powerful than a standard rifle. It's a short barreled rifle which allows SWAT Officers better control while inside of structures while still providing great accuracy. |
| Life Span | 10-15 years |
| Manufacturer's Description | Built for the demanding use of those who protect our communities every day, the Colt Enhanced Patrol Rifle (EPR) is the next evolution in the world's most dependable, thoroughly field-tested patrol rifle. Featuring an extended handguard that accepts modular rail segments for mounting a wide variety of pro-grade optics, lighting, and ergonomics-enhancing accessories, as well as the highly durable Magpul® MBUS® Pro Series front and rear back up sights and B5 Bravo buttstock. The Colt EPR reestablishes the Colt AR-15® as the finest tool for local, regional, and national law enforcement agencies. |
| Purpose | The AR-15 can stop threats of great bodily injury or death at close and intermediate ranges. The AR-15 platform is capable of firing more accurately and quicker than a pistol while holding more rounds in the magazine and having better ballistic qualities. |
| Authorized Usage | To defend against an imminent threat of serious bodily injury or death. Used by SWAT |
| Costs | $1,100                                                                              $0<br>anticipated yearly maintenance cost |
| Required Training | Prior to using a rifle, officers must be certified by POST instructors in the operation of the rifle. Additionally, all members that operate any rifle are required to pass a range qualification once a year. |
| Authority for Authorized Use | Use is established under FPD Policy 300 and Policy 311. It is the policy of the FPD to utilize rifles only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |

| Accuracy International AT-.308 | |
|---|---|
| Description | Sniper Rifle |
| Quantity | 4 |
| Capability | This weapon shoots a heavier round. It is utilized when there is a potential need to engage a target further away than the capabilities of our issued rifles or to engage a target behind an intermediate barrier such as glass or metal. The weapon is often deployed in an overwatch capacity to protect the public during events such as the International Marathon. |
| Life Span | 10-15 years |
| Manufacturer's Description | The AT (Accuracy Tactical) continues the legacy of the combat proven AW308 and takes the AW to new levels. The AIAT has a 20-inch quick change barrel and a folding stock. The AT is ideal for Law Enforcement and civilian users. |
| Purpose | The AIAT is an accurate rifle for precision shooting. These rifles are equipped with magnified optics and can be utilized to take precision shots at intermediate to long ranges. The .308 caliber bullet it shoots is also bigger and heavier than a typical .223 caliber bullet from an AR-15 which means it will penetrate barriers like glass with much less deflection. |

| Authorized Usage | To defend against an imminent threat of serious bodily injury or death. Used by SWAT |
|---|---|
| Costs | $5,000 $0<br>anticipated yearly maintenance cost |
| Required Training | Prior to using a rifle, officers must be certified by POST instructors in the operation of the rifle. Additionally, all members that operate any rifle are required to pass a range qualification once a year. |
| Authority for Authorized Use | Use is established under FPD Policy 300 and Policy 311. It is the policy of the FPD to utilize rifles only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |

| Benelli M3 Tactical Shotgun ||
|---|---|
| Description | SWAT Shotgun |
| Quantity | 3 |
| Capability | This is a 12-gauge semi-automatic pump shotgun used by SWAT officers. The semi-automatic capability reduces time between rounds versus a standard pump action shotgun. Not having to manipulate a fore-end gives SWAT officer the ability to get back on target faster increasing officer safety. The round is good for defeating barriers. |
| Life Span | 10-15 years |
| Manufacturer's Description | Benelli's M3 Tactical Shotgun delivers fast cycling semi-auto fire with conventional loads or pump action for low energy loads. It is available in a 12 gauge, pistol grip model that satisfies a shooters need for both a semi-automatic and a pump action shotgun in one convertible weapon. |
| Purpose | SWAT |
| Authorized Usage | To defend against an imminent threat of serious bodily injury or death. Used by SWAT |
| Costs | $800 $0<br>anticipated yearly maintenance cost |
| Required Training | Prior to using a shotgun, officers must be certified by POST instructors in the operation of the rifle. Additionally, all members that operate any shotgun are required to pass a range qualification once a year. |
| Authority for Authorized Use | Use is established under FPD Policy 300 and Policy 311. It is the policy of the FPD to utilize shotguns only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |

| Colt (11.5-inch barrel) M4 Carbine – Enhanced Patrol Rifle ||
|---|---|
| Description | Enhanced Patrol Rifle |
| Quantity | 24 |
| Capability | Equipped with optical sight systems and mounted flashlights, the short-barreled rifle (SBR) fires an intermediate-power cartridge (.223/5.56) which is more powerful than a standard pistol but less powerful than a standard rifle. The SBR gives police officers better maneuverability in and out of patrol vehicles and motorcycles. The SBR is ideal for close quarter deployments inside of structures and provides improved accuracy for long distance engagements. |
| Life Span | 10-15 years |

| Manufacturer's Description | Built for the demanding use of those who protect our communities every day, the Colt Enhanced Patrol Rifle (EPR) is the next evolution in the world's most dependable, thoroughly field-tested patrol rifle. Featuring an extended handguard that accepts modular rail segments for mounting a wide variety of pro-grade optics, lighting, and ergonomics-enhancing accessories, as well as the highly durable Magpul® MBUS® Pro Series front and rear back up sights and B5 Bravo buttstock. The Colt EPR reestablishes the Colt AR-15® as the finest tool for local, regional, and national law enforcement agencies |
|---|---|
| Purpose | The AR-15 can stop threats of great bodily injury or death at close and intermediate ranges. The AR-15 platform is capable of firing more accurately and quicker than a pistol while holding more rounds in the magazine and having better ballistic qualities. |
| Authorized Usage | To defend against an imminent threat of serious bodily injury or death. Used by the Officers |
| Costs | $1,190<br>$50 anticipated yearly maintenance cost |
| Required Training | Prior to using a rifle, officers must be certified by POST instructors in the operation of the rifle. Additionally, all members that operate any rifle are required to pass a range qualification once a year. |
| Authority for Authorized Use | Use is established under FPD Policy 300 and Policy 311. It is the policy of the FPD to utilize rifles only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |

| Colt (16-inch barrel) M4 Carbine AR-15 | |
|---|---|
| Description | Patrol Rifle |
| Quantity | 22 |
| Capability | Equipped with optical sight systems and mounted flashlights, these rifles fire an intermediate-power cartridge (.223/5.56) cartridge which is more powerful than a standard pistol but less powerful than a standard rifle. Provides improved accuracy for long distance engagements. |
| Life Span | 10-15 years |
| Manufacturer's Description | The civilian model 6920 is the civilian version of the current Colt M4 Carbine used by our modern military war fighters. Throughout the world today Colt's reliability, performance and accuracy provide our armed Forces with the confidence required to accomplish any mission, and this rifle can do the same for you. Colt's 6920 series shares many of the same features as it's combat-proven brother the Colt M4. From the forged aluminum upper and lower receivers, to the chrome lined barrel, even through the gas operated semi automatic firing system. Don't settle for imitations, buy the real thing, buy a Colt |
| Purpose | The AR-15 can stop threats of great bodily injury or death at close and intermediate ranges. The AR-15 platform is capable of firing more accurately and quicker than a pistol while holding more rounds in the magazine and having better ballistic qualities. |
| Authorized Usage | To defend against an imminent threat of serious bodily injury or death. Used by the Officers |
| Costs | $940                                                                                    $50<br>anticipated yearly maintenance cost |

| Required Training | Prior to using a rifle, officers must be certified by POST instructors in the operation of the rifle. Additionally, all members that operate any rifle are required to pass a range qualification once a year. |
| Authority for Authorized Use | Use is established under FPD Policy 300 and Policy 311. It is the policy of the FPD to utilize rifles only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |

| Black Hills Gold .308 Winchester 180 Nosler AccuBond | |
| --- | --- |
| Description | Specialized ammunition |
| Quantity | 520 Rounds |
| Capability | Penetrate Intermediate Barriers, Residential windows/Automotive Glass |
| Life Span | Indefinite |
| Manufacturer's Description | This round is loaded with a high quality Nosler AccuBond bullet for excellent down range performance. Through a proprietary bonding process that eliminates voids in the bullet core, AccuBond marries Nosler's traditional copper-alloy jacket with its special lead-alloy core. The result is a bullet that flies true, penetrates deep, won't cause extensive barrel fouling, and will retain 60-70% of its weight. The white polymer tip helps protect against deformation while initiating expansion upon impact. This round is used to penetrate intermediate barriers, residential windows, and automotive glass at 2,500 feet per second. |
| Purpose | To defend against an imminent threat of serious bodily injury or death. Used by SWAT |
| Authorized Usage | To defend against an imminent threat of serious bodily injury or death. Used by SWAT |
| Costs | $45 per box approx. $0 anticipated yearly maintenance cost |
| Required Training | Sworn members utilizing specialized ammunitions are trained by POST certified firearms instructors. |
| Authority for Authorized Use | Use is established under the FPD Policy 300, and Policy 311. It is the policy of the FPD to utilize specialized ammunition only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |

| Hornaday .308 Winchester Tap 168 grain ELD Match Tap Precision | |
| --- | --- |
| Description | Specialized ammunition |
| Quantity | 7800 Rounds |
| Capability | Precision Round, Limited Penetration |
| Life Span | Indefinite |
| Manufacturer's Description | Hornady .308 Winchester Tap 168 grain ELD Match Tap Precision bullet with Heat Shield tip delivers the excellent terminal performance TAP Precision is known for, but features a resilient, heat resistant polymer tip that improves the ballistic coefficient, resulting in higher impact velocities, less drop, less wind drift, and more energy on target. The round has a muzzle velocity of 2,672 feet per second. |
| Purpose | Precision round with limited Penetration |
| Authorized Usage | To defend against an imminent threat of serious bodily injury or death. Used by SWAT |

| | |
|---|---|
| Costs | $25 per box<br>approx. $0 anticipated yearly maintenance cost |
| Required Training | Sworn members utilizing specialized ammunitions are trained by POST certified firearms instructors. |
| Authority for Authorized Use | Use is established under the FPD Policy 300, and Policy 311.  It is the policy of the FPD to utilize specialized ammunition only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |

| Defense Technology Ferret 37mm CS 1192 | |
|---|---|
| Description | Tear Gas |
| Quantity | 5 |
| Capability | Can be launched via the 37mm single launcher |
| Life Span | 5 years |
| Manufacturer's Description | The Ferret® 37 mm CS Round is a frangible projectile filled with chemical agent. Upon impacting the barrier, the nose cone ruptures and instantaneously delivers the .16 oz. agent payload inside a structure. The munitions is 4.8 in. by 1.5 in. and travels at 650fps within an effective range of 50 yards. |
| Purpose | To safely resolve critical situations such as violent civil unrest and highrisk tactical operations |
| Authorized Usage | De-escalation tool not likely to inflict serious injury<br>Used by SWAT |
| Costs | $40                                                                          $0<br>anticipated yearly maintenance cost |
| Required Training | Sworn members utilizing chemical agents are trained by POST certified chemical agent instructors. |
| Authority for Authorized Use | Use is established under the FPD Policy 300, subsection 308.4.  It is the policy of the FPD to utilize chemical agents only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |

| Defense Technology Ferret 37mm OC 1160 | |
|---|---|
| Description | Tear Gas |
| Quantity | 9 |
| Capability | Can be launched via the 37mm single launcher |
| Life Span | 5 years |
| Manufacturer's Description | The Ferret® 37 mm OC Round is a frangible projectile filled with chemical agent. Upon impacting the barrier, the nose cone ruptures and instantaneously delivers the .16 oz. agent payload inside a structure. These munitions are 4.8 in. by 1.5 in. and travels at 650fps within an effective range of 50 yards. |
| Purpose | To safely resolve critical situations such as violent civil unrest and high-risk tactical operations |
| Authorized Usage | De-escalation tool not likely to inflict serious injury<br>Used by SWAT |
| Costs | $40                                                                          $0<br>anticipated yearly maintenance cost |
| Required Training | Sworn members utilizing chemical agents are trained by POST certified chemical agent instructors. |
| Authority for Authorized Use | Use is established under the FPD Policy 300, subsection 308.4.  It is the policy of the FPD to utilize chemical agents only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |

| Combined Tactical Systems 37mm Riot CS Powder Muzzle Blast | |
|---|---|
| Description | Tear Gas |
| Quantity | 1 |
| Capability | Can be launched via the 37mm single launcher |
| Life Span | 5 years |

| Manufacturer's Description | A cartridge designed to blast irritant powder directly from the muzzle toward a hostile crowd or individual. These muzzle munitions are designed with a "dual-rim" enabling the operator to chamber the round in both 37MM and 40MM Launchers. However, only 37MM will deliver optimum performance as stated in this specification sheet. | |
|---|---|---|
| Purpose | To safely resolve critical situations such as violent civil unrest and high-risk tactical operations | |
| Authorized Usage | De-escalation tool not likely to inflict serious injury<br>Used by SWAT | |
| Costs | $40<br>anticipated yearly maintenance cost | $0 |
| Required Training | Sworn members utilizing chemical agents are trained by POST certified chemical agent instructors. | |
| Authority for Authorized Use | Use is established under the FPD Policy 300, subsection 308.4.  It is the policy of the FPD to utilize chemical agents only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. | |

| Combined Tactical Systems 2430 CS/ 12-gauge barricade | |
|---|---|
| Description | Tear Gas |
| Quantity | 19 |
| Capability | Can be launched via a 12 gauge shotgun |
| Life Span | 5 years |
| Manufacturer's Description | Liquid filled, non-burning, fin-stabilized rounds designed to penetrate light to intermediate barriers such as windows and hollow core doors. The projectiles break upon impact and deliver agent payloads of powder or liquid throughout the adjacent target area. |
| Purpose | To safely resolve critical situations such as violent civil unrest and high-risk tactical operations |
| Authorized Usage | De-escalation tool not likely to inflict serious injury<br>Used by SWAT |
| Costs | $8                                                                                                    $0<br>anticipated yearly maintenance cost |
| Required Training | Sworn members utilizing chemical agents are trained by POST certified chemical agent instructors. |
| Authority for Authorized Use | Use is established under the FPD Policy 300, subsection 308.4.  It is the policy of the FPD to utilize chemical agents only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |

| Combined Tactical Systems 2440- 12-gauage OC powder | |
|---|---|
| Description | Tear Gas |
| Quantity | 10 |
| Capability | Can be launched via a 12 gauge shotgun |
| Life Span | 5 years |
| Manufacturer's Description | OC Liquid filled, non-burning, fin-stabilized rounds designed to penetrate light to intermediate barriers such as windows and hollow core doors. The projectiles break upon impact and deliver agent payloads of OC powder throughout the adjacent target area. |

| Purpose | To safely resolve critical situations such as violent civil unrest and high-risk tactical operations |
|---|---|
| Authorized Usage | De-escalation tool not likely to inflict serious injury<br>Used by SWAT |
| Costs | $8                                                                                          $0<br>anticipated yearly maintenance cost |
| Required Training | Sworn members utilizing chemical agents are trained by POST certified chemical agent instructors. |
| Authority for Authorized Use | Use is established under the FPD Policy 300, subsection 308.4.  It is the policy of the FPD to utilize chemical agents only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |

| Defense Technology Ferret 40mm liquid barricade penetrator round, OC 2260 ||
|---|---|
| Description | Tear Gas |
| Quantity | 0 |
| Capability | Can be launched via a 40mm launcher. |
| Life Span | 5 years |
| Manufacturer's Description | The Ferret® 40mm Round is non-burning and suitable for indoor use. Used primarily by tactical teams, it is designed to penetrate barriers, such as windows, hollow core doors, wallboard and thin plywood. Upon impacting the barrier, the nose cone ruptures and instantaneously delivers a small chemical payload inside of a structure or vehicle.  In a tactical deployment situation, the 40mm Ferret is primarily used to dislodge barricaded subjects from confined areas. Its purpose is to minimize the risks to all parties through pain compliance, temporary discomfort and/or incapacitation of potentially violent or dangerous subjects. |
| Purpose | To safely resolve critical situations such as violent civil unrest and high-risk tactical operations |
| Authorized Usage | De-escalation tool not likely to inflict serious injury<br>Used by SWAT |
| Costs | $10                                                                                        $0<br>anticipated yearly maintenance cost |
| Required Training | Sworn members utilizing chemical agents are trained by POST certified chemical agent instructors. |
| Authority for Authorized Use | Use is established under the FPD Policy 300, subsection 308.4.  It is the policy of the FPD to utilize chemical agents only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |

| Defense Technology Ferret 40 mm powder barricade round, CS 2292 ||
|---|---|
| Description | Tear Gas |
| Quantity | 10 |
| Capability | Can be launched via a 40mm launcher. |
| Life Span | 5 years |

| Manufacturer's Description | The Ferret® 40 mm Barricade Penetrating Round is filled with a CS powder chemical agent. It is a frangible projectile that is spin stabilized utilizing barrel rifling. It is non-burning and designed to penetrate barriers. Primarily used to dislodge barricaded subjects, it can also be used for area denial. Primarily used by tactical teams, it is designed to penetrate barriers, such as windows, hollow core doors, wallboard and thin plywood. Upon impact the nose ruptures and instantaneously delivers the agent payload inside a structure or vehicle. |
|---|---|
| Purpose | To safely resolve critical situations such as violent civil unrest and high-risk tactical operations |
| Authorized Usage | De-escalation tool not likely to inflict serious injury<br>Used by SWAT |
| Costs | $10                                                                              $0<br>anticipated yearly maintenance cost |
| Required Training | Sworn members utilizing chemical agents are trained by POST certified chemical agent instructors. |
| Authority for Authorized Use | Use is established under the FPD Policy 300, subsection 308.4.  It is the policy of the FPD to utilize chemical agents only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |

| Defense Technology Ferret 40 mm liquid barricade penetrator round, CS 2262 | |
|---|---|
| Description | Tear Gas |
| Quantity | 5 |
| Capability | Can be launched via a 40mm launcher. |
| Life Span | 5 years |
| Manufacturer's Description | The Ferret® 40mm Round is non-burning and suitable for indoor use. Used primarily by tactical teams, it is designed to penetrate barriers, such as windows, hollow core doors, wallboard and thin plywood. Upon impacting the barrier, the nose cone ruptures and instantaneously delivers a small chemical payload inside of a structure or vehicle.  In a tactical deployment situation, the 40mm Ferret is primarily used to dislodge barricaded subjects from confined areas. Its purpose is to minimize the risks to all parties through pain compliance, temporary discomfort and/or incapacitation of potentially violent or dangerous subjects. |
| Purpose | To safely resolve critical situations such as violent civil unrest and high-risk tactical operations |
| Authorized Usage | De-escalation tool not likely to inflict serious injury<br>Used by SWAT |
| Costs | $10                                                                              $0<br>anticipated yearly maintenance cost |
| Required Training | Sworn members utilizing chemical agents are trained by POST certified chemical agent instructors. |
| Authority for Authorized Use | Use is established under the FPD Policy 300, subsection 308.4.  It is the policy of the FPD to utilize chemical agents only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |

| Defense Technology Ferret 40 mm powder barricade round, OC 2290 | |
|---|---|
| Description | Tear Gas |
| Quantity | 16 |

| Capability | Can be launched via a 40mm launcher. |
|---|---|
| Life Span | 5 years |
| Manufacturer's Description | The Ferret® 40 mm Barricade Penetrating Round is filled with an OC powder chemical agent. It is a frangible projectile that is spin stabilized utilizing barrel rifling. It is non-burning and designed to penetrate barriers. Primarily used to dislodge barricaded subjects, it can also be used for area denial. Primarily used by tactical teams, it is designed to penetrate barriers, such as windows, hollow core doors, wallboard and thin plywood. Upon impact the nose ruptures and instantaneously delivers the agent payload inside a structure or vehicle. |
| Purpose | To safely resolve critical situations such as violent civil unrest and high-risk tactical operations |
| Authorized Usage | De-escalation tool not likely to inflict serious injury<br>Used by SWAT |
| Costs | $10              $0<br>anticipated yearly maintenance cost |
| Required Training | Sworn members utilizing chemical agents are trained by POST certified chemical agent instructors. |
| Authority for Authorized Use | Use is established under the FPD Policy 300, subsection 308.4. It is the policy of the FPD to utilize chemical agents only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |

| Defense Technology Triple-chaser separating canister, CS 1026 | |
|---|---|
| Description | Tear Gas |
| Quantity | 10 |
| Capability | Can be hand thrown, launched, or placed into a munitions Pole |
| Life Span | 5 years |
| Manufacturer's Description | The Triple-Chaser® CS consists of three separate canisters pressed together with separating charges between each. When deployed, the canisters separate and land approximately 20 feet apart allowing increased area coverage in a short period of time. This grenade can be hand thrown or launched from a fired delivery system. The grenade is 6.5 in. by 2.7 in. and holds an approximately 3.2 oz. of active agent payload. It has an approximate burn time of 20-30 seconds. |
| Purpose | To safely resolve critical situations such as violent civil unrest and high-risk tactical operations |
| Authorized Usage | De-escalation tool not likely to inflict serious injury<br>Used by SWAT |
| Costs | $32              $0<br>anticipated yearly maintenance cost |
| Required Training | Sworn members utilizing chemical agents are trained by POST certified chemical agent instructors. |
| Authority for Authorized Use | Use is established under the FPD Policy 300, subsection 308.4. It is the policy of the FPD to utilize chemical agents only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |

| Defense Technology Ferret 12-gauge liquid barricade round, CS 3012 | |
|---|---|
| Description | Tear Gas |
| Quantity | 10 |
| Capability | Can be launched via a 12 gauge shotgun |

| | |
|---|---|
| Life Span | 5 years |
| | |
| Manufacturer's Description | The Ferret® 12-Gauge Liquid CS non pyrotechnical properties also eliminate the fire hazard common with other products. The Ferret round is available with either liquid or powder carriers for the agent. These munitions are a 2.5 in. 12-Gauge round deploying .025 oz. of active agent. |
| Purpose | To safely resolve critical situations such as violent civil unrest and high-risk tactical operations |
| Authorized Usage | De-escalation tool not likely to inflict serious injury<br>Used by SWAT |
| Costs | $10                                                                                    $0<br>anticipated yearly maintenance cost |
| Required Training | Sworn members utilizing chemical agents are trained by POST certified chemical agent instructors. |
| Authority for Authorized Use | Use is established under the FPD Policy 300, subsection 308.4.  It is the policy of the FPD to utilize chemical agents only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |

| Defense Technology Ferret 12-gauge powder barricade round, CS 3092 | |
|---|---|
| Description | Tear Gas |
| Quantity | 10 |
| Capability | Can be launched via a 12 gauge shotgun |
| Life Span | 5 years |
| Manufacturer's Description | The Ferret® 12-Gauge Powder CS non pyrotechnic properties also eliminate the fire hazard common with other products. The Ferret round is available with either liquid or powder carriers for the agent. The powder carrier improves barricade penetration potential. |
| Purpose | To safely resolve critical situations such as violent civil unrest and high-risk tactical operations |
| Authorized Usage | De-escalation tool not likely to inflict serious injury<br>Used by SWAT |
| Costs | $10                                                                                    $0<br>anticipated yearly maintenance cost |
| Required Training | Sworn members utilizing chemical agents are trained by POST certified chemical agent instructors. |
| Authority for Authorized Use | Use is established under the FPD Policy 300, subsection 308.4.  It is the policy of the FPD to utilize chemical agents only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |

| Defense Technology Ferret 12-gauge powder barricade round, OC 3090 | |
|---|---|
| Description | Tear Gas |
| Quantity | 10 |
| Capability | Can be launched via a 12 gauge shotgun |
| Life Span | 5 years |
| Manufacturer's Description | The Ferret® 12-GaugePowder OC non pyrotechnical properties also eliminate the fire hazard common with other products. The Ferret® round is available with either liquid or powder carriers for the agent. These munitions are a 2.5 in. 12-Gauge round deploying .002 oz. of active agent. |

| Purpose | To safely resolve critical situations such as violent civil unrest and high-risk tactical operations |
|---|---|
| Authorized Usage | De-escalation tool not likely to inflict serious injury Used by SWAT |
| Costs | $8                                                                $0 anticipated yearly maintenance cost |
| Required Training | Sworn members utilizing chemical agents are trained by POST certified chemical agent instructors. |
| Authority for Authorized Use | Use is established under the FPD Policy 300, subsection 308.4. It is the policy of the FPD to utilize chemical agents only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |

| Defense Technology Ferret 12-gauge liquid barricade round, OC 3010 | |
|---|---|
| Description | Tear Gas |
| Quantity | 10 |
| Capability | Can be launched via a 12 gauge shotgun |
| Life Span | 5 years |
| Manufacturer's Description | The Ferret® 12-Gauge Liquid OC non pyrotechnical properties also eliminate the fire hazard common with other products. The Ferret round is available with either liquid or powder carriers for the agent. These munitions are a 2.5 in. 12-Gauge round deploying .015 oz. of active agent. |
| Purpose | To safely resolve critical situations such as violent civil unrest and high-risk tactical operations |
| Authorized Usage | De-escalation tool not likely to inflict serious injury Used by SWAT |
| Costs | $10                                                               $0 anticipated yearly maintenance cost |
| Required Training | Sworn members utilizing chemical agents are trained by POST certified chemical agent instructors. |
| Authority for Authorized Use | Use is established under the FPD Policy 300, subsection 308.4. It is the policy of the FPD to utilize chemical agents only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |

| Defense Technology 12-gauge barricade projectile, CS 23 | |
|---|---|
| Description | Tear Gas |
| Quantity | 10 |
| Capability | Can be launched via a 12 gauge shotgun |
| Life Span | 5 years |
| Manufacturer's Description | |
| Purpose | To safely resolve critical situations such as violent civil unrest and high-risk tactical operations |
| Authorized Usage | De-escalation tool not likely to inflict serious injury Used by SWAT |
| Costs | $10                                                               $0 anticipated yearly maintenance cost |
| Required Training | Sworn members utilizing chemical agents are trained by POST certified chemical agent instructors. |

| Authority for Authorized Use | Use is established under the FPD Policy 300, subsection 308.4.  It is the policy of the FPD to utilize chemical agents only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |
|---|---|

| Smith & Wesson 12-gauge barricade projectile, CS | | |
|---|---|---|
| Description | Tear Gas | |
| Quantity | 19 | |
| Capability | Can be launched via a 12 gauge shotgun | |
| Life Span | 5 years | |
| Manufacturer's Description | Non-pyrotechnical 12-Gauge barricade round with a small CS charge. | |
| Purpose | To safely resolve critical situations such as violent civil unrest and high-risk tactical operations | |
| Authorized Usage | De-escalation tool not likely to inflict serious injury<br>Used by SWAT | |
| Costs | $10<br>anticipated yearly maintenance cost | $0 |
| Required Training | Sworn members utilizing chemical agents are trained by POST certified chemical agent instructors. | |
| Authority for Authorized Use | Use is established under the FPD Policy 300, subsection 308.4.  It is the policy of the FPD to utilize chemical agents only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. | |

| Defense Technology Aerosol OC/CS grenade 1050 | | |
|---|---|---|
| Description | Tear Gas | |
| Quantity | 7 | |
| Capability | Can be hand thrown, launched, or placed into a munitions Pole | |
| Life Span | 5 years | |
| Manufacturer's Description | Designed for indoor use, this grenade contains no CFCs, is not a fire hazard and requires minimal decontamination by comparison to smoke, powders, or liquids. The Aerosol Grenade is most commonly used in tactical situations by Law Enforcement and Corrections and was designed with indoor operations in mind when a non fire-producing delivery system is desired. It is most effective when used in confined areas and close to the target area. Used to minimize the risks to all parties through pain compliance, temporary discomfort and/or incapacitation of potentially violent or dangerous subjects. The Aerosol Grenade is ideal for cell extractions or barricade situations where the use of pyrotechnic, powder, or liquid devices is not practical or desired. The OC and CS combination provide sufficient effects in confined areas of up to 1,500 square feet. The Aerosol Grenade is not recommended for outdoor use. | |
| Purpose | To safely resolve critical situations such as violent civil unrest and high-risk tactical operations | |
| Authorized Usage | De-escalation tool not likely to inflict serious injury<br>Used by SWAT | |
| Costs | $35<br>anticipated yearly maintenance cost | $0 |
| Required Training | Sworn members utilizing chemical agents are trained by POST certified chemical agent instructors. | |

| Authority for Authorized Use | Use is established under the FPD Policy 300, subsection 308.4. It is the policy of the FPD to utilize chemical agents only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |
|---|---|

| Defense Technology Spede-Heat continuous discharge chemical grenade, OC 1070 | |
|---|---|
| Description | Tear Gas |
| Quantity | 3 |
| Capability | Can be hand thrown, launched, or placed into a munitions Pole |
| Life Span | 5 years |
| Manufacturer's Description | The Spede-Heat™ OC Grenade is a high volume, continuous burn it expels its payload in approximately 20-40 seconds. The payload is discharged through four gas ports on top of the canister, three on the side and one on the bottom. This launchable grenade is 6.12 in. by 2.62 in. and holds approximately 1.09 oz. of active agent. |
| Purpose | To safely resolve critical situations such as violent civil unrest and high-risk tactical operations |
| Authorized Usage | De-escalation tool not likely to inflict serious injury<br>Used by SWAT |
| Costs | $                                                                       $0<br>anticipated yearly maintenance cost |
| Required Training | Sworn members utilizing chemical agents are trained by POST certified chemical agent instructors. |
| Authority for Authorized Use | Use is established under the FPD Policy 300, subsection 308.4. It is the policy of the FPD to utilize chemical agents only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |

| Defense Technology Riot control continuous discharge grenade, OC 1080 | |
|---|---|
| Description | Tear Gas |
| Quantity | 3 |
| Capability | Can be hand thrown, launched, or placed into a munitions Pole |
| Life Span | 5 years |
| Manufacturer's Description | The Riot Control OC Grenade is designed specifically for outdoor use in crowd control situations with a high volume continuous burn that expels its payload in approximately 20-40 seconds through four gas ports located on the top of the canister. This grenade can be used to conceal tactical movement or to route a crowd. The volume of smoke and agent is vast and obtrusive. This launchable grenade is 6.0 in. by 2.35 in. and holds approximately 0.88 oz. of active agent. |
| Purpose | To safely resolve critical situations such as violent civil unrest and high-risk tactical operations |
| Authorized Usage | De-escalation tool not likely to inflict serious injury<br>Used by SWAT |
| Costs | $35                                                                    $0<br>anticipated yearly maintenance cost |
| Required Training | Sworn members utilizing chemical agents are trained by POST certified chemical agent instructors. |
| Authority for Authorized Use | Use is established under the FPD Policy 300, subsection 308.4. It is the policy of the FPD to utilize chemical agents only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |

| Defense Technology Instantaneous blast CS grenade 1042 | |
|---|---|
| Description | Tear Gas |
| Quantity | 3 |
| Capability | Can be hand thrown, launched, or placed into a munitions Pole |
| Life Span | 5 years |
| Manufacturer's Description | The Instantaneous Blast CS Grenade is designed for indoor or outdoor use; this grenade's powder is expelled upon initiation of a small internal detonator that has sufficient force to split the canister at six machined groves on the outside surface. this device is well suited for affecting numerous subjects grouped within a contained portion of a prison yard or area, using wind to the advantage. This 6.12 in. by 2.62 in. grenade will deliver approximately 1.5 oz. of active agent. |
| Purpose | To safely resolve critical situations such as violent civil unrest and high-risk tactical operations |
| Authorized Usage | De-escalation tool not likely to inflict serious injury Used by SWAT |
| Costs | $35                                                                                          $0 anticipated yearly maintenance cost |
| Required Training | Sworn members utilizing chemical agents are trained by POST certified chemical agent instructors. |
| Authority for Authorized Use | Use is established under the FPD Policy 300, subsection 308.4.  It is the policy of the FPD to utilize chemical agents only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |

| Defense Technology Spede-Heat continuous discharge chemical grenade, CS 1072 | |
|---|---|
| Description | Tear Gas |
| Quantity | 10 |
| Capability | Can be hand thrown, launched, or placed into a munitions Pole |
| Life Span | 5 years |
| Manufacturer's Description | The Spede-Heat™ CS Grenade is a high volume, continuous burn it expels its payload in approximately 20-40 seconds. The payload is discharged through four gas ports on top of the canister, three on the side and one on the bottom. This launchable grenade is 6.12 in. by 2.62 in. and holds approximately 2.9 oz. of active agent. |
| Purpose | To safely resolve critical situations such as violent civil unrest and high-risk tactical operations |
| Authorized Usage | De-escalation tool not likely to inflict serious injury Used by SWAT |
| Costs | $35                                                                                          $0 anticipated yearly maintenance cost |
| Required Training | Sworn members utilizing chemical agents are trained by POST certified chemical agent instructors. |
| Authority for Authorized Use | Use is established under the FPD Policy 300, subsection 308.4.  It is the policy of the FPD to utilize chemical agents only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |

| Defense Technology Flameless tri-chamber CS grenade 1032 |
|---|

| Description | Tear Gas |
|---|---|
| Quantity | 6 |
| Capability | Can be hand thrown, launched, or placed into a munitions Pole |
| Life Span | 5 years |
| Manufacturer's Description | The design of the Tri-Chamber Flameless CS Grenade allows the contents to burn within an internal can and disperse the agent safely with reduced risk of fire. The grenade is designed primarily for indoor tactical situations to detect and/or dislodge a barricaded subject. This grenade will deliver approximately .70 oz. of agent during its 20-25 seconds burn time. The Tri-Chamber Flameless Grenade can be used in crowd control as well as tactical deployment situations by Law Enforcement and Corrections, but was designed with the barricade situation in mind. Its applications in tactical situations are primarily to detect and/or dislodge barricaded subjects. The purpose of the Tri-Chamber Flameless Grenade is to minimize the risks to all parties through pain compliance, temporary discomfort, and/or incapacitation of potentially violent or dangerous subjects. The Tri-Chamber Flameless Grenade provides the option of delivering a pyrotechnic chemical device indoors, maximizing the chemicals' effectiveness via heat and vaporization, while minimizing or negating the chance of fire to the structure. |
| Purpose | To safely resolve critical situations such as violent civil unrest and high-risk tactical operations |
| Authorized Usage | De-escalation tool not likely to inflict serious injury Used by SWAT |
| Costs | $35 $0 anticipated yearly maintenance cost |
| Required Training | Sworn members utilizing chemical agents are trained by POST certified chemical agent instructors. |
| Authority for Authorized Use | Use is established under the FPD Policy 300, subsection 308.4. It is the policy of the FPD to utilize chemical agents only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |

| Defense Technology Flameless tri-chamber OC grenade 1030 | |
|---|---|
| Description | Tear Gas |
| Quantity | 4 |
| Capability | Can be hand thrown, launched, or placed into a munitions Pole |
| Life Span | 5 years |

| Manufacturer's Description | Designed for law enforcement and corrections, the OC Flameless Tri-Chamber Pyrotechnic Grenade combines the effectiveness of Oleoresin Capsicum (OC) as an incapacitating agent with the flexible delivery methods, range and area coverage of pyrotechnic munitions. The OC Flameless Tri-Chamber Grenade can be used in crowd control, or barricade situations, as a less lethal solution to incapacitate subjects through temporary respiratory discomfort, while reducing or negating the chance of fire to structures. The Tri-Chamber Flameless Grenade can be used in crowd control as well as tactical deployment situations by Law Enforcement and Corrections, but was designed with the barricade situation in mind. Its applications in tactical situations are primarily to detect and/or dislodge barricaded subjects. The purpose of the Tri-Chamber Flameless Grenade is to minimize the risks to all parties through pain compliance, temporary discomfort, and/or incapacitation of potentially violent or dangerous subjects. The Tri-Chamber Flameless Grenade provides the option of delivering a pyrotechnic chemical device indoors, maximizing the chemicals' effectiveness via heat and vaporization, while minimizing or negating the chance of fire to the structure. | |
| --- | --- | --- |
| Purpose | To safely resolve critical situations such as violent civil unrest and high-risk tactical operations | |
| Authorized Usage | De-escalation tool not likely to inflict serious injury<br>Used by SWAT | |
| Costs | $35<br>anticipated yearly maintenance cost | $0 |
| Required Training | Sworn members utilizing chemical agents are trained by POST certified chemical agent instructors. | |
| Authority for Authorized Use | Use is established under the FPD Policy 300, subsection 308.4. It is the policy of the FPD to utilize chemical agents only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. | |

| Defense Technology Riot control continuous discharge grenade, CS 1082 | |
| --- | --- |
| Description | Tear Gas |
| Quantity | 8 |
| Capability | Can be hand thrown, launched, or placed into a munitions Pole |
| Life Span | 5 years |
| Manufacturer's Description | The Riot Control CS Grenade is designed specifically for outdoor use in crowd control situations with a high volume continuous burn that expels its payload in approximately 20-40 seconds through four gas ports located on the top of the canister. This grenade can be used to conceal tactical movement or to route a crowd. The volume of smoke and agent is vast and obtrusive. This launchable grenade is 6.0 in. by 2.35 in. and holds approximately 2.7 oz. of active agent. |
| Purpose | To safely resolve critical situations such as violent civil unrest and high-risk tactical operations |
| Authorized Usage | De-escalation tool not likely to inflict serious injury<br>Used by SWAT |
| Costs | $35                                                          $0<br>anticipated yearly maintenance cost |
| Required Training | Sworn members utilizing chemical agents are trained by POST certified chemical agent instructors. |

| Authority for Authorized Use | Use is established under the FPD Policy 300, subsection 308.4.  It is the policy of the FPD to utilize chemical agents only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |

| Defense Technology Pocket tactical grenade, CS 1016 | |
|---|---|
| Description | Tear Gas |
| Quantity | 8 |
| Capability | Can be hand thrown, launched, or placed into a munitions Pole |
| Life Span | 5 years |
| Manufacturer's Description | The Pocket Tactical CS Grenade is small, and lightweight. The 0.9 oz. of active agent will burn approximately 20-40 seconds. At 4.75 in. by 1.4 inches in size, it easily fits in most tactical pouches. This is a launchable grenade; however it is normally used as a signaling or covering device. Though this device is slightly over four inches in length, it produces a smoke cloud so fast it appears to be an enveloping screen produced by a full size tactical grenade. |
| Purpose | To safely resolve critical situations such as violent civil unrest and high-risk tactical operations |
| Authorized Usage | De-escalation tool not likely to inflict serious injury<br>Used by SWAT |
| Costs | $35                                                                              $0<br>anticipated yearly maintenance cost |
| Required Training | Sworn members utilizing chemical agents are trained by POST certified chemical agent instructors. |
| Authority for Authorized Use | Use is established under the FPD Policy 300, subsection 308.4.  It is the policy of the FPD to utilize chemical agents only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |

| Defense Technology Pocket tactical grenade, OC 1019 | |
|---|---|
| Description | Tear Gas |
| Quantity | 15 |
| Capability | Can be hand thrown, launched, or placed into a munitions Pole |
| Life Span | 5 years |
| Manufacturer's Description | The Pocket Tactical OC Grenade is a quick burning, reduced volume, continuous discharge grenade. Pelletized chemical agent is discharged through one (1) gas port located on the bottom of the canister. The Pocket Tactical Grenade is a small, lightweight, easily carried device that provides a medium volume of chemical agent or smoke for certain situations. It was designed with the tactical team in mind for distraction, concealment, rescue, or signaling. The pocket grenade is not specifically intended as a crowd management device; however, it can be used in chemical configurations in conjunction with larger smoke canisters to "piggy back" chemical agent into a predominately smoke environment. This device should be deployed utilizing wind advantage. |
| Purpose | To safely resolve critical situations such as violent civil unrest and high-risk tactical operations |
| Authorized Usage | De-escalation tool not likely to inflict serious injury<br>Used by SWAT |
| Costs | $35                                                                              $0<br>anticipated yearly maintenance cost |

| Required Training | Sworn members utilizing chemical agents are trained by POST certified chemical agent instructors. |
|---|---|
| Authority for Authorized Use | Use is established under the FPD Policy 300, subsection 308.4.  It is the policy of the FPD to utilize chemical agents only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |

| Defense Technology Muzzle blast 40 mm round, OC 6040 | |
|---|---|
| Description | Tear Gas |
| Quantity | 10 |
| Capability | Can be launched via a 40mm launcher |
| Life Span | 5 years |
| Manufacturer's Description | The 40 mm Muzzle Blast OC Round is widely used as a crowd management tool for the immediate and close deployment of chemical agent. It can also be employed in tactical operations such as barricaded subjects for area denial, area contamination, and a means of contaminating crawl spaces and attics. As a pain compliance round it is an excellent device for deploying chemical-laden OC powder at close ranges for indoor or outdoor operations. It has a maximum effective range of 30 feet /9.1 meters. |
| Purpose | To safely resolve critical situations such as violent civil unrest and high-risk tactical operations |
| Authorized Usage | De-escalation tool not likely to inflict serious injury<br>Used by SWAT |
| Costs | $35    $0<br>anticipated yearly maintenance cost |
| Required Training | Sworn members utilizing chemical agents are trained by POST certified chemical agent instructors. |
| Authority for Authorized Use | Use is established under the FPD Policy 300, subsection 308.4.  It is the policy of the FPD to utilize chemical agents only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |

| Defense Technology Muzzle blast 40 mm round, CS 6042 | |
|---|---|
| Description | Tear Gas |
| Quantity | 10 |
| Capability | Can be launched via a 40mm launcher |
| Life Span | 5 years |
| Manufacturer's Description | The 40 mm Muzzle Blast CS Round is widely used as a crowd management tool for the immediate and close deployment. It can also be employed in tactical operations such as barricaded subjects, room clearing, area denial, and for small space contamination, and a means of contaminating crawl spaces and attics. As a pain compliance round it is an excellent device for deploying chemical-laden CS powder at close ranges for indoor or outdoor operations. The cloud of agent is very effective in filling holes in dispersals lines or engaging crowds at close distances. |
| Purpose | To safely resolve critical situations such as violent civil unrest and high-risk tactical operations |
| Authorized Usage | De-escalation tool not likely to inflict serious injury<br>Used by SWAT |

| Costs | $35 | $0 |
| --- | --- | --- |
| | anticipated yearly maintenance cost | |
| Required Training | Sworn members utilizing chemical agents are trained by POST certified chemical agent instructors. | |
| Authority for Authorized Use | Use is established under the FPD Policy 300, subsection 308.4. It is the policy of the FPD to utilize chemical agents only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. | |

| Defense Technology Smoke Maximum HC Smoke 1083 | | |
| --- | --- | --- |
| Description | Smoke | |
| Quantity | 6 | |
| Capability | Can be hand thrown, launched, or placed into a munitions Pole | |
| Life Span | 5 years | |
| Manufacturer's Description | The Military-Style Maximum Smoke Grenade comes from the Defense Technology® #3 smoke grenade. It is a slow burning, high volume, continuous discharge grenade designed for outdoor use in crowd management situations. Emits grey-white smoke only for approximately 1.5 to 2 minutes. | |
| Purpose | To safely resolve critical situations such as violent civil unrest and high-risk tactical operations | |
| Authorized Usage | | |
| Costs | $38 | $0 |
| | anticipated yearly maintenance cost | |
| Required Training | Sworn members utilizing chemical agents are trained by POST certified chemical agent instructors. | |
| Authority for Authorized Use | Use is established under the FPD Policy 300, subsection 308.4. It is the policy of the FPD to utilize chemical agents only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. | |

| Defense Technology Triple-Chaser separating canister, SAF-Smoke 1027 | | |
| --- | --- | --- |
| Description | Smoke | |
| Quantity | 9 | |
| Capability | Can be hand thrown, launched, or placed into a munitions Pole | |
| Life Span | 5 years | |
| Manufacturer's Description | The Triple-Chaser® Saf-Smoke™ consists three separate canisters pressed together with separating charges between each. When deployed, the canisters separate and land approximately 20 feet apart allowing increased area coverage in a short period of time. This grenade can be hand thrown or launched from a fired delivery system and is an effective way to quickly deploy a wide blanket of agent. The grenade is 6.5 in. by 2.7 in. and delivers Saf-Smoke™. It has an approximate burn time of 20 seconds. | |
| Purpose | To safely resolve critical situations such as violent civil unrest and high-risk tactical operations | |
| Authorized Usage | De-escalation tool not likely to inflict serious injury Used by SWAT | |
| Costs | $38 | $0 |
| | anticipated yearly maintenance cost | |
| Required Training | Sworn members utilizing chemical agents are trained by POST certified chemical agent instructors. | |

| Authority for Authorized Use | Use is established under the FPD Policy 300, subsection 308.4. It is the policy of the FPD to utilize chemical agents only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |
| --- | --- |

| **Defense Technology 8933 Low Roll Distraction Device** | |
| --- | --- |
| Description | Diversionary Device (Flash Bang) |
| Quantity | |
| Capability | This intermediate less lethal specialty munition allows for light sound diversion during tactical operations which allows for tactical advantage during high-risk situations. |
| Life Span | Reusable 25 times |
| Manufacturer's Description | The Non-Reloadable Distraction Device® unit incorporates an M201A1 type fuze with hex design gun steel body. This is compact version of the 8933 Low Roll® body Distraction Device is the newest version of the first reusable non-bursting canister that limits movement and rolling once deployed. The compact Distraction Device fits safely in your hand and packs all the power of the full-size Distraction Device. This is a smaller, lighter device with the same output. |
| Purpose | To safely resolve critical situations during high-risk tactical operations. |
| Authorized Usage | De-escalation tool not likely to inflict serious injury<br>Used by SWAT |
| Costs | $30                                                                                   $0<br>anticipated yearly maintenance cost |
| Required Training | Prior to use, officers must attend inhouse training conducted by POST certified instructors or attend POST certified training. |
| Authority for Authorized Use | Use is established under FPD Policy 300. It is the policy of the FPD to utilize diversion devices only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |

| **Defense Technology 8908CI Command Initiated Distraction Device** | |
| --- | --- |
| Description | Diversionary Device (Flash Bang) |
| Quantity | 8 |
| Capability | This intermediate less lethal specialty munition allows for light sound diversion during tactical operations which allows for tactical advantage during high-risk situations. |
| Life Span | One time use |
| Manufacturer's Description | The Command Initiated Reload can be initiated on command from a remote point alleviating initiation delay when instantaneous results are desired. It is ideal for operations utilizing bang poles, deterring retreat and achieving space denial from predetermined areas. 12″ of thermo tubing is included with the reload. Some assembly and accessories are required. |
| Purpose | To safely resolve critical situations during high-risk tactical operations. |
| Authorized Usage | De-escalation tool not likely to inflict serious injury<br>Used by SWAT |
| Costs | $35                                                                                   $0<br>anticipated yearly maintenance cost |
| Required Training | Prior to use, officers must attend inhouse training conducted by POST certified instructors or attend POST certified training. |

| Authority for Authorized Use | Use is established under FPD Policy 300. It is the policy of the FPD to utilize diversion devices only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |

| Remington 870 Pump Action Shotgun – Less Lethal | |
|---|---|
| Description | Less Lethal Shotgun |
| Quantity | 10 |
| Capability | Deploying 12 gauge less lethal flexible baton munitions (Super sock) |
| Life Span | 15-20 years |
| Manufacturer's Description | The Remington 870 barrel has a fixed cylinder choke for optimum performance with buckshot and slugs at close range. A myriad of aftermarket Remington 870 accessories enables owners to customize the 870 Express for specific purposes. 870 Remington is a receiver milled from a solid billet of steel for maximum strength, and twin action bars that prevent binding and twisting while cycling the action. |
| Purpose | Deploys 12 gauge less lethal flexible baton (Super sock) as impact munitions. |
| Authorized Usage | De-escalation tool not likely to inflict serious injury. Used by SWAT and Patrol. |
| Costs | $500                                                                          $50 anticipated yearly maintenance cost |
| Required Training | Sworn members utilizing less lethal shotguns are trained by POST certified instructors for 2 hours. |
| Authority for Authorized Use | Use is established under the FPD Policy 300, subsection 308.4. It is the policy of the FPD to utilize impact munitions only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |

| Defense Technology 37MM Tactical Single Launcher | |
|---|---|
| Description | 37 MM Projectile Launcher |
| Quantity | 2 |
| Capability | Deploying 40mm less lethal impact projectiles and 40mm chemical agent rounds |
| Life Span | 25 years |
| Manufacturer's Description | The 37LMTS is a tactical 37mm single shot launcher. The Ambidextrous Lateral Sling Mount (LSM) and QD mounting systems allow both a single and two point sling attachment. The 37LMTS will fire standard 37/38mm Less Lethal ammunition, up to 8 inches in cartridge length. The Picatinny Rail Mounting System will accept a wide array of enhanced optics/sighting systems. |
| Purpose | Deploying 40mm less lethal impact projectiles and 40mm chemical agent rounds |
| Authorized Usage | De-escalation tool not likely to inflict serious injury. Used by SWAT |
| Costs | $300                                                                          $0 anticipated yearly maintenance cost |
| Required Training | Sworn members utilizing munitions launchers are trained by POST certified chemical agent instructors and POST certified less lethal instructors. |
| Authority for Authorized Use | Use is established under the FPD Policy 300, subsection 308.4, and Policy 311. It is the policy of the FPD to utilize projectile launchers only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |

| Defense Technology 1440 40MM Tactical 4-Shot Launcher | |
|---|---|
| Description | 40 MM Projectile Launcher |
| Quantity | 2 |

| Capability | Deploying 40mm less lethal impact projectiles and 40mm chemical agent rounds |
|---|---|
| Life Span | 15 years |
| Manufacturer's Description | Designed for riot and tactical situations, the Defense Technology® 1440 40mm Tactical 4-Shot Launcher is low-profile and lightweight, providing multi-shot capability in an easy to carry launcher. It features the Rogers Super Stoc™ expandable gun stock, an adjustable Picatinny mounted front grip, and a unique direct-drive system to advance the magazine cylinder. |
| Purpose | Deploying 40mm less lethal impact projectiles and 40mm chemical agent rounds |
| Authorized Usage | De-escalation tool not likely to inflict serious injury<br>Used by SWAT |
| Costs | $300                                                                                          $0<br>anticipated yearly maintenance cost |
| Required Training | Sworn members utilizing munitions launchers are trained by POST certified chemical agents instructors and POST certified less lethal instructors. |
| Authority for Authorized Use | Use is established under the FPD Policy 300, subsection 308.4, and Policy 311. It is the policy of the FPD to utilize projectile launchers only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |

| Penn Arms L637-1 37MM Projectile Launcher | |
|---|---|
| Description | 37 MM Projectile Launcher |
| Quantity | 1 |
| Capability | Deploying 37mm less lethal impact projectiles |
| Life Span | 25 years |
| Manufacturer's Description | A spring-advance magazine drum launcher with a six-shot capacity and a smooth barrel. |
| Purpose | Deploying 37mm less lethal impact projectiles |
| Authorized Usage | De-escalation tool not likely to inflict serious injury.  Used by SWAT and patrol |
| Costs | $300                                                                                          $0<br>anticipated yearly maintenance cost |
| Required Training | Sworn members utilizing munitions launchers are trained by POST certified chemical agents instructors and POST certified less lethal instructors. |
| Authority for Authorized Use | Use is established under the FPD Policy 300, subsection 308.4, and Policy 311. It is the policy of the FPD to utilize projectile launchers only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |

| Sage KO1/S Impact Baton 37MM Projectile | |
|---|---|
| Description | 37 MM Projectile |
| Quantity | 17 |
| Capability | 37mm launcher |
| Life Span | 25 years |
| Manufacturer's Description | The KO1 is a direct fire modular impact baton round that is designed to be used in situations where kinetic energy is preferred for the incapacitation of hostile and/or non-compliant individuals. |

| Purpose | To safely resolve critical situations such as high-risk tactical operations. These are necessary because there is no reasonable alternative that can achieve the same objective of officer and civilian safety/will safeguard the public's welfare, safety, civil rights, and civil liberties. |
|---|---|
| Authorized Usage | De-escalation tool not likely to inflict serious injury.  Used by SWAT amd patrol. |
| Costs | $30                                                                                                    $0<br>anticipated yearly maintenance cost |
| Required Training | Sworn members utilizing munitions launchers are trained by POST certified chemical agents instructors and POST certified less lethal instructors. |
| Authority for Authorized Use | Use is established under the FPD Policy 300, subsection 308.4.  It is the policy of the FPD to utilize impact munitions only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |

| Sage K03OC/S OC Impact Baton 37MM Projectile | |
|---|---|
| Description | 37 MM Projectile |
| Quantity | 6 |
| Capability | 37mm launcher |
| Life Span | 25 years |
| Manufacturer's Description | The KO3 is a direct fire crush nose chemical impact baton round that is designed to be used in situations where a combination of kinetic energy and chemical agents is preferred for the incapacitation of hostile and/or non-compliant individuals. |
| Purpose | To safely resolve critical situations such as high-risk tactical operations. These are necessary because there is no reasonable alternative that can achieve the same objective of officer and civilian safety/will safeguard the public's welfare, safety, civil rights, and civil liberties. |
| Authorized Usage | De-escalation tool not likely to inflict serious injury.  Used by SWAT and patrol. |
| Costs | $30                                                                                                    $0<br>anticipated yearly maintenance cost |
| Required Training | Sworn members utilizing munitions launchers are trained by POST certified chemical agents instructors and POST certified less lethal instructors. |
| Authority for Authorized Use | Use is established under the FPD Policy 300, subsection 308.4.  It is the policy of the FPD to utilize impact munitions only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |

| Winchester Lake Erie Chemical Launcher Attachment | |
|---|---|
| Description | 12 Gauge Projectile Launcher |
| Quantity | 1 |
| Capability | These launching cups attach to 12 gauge less lethal shotguns and allow us to launch canisters of chemical agents or smoke. |
| Life Span | 25 years |
| Manufacturer's Description | |
| Purpose | These launching cups attach to 12 gauge less lethal shotguns and allow us to launch canisters of chemical agents or smoke. |
| Authorized Usage | De-escalation tool not likely to inflict serious injury.  Used by SWAT. |

| Costs | $500 | $0 |
|---|---|---|
| | anticipated yearly maintenance cost | |
| Required Training | Sworn members utilizing munitions launchers are trained by POST certified chemical agents instructors and POST certified less lethal instructors. | |
| Authority for Authorized Use | Use is established under the FPD Policy 300, subsection 308.4.  It is the policy of the FPD to utilize impact munitions only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. | |

| Defense Technology 1370 12-Gauge TkO/ Launching Cup | | |
|---|---|---|
| Description | 12 Gauge Projectile Launcher | |
| Quantity | 1 | |
| Capability | These launching cups attach to 12 gauge less lethal shotguns and allow us to launch canisters of chemical agents or smoke. | |
| Life Span | 25 years | |
| Manufacturer's Description | The launching cup will project the Pocket Tactical Grenade beyond the normal throwing distance. This will extended the ability and safety of the officers involved. Removable shotgun forend to ensure proper stand-off when using breaching rounds. | |
| Purpose | To limit the escalation of conflict where employment of lethal force is prohibited or undesirable. | |
| Authorized Usage | De-escalation tool not likely to inflict serious injury.  Used by SWAT. | |
| Costs | $40 | $0 |
| | anticipated yearly maintenance cost | |
| Required Training | Sworn members utilizing munitions launchers are trained by POST certified chemical agents instructors and POST certified less lethal instructors. | |
| Authority for Authorized Use | Use is established under the FPD Policy 300, subsection 308.4.  It is the policy of the FPD to utilize impact munitions only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. | |

| Combined Tactical Systems Super Sock Bean Bag | |
|---|---|
| Description | Less lethal munitions |
| Quantity | 225 |
| Capability | This intermediate less lethal specialty munition allows for direct impact from a minimum range and a maximum effective range of 75ft |
| Life Span | 5 years |
| Manufacturer's Description | This 12-Gauge Round is a translucent 12-Gauge shell loaded with a 51-Gram tear shaped bag made from a cotton and ballistic material blend. . The 12-Gauge Drag Stabilized projectile does not require a minimum range to unfold or stabilize. This round has a velocity of 280 fps with a maximum effective range of 75 feet. |
| Purpose | To safely resolve critical situations such as crowd control during riotous situations and high-risk tactical operations. These are necessary because there is no reasonable alternative that can achieve the same objective of officer and civilian safety/will safeguard the public's welfare, safety, civil rights, and civil liberties. |
| Authorized Usage | De-escalation tool not likely to inflict serious injury.  Used by SWAT and patrol. |

| Costs | $6.75 per round |
| | approx. $0 anticipated yearly maintenance cost |
| Required Training | Sworn members utilizing munitions launchers are trained by POST certified less lethal instructors. |
| Authority for Authorized Use | Use is established under the FPD Policy 300, subsection 308.7, and Policy 311. It is the policy of the FPD to utilize less lethal munition only for official law enforcement purposes, and pursuant to State and Federal law regarding the use of force. |

| Long Range Acoustic Device (LRAD) | |
|---|---|
| Description | American Tech Cord 500 |
| Quantity | 1 |
| Capability | Used to send messages over long range |
| Life Span | 25 years |
| Manufacturer's Description | LRAD systems deliver live or recorded voice messages with exceptional clarity for any operational scenario. Optimized to the primary range of hearing, LRAD's Advanced Driver and Waveguide Technology ensure every broadcast is clearly heard and understood, even above crowd, engine, and background noise. |
| Purpose | Device used for public announcements. |
| Authorized Usage | Any critical situation to make public announcements: Critical incidents, civil unrest, search and rescue, public safety. |
| Costs | $1,000                                                                                          $0<br>anticipated yearly maintenance cost |
| Required Training | All operators receive training prior to operating the LRAD in the field. |
| Authority for Authorized Use | Use is established under FPD Policy 312.  It is the policy of the FPD to utilize the LRAD only for official law enforcement purposes, and pursuant to State and Federal law. |

| Meridian Rapid Defense Group Archer 1200 | |
|---|---|
| Description | Anti-vehicle Barrier |
| Quantity | 16 barriers, 1 trailer, 2 haulers |
| Capability | The Archer 1200 Anti-Vehicle Barrier is a portable barrier which can protect closed areas from vehicle-ramming attacks. These barriers replace wooden, and water filled barricades during special events and are easily deployed when there is an increase in the level of threat to a specific location or crowded area. They allow for pedestrians to move between them but can stop vehicles from entering closed areas. These barriers will be used during special events and critical incidents where pedestrian safety is a concern.<br>The Folsom Police Department has applied for a grant to obtain 16 barriers but have not taken possession yet. |
| Life Span | 10 years |
| Manufacturer's Description | An unanchored, "drop-and-stop" barrier for a VSM (Vehicle Safety Mitigation) solution deployment on any surface. Archer 1200 barriers has the shortest stopping distance in its class, modular design, no heavy equipment required for deployment |
| Purpose | To be used based on the specific circumstances of a given critical incident, large event, natural disaster or community event that is taking place. |
| Authorized Usage | Authorized for use would include but not be limited to critical incidents, emergencies, and community events. |
| Costs | $150,000<br>approx. $0 anticipated yearly maintenance cost |
| Required Training | All officers deploying the vehicle barriers will receive training on how to properly load, unload, move, and deploy the barriers in the field. |
| Authority for Authorized Use | It will be the policy of the Department to use the vehicle barriers for official law enforcement purposes including road closures, and special events |

# EXHIBIT 7

# Folsom Police Department
## Richard D. Hillman
### CHIEF OF POLICE

December 19, 2023

George Umberger II
9268 Greenback Lane
Orangevale, CA 95662

Re:    *Service Complaint submitted December 16, 2023*

Dear George Umberger II,

You submitted a complaint dated 12/16/2023 relative to an incident that occurred on July 13, 2023. A thorough inquiry of your service complaint was conducted by our Investigation Division and our Professional Standards Unit. The entire report was then forwarded to Command Staff for a final determination. After an evaluation of your complaint, the allegations of officer misconduct were determined to be unfounded. Due to regulations provided in the California Government Code [Section 3300], this office is prohibited from disclosing any investigatory details.

Respectfully,

Sergeant R. Kehm

# Folsom Police Department
## Richard D. Hillman
### CHIEF OF POLICE

August 8, 2023

Lisabeth King
1780 Creekside Drive #1125
Folsom, CA 95630

Re:    *Service Complaint submitted July 13, 2023*

Dear Ms. King,

You submitted a complaint dated July 13, 2023 relative to an incident that occurred in July 2023. A thorough inquiry into your service complaint was conducted by our Investigations Division. The entire report was then forwarded to Command Staff for a final determination. After an evaluation of your complaint, the allegations of Officer misconduct were determined to be unfounded. Due to regulations provided in the California Government Code [Section 3300], this office is prohibited from disclosing any investigatory details.

Respectfully,

*David Canepa #224*

David Canepa
Lieutenant
Investigations Division

46 Natoma Street, Folsom, California 95630 | www.folsom.ca.us/police

# Folsom Police Department
## Richard D. Hillman
### *CHIEF OF POLICE*

July 20, 2023

Lisabeth King
1780 Creekside Drive #1125
Folsom, CA 95630

Dear Ms. King,

On July 14, 2023, this office received a copy of your complaint alleging misconduct by members of this department.

This office takes allegations of officer misconduct seriously and appreciates the time you took to notify us. We make every effort to provide the best possible service and continually strive to ensure that all employees conduct themselves professionally. To maintain the trust and support of the public, it is our policy to investigate all complaints about the conduct of our employees. When an investigation establishes that an employee's conduct was improper, corrective action occurs.

The allegations of misconduct you reported will be investigated by this office. Because of regulations provided in the California Government Code [Section 3300], this office is prohibited from disclosing any disciplinary action taken against the accused employee.

I regret that you were dissatisfied with the circumstances of your contact with an employee of this department. It is my hope that any future contacts you have with members of the Folsom Police Department are pleasant and helpful.

Thank you for bringing your concerns to our attention.

Sincerely,

Lieutenant David Canepa
Criminal Investigation Division

46 Natoma Street, Folsom, California 95630 | www.folsom.ca.us/police

# EXHIBIT 8

experienced investigators with whom I have spoken, as well as the facts and circumstances of this investigation, as described above, I formed the opinion that **George Umberger** was in violation of Penal Code Sections 632 (Eavesdropping) and that a search of the requested location(s), vehicle(s), and person(s) will reveal evidence of those offenses and/or **Umberger's** involvement in those offenses.

I request that the search warrant authorizes the seizure of any computers and computer systems as evidence for the purpose of later applying for search warrants for said devices. Any device containing electronically stored data seized pursuant to this warrant will not be searched until an additional search warrant can be obtained authorizing the search of the device in compliance with the California Electronic Communications Privacy Act (ECPA).

Based on my training and experience, as well as the training and experience of other experienced investigators with whom I have spoken, as well as my review of other crime reports, I know that, although it may be possible to search these digital storage devises where they are located, investigators with specialized skills, software and equipment are frequently needed to examine the device and extract and preserve the data and information found within. I know this is a process, which cannot usually be performed where the digital storage device is located, thus I request that this warrant authorize the seizure of digital storage devices, which will be searched only upon your affiant or another law enforcement officer obtaining a subsequent search warrant in compliance with the provisions of the California ECPA.

In the event that law enforcement officers encounter safes, locked cabinets, or other secured containers at the location or in the vehicle listed in this affidavit, it is requested that the Court direct the officers or their agents to access those items to search for evidence listed in this affidavit. I know that some safes or locked storage containers may require the assistance of a locksmith or other experts to open. I therefore request permission to employ such experts if needed and to remove the safe or storage container to a location where it can be opened.

**REQUEST TO USE LAW ENFORCEMENT RECONNAISSANCE TECHNOLOGY**

Based on my training and experience, as well as the training and experience of other experienced investigators with whom I have spoken, as well as my review of other crime reports, I am aware that there exists an increased threat of violence, often involving firearms and other deadly weapons whenever officers enter a structure for the purpose of executing a search warrant to search for firearms, controlled substances, weapons, the fruits and instrumentalities of a violent crime, and/or to execute an arrest warrant on an individual wanted for a violent crime. Based on my training and experience, I have formed the opinion that this heightened threat exists for two reasons. First, in executing warrants for these purposes, officers frequently discover firearms and other deadly weapons, and these weapons are often located in places and in a manner that enable the occupants to quickly use them against anyone who is perceived as a threat. Second, officers will give notice of their authority and purpose either before they enter the structure or, in the case of exigent circumstances, shortly thereafter. In any event, when the occupants become aware of the officers' authority and objective, it is not unusual for them to panic because of the possibility that they are about to be taken into custody and subsequently prosecuted and imprisoned. In this fight-or-flight

Page **12** of 15